UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JASON YORK and
MAUREEN YORK,
Plaintiffs,

VS. C.A. NO. 04-551S

DAY TRANSFER MOVING &
STORAGE CO.,
APOLLO VAN LINES, INC.,
ANDREWS EXPRESS &
STORAGE WAREHOUSE, INC.,
and WILLIAMS MOVING
COMPANY,
Defendants.

DEPOSITION OF JASON YORK, a Plaintiff in the above-entitled cause, taken on behalf of the Defendant, Andrews Express & Storage Warehouse, Inc., before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Partridge, Snow & Hahn, LLP, 180 South Main Street, Providence, Rhode Island, on December 15, 2005, at 10:00 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

APPEARANCES:

FOR THE PLAINTIFFS:
BY: JOSEPH R. PALUMBO, JR., ESQUIRE
294 VALLEY ROAD
MIDDLETOWN, RI 02842
(401)846-5200

FOR THE DEFENDANT:
(APOLLO VAN LINES, INC.)
LENIHAN, GRADY & STEELE
BY: THOMAS J. GRADY, ESQUIRE
6 CANAL STREET
WESTERLY, RI 02891
(401)596-0183

FOR THE DEFENDANT:
(ANDREWS EXPRESS & STORAGE WAREHOUSE)
PARTRIDGE, SNOW & HAHN, LLP
BY: ROBERT K. TAYLOR, ESQUIRE
& CAROLINE MEDINA, ESQUIRE
180 SOUTH MAIN STREET
PROVIDENCE, RI 02903
(401)861-8200

FOR THE DEFENDANTS:
(DAY TRANSFER & WILLIAMS MOVING COMPANY)
GEORGE W. WRIGHT & ASSOCIATES, LLC
BY: GEORGE W. WRIGHT, ESQUIRE
401 HACKENSACK AVENUE
HACKENSACK, NJ 07601
(201)342-8884

ALSO PRESENT: MAUREEN YORK

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

# I N D E X

WITNESS

| | PAGE |
|---|---|
| JASON DELANO YORK | |
| EXAMINATION BY MR. TAYLOR ................. | 5 |
| EXAMINATION BY MR. WRIGHT ................. | 136 |
| EXAMINATION BY MR. GRADY ................. | 216 |

# E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| A | APPLICATION FOR SHIPMENT AND/OR STORAGE OF PERSONAL PROPERTY (1 PG.) | 17 |
| B | BILL OF LADING (1 PG.) | 40 |
| C | BILL OF LADING (1 PG.) | 45 |
| D | DAY TRANSFER CO. FORM (1 PG.) | 45 |
| E | JOINT STATEMENT OF LOSS OR DAMAGE AT DELIVERY (12 PGS.) | 66 |
| F | SHIPMENT EVALUATION AND INSPECTION RECORD (2 PGS.) | 68 |
| G | PERSONAL NOTES OF MAUREEN AND JASON YORK (55 PGS.) | 74 |
| H | 8/20/04 LETTER FROM SERVICEMASTER TO RICH WILLIAMS MOVING COMPANY (1 PG.) | 87 |
| I | E-MAILS BETWEEN GARY GOOD AND CHARLES RUSHWORTH (2 PGS.) | 90 |
| J | MARINE CORPS REQUEST MAST APPLICATION (20 PGS.) | 110 |
| K | 9/21/04 LETTER FROM BONNIE MILLER TO JASON YORK (1 PG.) | 118 |

| | | |
|---|---|---|
| L | SUPPLEMENTAL PAGE TO NAVMC 11296 REQUEST MAST FORM (1 PG.) | 119 |
| M | DD FORM 1842, MAY 2000 (9 PGS.) | 121 |
| N | 12/8/04 MEMO FROM COMMANDANT OF THE MARINE CORPS TO MAJOR JASON D. YORK (2 PGS.) | 123 |
| O | 5/13/05 LETTTER FROM COMMANDANT OF THE MARINE CORPS TO MAJOR JASON D. YORK (1 PG.) | 126 |
| P | 7/5/05 LETTER FROM ENRIQUE B. MENDEZ TO MAJOR JASON D. YORK (2 PGS.) | 126 |
| Q | E-MAIL CORRESPONDENCE (2 PGS.) | 127 |
| R | PERSONAL PROPERTY COUNSELING CHECKLIST (2 PGS.) | 222 |
| S | 5/5/13 MEMO FROM COMMANDANT OF THE MARINE CORPS TO MAJOR JASON D. YORK AND ATTACHMENTS - 51 PGS.) | 231 |

INSTRUCTIONS TO WITNESS: SEE PAGE 131

A. I was promoted to Major in March of 2003.
Q. Before you arrived at 505 Wolcott Street in Rhode Island, where did you live?
A. Before that my last residence was San Antonio, Texas -- I'm sorry, Schertz, Texas, which is right north of San Antonio, and the address was, if I'm remembering correctly, 2721 Ashley Meadow.
Q. And how long had you been at that address?
A. I was there for three years.
Q. And were you in the military at that time?
A. I was.
Q. What was the nature of your responsibilities in the military during those three years?
A. During those years I was the inspector instructor for a reconnaissance unit in San Antonio with the United States Marine Corps, as well as the operations officer for the 4th Reconnaissance Battalion.
Q. When did you join the military?
A. I was commissioned in the Marine Corps in May of 1992.
Q. Could you walk me through your jobs in the Marine Corps since 1992 up until the summer of 2004, please?
A. Sure. Initially I went to officers candidate

available to me for assignment had I been able to graduate on time. The primary of which is joint duty, which is one of the key ingredients for progression in today's armed forces as an officer.

Q. And what's the significance of completing your studies in June in terms of getting into that kind of program?

A. Well, those billets typically move in the summertime. That's when people rotate and go to new duty stations and billets become open. When you get off of that schedule, those billets are no longer available to you.

Q. When were you assigned to Alabama?

A. Why was I assigned?

Q. When?

A. When? Well, it was April of 2005.

Q. And how long do you expect that assignment to last?

A. I expect it to last at least three years, and that's from the date I reported in, which would have been November of this year.

Q. When did you learn that you would be attending the Naval War College?

A. I learned in the spring, early spring of 2004.

Q. And did you take any steps at that time to start

planning for a move to the Rhode Island area?
A. Absolutely.
Q. What did you do?
A. I contacted -- once I received my orders, I contacted the local Transportation Management Office to set up a time to ship my goods.
Q. What is the Transportation Management Office?
THE WITNESS: What is it?
MR. TAYLOR: Yes.
A. That is the office on the base where I was stationed that deals with personal property shipments as well as other things, I don't know what that is, but for me it was personal property.
Q. And was there a procedure that you went through with the TMO in order to have your goods moved?
A. Yes. I had to have a copy of my orders, which I turned in to them, and I had to establish a date for them to pick it up.
Q. Did you meet with representatives of the TMO in the early parts of 2004?
A. Yes.
Q. And on how many occasions?
A. Just once.
Q. Do you remember who you met with?
A. No.

Q. Do you remember what happened at that meeting?
A. At that meeting we were shown a video, and basically they walked us through line by line filling out our paperwork to get a move.
Q. You say us, was there someone else with you?
A. There were some other people there. I don't know who they were.
Q. Were you married at the time?
A. Yes, I was.
Q. When did you get married?
A. I was married in 1996, on the 10th of August.
Q. What do you remember about the video they showed you?
A. Not much really.
Q. And what paperwork did you fill out when you went to the TMO?
A. I really couldn't tell you. I don't remember other than just the dates, the primary dates when we wanted to have our shipment packed up and picked up.
MR. TAYLOR: Mark this, please.
(DEFENDANT'S EXHIBIT A MARKED FOR IDENTIFICATION)
Q. Showing you what's been marked as Exhibit A to your deposition, have you ever seen this document before?

A. I have.

Q. Can you tell me what it is?

A. This is an application for shipment and/or storage of personal property.

Q. And did you participate in the preparation of this form?

A. I believe so. I don't remember specifically.

Q. What do you know about the way that this form was prepared?

A. Well, I believe the TMO office prepares this form, and I simply provide them with the information that they put in.

Q. When you met with the TMO office, do you remember discussing with them the nature of the goods that were going to be shipped?

A. The nature of the goods? Could you be more specific.

Q. Did you have any discussions about how much was going to be shipped in terms of quantity?

A. Yes, I do. Weight was a consideration because you were limited in the amount of weight that you could ship.

Q. So do you remember discussions about quantity with the TMO?

A. Yes, I do.

Q. What do you remember about the discussions?
A. I remember that by your pay grade in the military you are limited to a certain amount of weight, and anything over that weight, then the government will not pay for.
Q. And were you asked questions about how much you were going to be shipping in terms of weight?
A. Yes, we were asked to estimate how much weight, and they had a formula, but I don't remember exactly what it was.
Q. Did you provide some information about the amount of goods that you would be shipping?
A. Yes, I estimated my weight according to their formula.
Q. Did you have any discussions with the TMO about particular items that you were going to be shipping?
A. Yes.
Q. What do you remember about those discussions?
A. Just that if you were going to ship any items that were -- or that you couldn't ship any items that were dangerous or flammable or explosive, and you should also identify any firearms was one thing. There were some other categories. Things that were particularly valuable, if I remember,

such as jewelry and stuff like that, they recommended not shipping.

Q. Did you have discussions with the TMO about any items that you had that would be particularly valuable?

A. Did I discuss with them any of my items? No.

Q. You didn't advise them that you had any items that were of particular value?

A. Not in conversation. I think on the forms that they asked to be -- or the information we had submitted to them, I wrote down that I did have firearms.

Q. Do you remember writing down on any of the forms that you had any particularly valuable items?

A. No, but they didn't ask us to put down the value of any items, as I recall. It was more concerned with items that were large that would require special preparation, if I remember correctly, such as a piano or a water bed, that sort of thing.

Q. You said you recognized Exhibit A; is that right?

A. I do. I have seen that before.

Q. Do you remember seeing it at the time that it was prepared?

A. I don't know.

Q. Were you given copies of forms that were prepared in connection with your move back in the beginning parts of 2004?
A. Yes, we were.
Q. The TMO gave you copies of the forms that they prepared?
A. I believe so, yes.
Q. Was the spring of 2004 the first time that you had gone through a move during the course of your service with the military?
A. No, it was not.
Q. So had you gone through the moving process with the military on prior occasions?
A. I had, but the military has used so many different programs, it's kind of different every time.
Q. How many times had you moved prior to the summer of 2004?
A. Where I've utilized government services, I believe it's four times.
Q. Since 1992?
A. Yes.
Q. Would you agree that it's common for military families to move every couple of years?
A. You bet ya.

Q. Now, when you say that this move was utilizing government services, what did you mean by that?
A. Whereas I had the government provide an outside party to ship my stuff, many times previously I've utilized what is the known as the DITY move program, which is do it yourself, wherein in that case I pack and ship my own goods and get reimbursed by the government for it.
Q. But in the case of the move that you were planning in the beginning of 2004, it was going to be a government move, correct?
A. It was.
Q. The government was paying for it?
A. Correct.
Q. The government was hiring the carrier?
A. As far as I know, yes.
Q. You didn't hire a carrier for that move; did you?
A. I did not.
Q. Did your wife participate in discussions with anyone from the military relating to the move?
MR. PALUMBO: When?
MR. TAYLOR: In the spring and summer of early 2004.
A. In the spring and early summer of 2004 did my wife participate? I'm not sure I caught the

(DEFENDANT'S EXHIBIT B MARKED FOR IDENTIFICATION)
Q. Mr. York, I'm showing you what's been mark as Exhibit B to your deposition. Have you seen this document before?
A. I have seen this before.
Q. Can you tell me what it is, please?
A. This is a bill of lading.
Q. What's it a bill of lading for?
A. Privately owned personal property.
Q. Whose personal property is this bill of lading for?
A. I imagine it's mine. Yes, my name is on there.
Q. Have you seen this document before?
A. I have.
Q. So you know this document relates to your goods, correct?
A. Yes.
Q. When did you first see this document?
A. I can't recall specifically, but I think that TMO gave this to me, the San Antonio TMO office, sometime after I applied for a move.
Q. And did anyone from the San Antonio TMO office explain to you what this is?
A. No.
Q. You said before that you had done do-it-yourself

A. I don't know anything about how it was prepared.

Q. Do you know whether it was prepared by somebody in the TMO in San Antonio?

A. I don't know. That's who I received it from, but I don't know how it came into existence.

Q. But it was your understanding that this bill of lading was part of the documentation that related to the shipment of your goods from San Antonio to Newport?

MR. PALUMBO: Can we have that question read back, please.

(QUESTION READ BACK)

MR. PALUMBO: Did you mean it was his understanding back then?

MR. TAYLOR: At that time.

MR. PALUMBO: Okay, thank you.

A. At the time when I received this, yes, I assumed it had something to do with my shipment, since I got it from TMO.

Q. Did you review this document when you received it from TMO?

A. I'm sure I did, but unless it had the dates on it -- yes, it did have the dates, so, yes, I reviewed it to find the dates.

Q. And do you recall having any questions about this document?

A. No, because the dates were what I had requested, so that was all I was looking for.

MR. TAYLOR: Mark this as C, please.

(DEFENDANT'S EXHIBIT C MARKED FOR IDENTIFICATION)

Q. Showing you what's been marked as Exhibit C. Have you seen this document before?

A. Yes.

Q. And what is this document?

A. I believe this is the document that was given to me by TMO, which is the same document in Exhibit B.

Q. And do you see in the middle of the page there's some handwriting?

A. Yes.

Q. Would you agree with me that that handwriting appears to say member's copy?

A. I would agree with that.

Q. Do you believe this was the document that was given to you by San Antonio TMO?

A. I believe so.

(DEFENDANT'S EXHIBIT D MARKED FOR IDENTIFICATION)

Q. Showing you what's been marked as Exhibit D to your deposition. Have you ever seen this document

before?
A. Yes.
Q. Can you tell me what it is, please?
A. I'm not really sure. It was part of the paperwork that was presented to me at the conclusion of my pack-up or pick-up by Apollo. Not that it was given to me but it was presented to me.
Q. Do you recall who it was from Apollo that, to use your word, presented this document to you?
A. It was the driver.
Q. Do you remember anything more about him?
A. Yes.
Q. Do you remember his name?
A. I don't remember his name, although I've come to learn later that I think it is Tracy.
Q. And you said there were other documents besides this one that were presented to you at the same time?
A. Yes.
Q. What other documents were you given?
A. What was I given? Well, the document I was given was a copy of the household goods inventory that was prepared by the driver from Apollo.
Q. And that's the document we already discussed that

Q. And is that your signature at the bottom of the page, on the first page?
A. It is.
Q. What is this document?
A. This is my application to request MAST. It's a procedure within the military to speak directly with a commander.
Q. And what sort of commander?
A. In my case I wanted to go to the Secretary of the Navy, which was the Honorable Mr. England at the time, although he's not there anymore.
Q. When did you prepare this document?
A. When did I prepare it? Before the 2nd of September, I'm not sure exactly of the day.
Q. Looking at the second page of Exhibit J, who prepared this Paragraph 8.b?
A. I did.
Q. And was this an accurate recitation of the facts as you knew them at the time?
A. Yes.
Q. Now, looking at the first page, in the third full paragraph, about two thirds of the way down, see where it refers to IAQM?
A. Yes.
Q. It continues, "After assessing the damage, they

decontamination of the house," correct?
A. Yes.
Q. To your knowledge, did Williams pay the cost of mold remediation for your household goods?
A. To my knowledge, yes.
Q. And to your knowledge did they pay 50 percent of the cost of the structural decontamination?
A. No.
Q. They didn't pay 50 percent?
A. To my understanding they paid 100 percent.
Q. Now, did you pursue this MAST application?
A. No, I did not carry it through. It was submitted, and I had a date set up, but sufficient action or what I thought was sufficient action had taken place before I was scheduled to speak to the Commanding General, so it was withdrawn.
Q. Who were you scheduled to meet with?
A. I can't remember the General's name. He was Commanding General of the Training & Education Command in Quantico, Virginia, but I don't remember his name.
Q. Did you have any conversations with any of your other superiors in the military about this application at the time you submitted it?
A. Yes. I informed my boss, Colonel Rushworth,

Q. What is this letter related to?
A. Without reading it again, what I remember it being was that this was the approval from the Navy Judge Advocate General's Office to exceed the $40,000 cap we spoke of earlier.
Q. In fact, if you look at the bottom of the first page, there's a number $52,665.07; do you see that?
A. Yes.
Q. Have you received that amount of money from the U.S. government in connection with losses relating to your move from Texas to Newport?
A. Yes.
Q. In addition to the $52,665.07, have you received any other compensation from the government?
A. From the government relating to?
Q. Relating to this loss?
A. Relating to this loss, no.
(DEFENDANT'S EXHIBIT Q MARKED FOR IDENTIFICATION)
Q. Showing you what's been marked as Exhibit Q to your deposition. Have you seen this document before?
A. I have.
Q. What is this document?
A. This was an update on my situation from Tina

A. What do you mean by loss?
Q. Let me put it this way, do you contend you've been harmed in any other way?
A. Oh, definitely.
Q. Tell me what you contend your harms have been?
A. Well, as a result of this incident, obviously financially we've lost -- we pretty much cleaned out our savings that we had and had been planning to invest for sometime. As a result of this incident, the stress that was put on my family from having to endure this, and the lack of concern by the parties involved was very traumatic and has continued with us to this day. My career has been hazard. My potential for further advancement through what I had to do within my chain of command and also by the fact that my graduation from school was delayed and my choices for future jobs was severely limited due to that. I've suffered physical injury as a result of this to my back while I was having to deal with this process. My wife as well suffered physical injury, and we're still living with this today because it has not been resolved. So, yeah, we've been harmed by it.
Q. Well, you say it has not been resolved, you're

career path that you believe you might have been on had things been different?

A. I have not calculated that, but as far as pay scales and retirement info and that sort of thing, that information is out there. I just haven't sat down and figured it out myself.

Q. As of this point in time, you can't put a number on future financial loss as a result of any difference in your military employment; is that right?

A. No, I can't, not right now.

Q. And you referred to stress. Have you sought any medical treatment for stress as a result of this incident?

A. Myself, I have not.

Q. Has anyone else in your family sought medical treatment for stress?

A. Yes.

Q. Who is that?

A. My wife has.

Q. And what has she done?

A. She has gone to talk to a counselor about this experience and what it has done to her.

Q. On how many occasions has she done that?

A. I can't recall exactly. It was prior to her

leaving Rhode Island in April. I don't remember the number of times.

Q. Has she received any medical treatment in connection with alleged stress?

A. In connection with the stress, no, she has not received any medical treatment that I'm aware of.

Q. You said you suffered some physical injury, what was that?

A. I suffered severe trauma to my back, lower back, when I was gathering evidence that the articles that were cleaned by ServiceMaster had not, in fact, been cleaned sufficiently and still had mold.

Q. Where were you when this trauma occurred?

A. I was at the storage facility where our goods were stored when ServiceMaster returned them, which is Newport Mini Storage.

Q. What were you doing?

A. Well, the items that they had moved inside the storage facility, I would look at each one and see if there was any evidence of mold.

Q. You were moving boxes?

A. Moving boxes as well as power tools.

Q. Was anyone else with you at that time?

A. No, there was not.

Q. Did you ever ask anyone for assistance moving those boxes?
A. I did not.
Q. What was the nature of the trauma to your back?
A. The nature, it was diagnosed as a skeletal muscle injury. I don't remember the exact name for it, if it was anything, but it was just an emergency room visit where I was examined, and then a follow-up visit with my military healthcare provider.
Q. And was there any treatment prescribed for you?
A. Yes, there was.
Q. What was that?
A. They gave me medication, muscle relaxants, some pain killers and the like. There was also a program of physical therapy as well as they prescribed bed rest, but I was not able to do that at the time due to the circumstances we were involved in.
Q. Have you gotten any further medical treatment in connection with your back since that time?
A. Yes, I have. I've had the same injury three times since it originally happened. One most recently requiring another trip to the Emergency Room, and I'm on a program of physical therapy

U-Haul or a similar service?
A. No. In every move that we've done there has always been some sort of DITY move, even if it's just throwing a suitcase in the back of your car and getting it weighed. So every move I've done has involved a DITY move of some sort.
Q. Do you recall who any of carriers were that you used prior to June of 2004?
A. No, I don't.
Q. Did any of those pre-2004 moves involve meetings of the type you had with the TRO in San Antonio for this move?
A. I believe so, yes. I can't really remember.
Q. Do you recall receiving any type of shipping records relating to your pre-2004 move?
A. Shipping records to my pre-2004 move? I'm not sure I understand the question.
Q. Prior to 2004, had you received any DD Form 1299 of the type we've marked as Exhibit A?
A. I'm sure I probably received those on previous moves. I can't remember specifically.
Q. Can you recall whether you had received bills of lading on the pre-2004 moves?
A. I can't recall specifically.
Q. During any of your meetings you had had with TRO

Q. At that time did you have any expectation as to how long it would take on an average to attain your next promotion to Lieutenant Colonel?
A. Yes. There is a general guideline, but it changes from year to year, so I had a general expectation, yes.
Q. In the spring of 2004, do you recall having any specific length of time by which you expected to make Lieutenant Colonel?
A. I expected to be in zone for Lieutenant Colonel sometime in 2007, 2008.
Q. Was that based on a marine officer's average experience, or did it also involve any specific discussions with any of your superior officers?
A. Both. In general, you can expect to be considered for Lieutenant Colonel at 16 years. That's what it is, give or take how things change, and it's actually been getting shorter as the years have gone on because the Marine Corps is generally behind the other services, but that's the rule of thumb that you would get in professional development classes and you would also hear from your superiors if you talked to them.
Q. Since the spring of 2004 have you had any reason

2008. At that point I would be available to go to joint duty.
Q. Is there anything that's happened to you since the spring of 2004 that leads you to believe that you will not be promoted at all in the future?
A. Yes.
Q. And what is that?
A. Well, the fact that I have requested MAST through my chain of command as a marine officer, although it is not forbidden, it is acceptable to do it, it is not looked upon highly, unofficially. Two, I will not have any joint experience before I am in zone for Lieutenant Colonel by the fact that I am in Montgomery, and, three, the type of duty that I am doing in Montgomery is a type of duty that I have done before. It's inspector instructor duty, which I was doing in San Antonio prior to coming to Newport, Rhode Island, so it doesn't give me the amount of variety in assignments that is generally looked more highly upon.
Q. Would you agree that at this point it's unpredictable whether you will be promoted to Lieutenant Colonel and, if so, when?
A. It is unpredictable, but in comparison to my

now?
A. Did I have any subsequent knowledge of potential assignments subsequent to?
Q. After moving to Newport in the summer of '04, did any other job or assignment prospects come to your attention other than the Alabama assignment that you're on now?
A. Yes, they came to my attention, but those were jobs that were available during the summer of '05.
Q. And what were those jobs?
A. I can't remember all of them, but it's various jobs. That's where all the joint assignments were, but it was all over the Marine Corps.
Q. I'm sorry, I didn't hear that?
A. It was all over the Marine Corps, different types of assignments.
Q. Have you ever been promised a joint duty assignment at any point?
A. No.
Q. Exhibit A refers to -- I'm looking at Box 13 just above your e-mail address. It says group counseled per DD 1797; do you know what the reference to the 1797 means?
A. I do not know.
Q. Was the TMO officer that you met with that day

Colonel McGovern at Fort Sam?
A. I did not meet with anyone in uniform.
Q. Do you know who this Colonel James McGovern was?
A. I do not.
Q. Do you recall meeting him?
A. No.
Q. Do you recall anything about the person you did meet with?
A. It was a female.
Q. Not uniformed?
A. Not in uniform, no.
Q. Was the date of that meeting the date at the top, February 27, '04?
A. I can't remember when that was. I don't know. I don't know if that's the date it was prepared or the date the meeting happened. I would have to look back at my personal notes and calendars.
Q. Can you recall independently that this meeting with the nonuniformed female instructor took place three to four months before Apollo came to pick up your goods?
A. Yes, it was a substantial amount of time before that.
Q. Just so I'm clear, was it your earlier testimony that you were given Exhibit A, the DD 1299, the

same day as you received the bill of lading marked B and C?

A. The bill of lading marked --

Q. The privately only personal property bill of lading?

A. I think so, but I can't remember with any clarity.

Q. Do you recall any discussion by this female instructor about what this bill of lading was or what it represented?

A. I don't remember that she was an instructor, but I don't recall anything specific.

Q. So you don't recall any discussion by her about this bill of lading?

A. About this, no. I mean, it was -- all I remember was a general brief, just a videotape dealing mostly with your entitlements during a move, and that was the extent of it.

Q. Were you handed a packet of documents by this person that included Exhibits A, B, and C?

A. I can't recall. I know that A and C at least came into my possession at some point, but I can't remember specifically how it happened.

Q. When you received C, did you have an understanding as to what it was?

the name Day Transfer?
A. Yes, I did not become aware of Day Transfer until after the 16th of August.
Q. When you traveled to Rhode Island, I think on more than one occasion between March and August of '04, did you have a copy of Exhibit C with you?
A. No.
Q. Prior to your first visit to Newport, I think you mentioned in March of '04, can you recall having already received a copy of Exhibit C?
A. I can't recall when I received it.
Q. Do you recall having it by the time your goods were picked up in June of '04?
A. I'm pretty sure I had it by that point, but I don't really recall.
Q. Do you recall where you kept it at that time or up to that time?
A. It would have been in a folder where I put all of our moving documents such as our household goods inventory and everything else.
Q. Did you receive the inventory before or after June 4th?
A. I received the inventory on the day that we moved, which was -- was that the 4th? Yes.
Q. So am I correct that prior to June of '04, June 4

of '04, you already had a folder containing some documents, and that on the 4th of June you added the inventory to that packet of documents?

A. Correct.

Q. Prior to June 4th, did that file include the DD Form 1299, Exhibit A?

A. It should have. Like I said, I can't remember the specifics, but when I had got possession of that form, that's where I would have placed it.

Q. Prior to June 4th, '04, did your file also include a copy of Exhibit C with the notation, member copy?

A. Could you state that question again.

Q. Sure. Prior to June 4th, '04, the pick-up date, did your -- I will call it your move file, have a copy of Exhibit C indicating member copy in the middle?

A. I believe it did.

Q. Prior to June 4th, had you had an opportunity to read any of the information on Exhibit C?

A. Did I have an opportunity? Probably, but I don't believe I did.

Q. You don't believe you reviewed it, but you had the opportunity to review it?

A. Sure.

MS. YORK: I need to take a break.
(OFF THE RECORD)
Q. On any of your previous moves before 2004, did you have loss or damage claims against any of those carriers?
A. Yes.
Q. And can you tell me what carrier was involved?
A. I don't remember.
Q. Was this a government assisted move, or did you deal directly with the carrier?
A. No, this was a government assisted move. I made the arrangements through the TMO office.
Q. Do you recall how large your claim was in that instance?
A. No, I don't. I think the largest claim we ever filed was somewhere in the neighborhood of $2,400.
Q. When you say the largest, was there that claim or more than that claim?
A. When I say the largest, I mean in all of the claims that we have filed on previous moves to the one conducted by Day Transfer, the largest amount that we had filed was $2,400.
Q. When did that move occur that gave rise to the $2,400 claim?
A. That was our move from Virginia to San Antonio.

Q. Do you recall anything about those claims, the amounts, who they were filed with?
A. No. They were relatively minor in the amounts, and actually I may not have filed them just because the amounts were so minor, and it was too much of a hassle, so I can't really tell you.
Q. Do you recall the reason the carrier paid the full amount of your claim on the $2,400?
A. I do not recall why.
Q. Going back to your year 2004 move from Texas to Rhode Island, did you have any discussions with any DOD representatives concerning Exhibit 3 after the move?
THE WITNESS: What's Exhibit 3?
MR. WRIGHT: That's the bill of lading.
THE WITNESS: Oh, C?
MR. WRIGHT: C, the members copy bill of lading.
A. I don't recall any conversations with any DOD personnel about Exhibit C.
Q. Do you recall the discussions with any government personnel after the move relating to any carrier limitation of liability?
A. Could you restate that question again, please.

Q. Declared a value on your shipment, in other words, have you ever declared a value on your shipment for loss or damage purposes?

A. Not that I recall, no.

Q. Do you recall ever making a conscious decision not to declare a value on any previous shipments?

A. I do not recall making a conscious decision not to declare a value.

Q. What about with respect to this shipment, did you make a conscious decision not to declare any value?

A. No, I did not. I made a decision based upon the explanation of the driver from Apollo on what the value of my shipment was.

MR. GRADY: Objection. The answer is not responsive to the question.

Q. Did anyone from the DOD advise you of the amount of compensation that you would be entitled to if there were any loss or damage to the part of the shipment covered by Exhibit A and Exhibit C?

A. I believe I was advised on the maximum amount that the government would pay out.

Q. And what amount was that?

A. Well, I've learned since that it was $40,000, but I can't remember if that was what I heard

before.
Q. Do you recall any discussions at all with any government personnel prior to June 4th of '04 of what you would be entitled to in the way of compensation as a maximum amount if there was loss or damage to your shipment?
A. I'm kind of confused about that question. Didn't I just answer that?
Q. I think you testified that you later were told what the government would pay out, and I believe your testimony was that you believe you found out later after the shipment?
A. So your question is prior to the move was I informed?
Q. By any government representative as to what you would be entitled to as compensation if there was loss or damage?
A. Yes, I believe I was.
Q. And do you recall what he or she told you?
A. I don't recall specifically, but, I mean, I know that it's $40,000 is the maximum.
Q. Do you know whether the woman you met with at the TMO in San Antonio was the person who informed you of that, or did you know about it before 2004?
A. I really can't recall. I don't know.

A. I saw Indoor Air Quality Management, and later on I saw SmokeClean's estimate.
Q. Did you retain copies of any of these estimates from any of these companies including ServiceMaster?
A. The only ones I received were ServiceMaster and Indoor Air Quality Management, and I did retain copies of each of those.
Q. Do you recall what each of those bids were?
A. Not specifically. I know Indoor Air Quality Management was in the area of $14,000 and ServiceMaster was in the area of $10,000.
Q. Were any of the other estimates below 10 or above 14?
A. From what I understand, which I found out through Tina Vars, there was another estimate that was below 10 from a company called Angel Clean, which Rick Williams had researched, however, they never did an inventory or an estimate or came to our home to do an estimate.
Q. Besides the Indoor Air Quality and the ServiceMaster estimates, do you recall any of the others, the amounts of any of the others?
A. No, I don't.
Q. Prior to June 4th of 2004, had you had any direct

contact with Day or Williams?
A. Prior to June 4, 2004, not that I'm aware of. Although, we did have a conversation with a representative from one of the parties involved, and I don't know who it was. I think it may have been Lone Star, or it may have Apollo to come out and do a pre-move survey.
Q. This occurred before June 4th?
A. It did.
Q. Do you recall was that a face-to-face meeting or a phone call?
A. Well, a phone call first to set up a time, and then they later came by to take a look at our shipment.
Q. You're not certain whether it was a Lone Star or Apollo representative?
A. I can't remember who it was.
Q. And did they give you any paperwork after that inspection?
A. Not that I recall. It was mainly for their own purposes, to make sure they brought out the appropriate materials to pack.
Q. Did they give you a business card?
A. If they did, I no longer have it. I can't recall.

Q. Were there any discussions between you and anyone at the TMO relating to any health issues involving you or anyone in your family?

MR. TAYLOR: At the San Antonio TMO?

MR. WRIGHT: Yes.

A. No.

Q. Was there any other DOD department or division beside TMO that you dealt with in San Antonio relating to this move up to June 4th of '04?

A. Not that I recall.

Q. Any others after June '04 in San Antonio, any other departments or divisions of the Department of Defense?

A. In regard to our move, I can't recall any.

Q. Do you recall speaking or meeting with anyone other than this female representative that you identified earlier?

A. I called JPPSO, and this was just a phone number that was provided by the female that I spoke about earlier. I don't really know who they are or where they are, but supposedly they have a hand in this, and it was mainly just to confirm the date for our move, and that was because we didn't have a date in a timely manner, or there was some delay, but I called them to pressure them

A. What would be a bad reaction?
Q. Well, anything abnormal, breathing problems, allergic reaction, anything causing discomfort?
A. I don't believe so.
Q. Was the delivery of your shipment to Newport time sensitive at the time it was picked up in June of '04?
A. Yes.
Q. And how is that, in what way?
A. It needed to be there before we were ready to move into our home.
Q. In other words, before mid-August?
A. Correct.
Q. And was that communicated to the TMO in San Antonio?
A. It was.
Q. Was there any other time sensitive information communicated to the TMO by you other than the need to have the goods in Newport by mid-August?
A. No. Not by me, although I believe DOD has their own requirements.
Q. By the time the goods had been picked up in June, had your lease already been signed for 505 Wolcott?
A. It had been signed.

Q. And that was going into effect in August?
A. Yes, the lease would begin in mid-August.
Q. Did you communicate that information to TMO at any time prior to June 4th pick-up?
A. To the San Antonio TMO, no, I did not.
Q. Do you recall having any discussions with anyone at TMO prior to June of '04 about your housing allowance that you would receive in Newport?
THE WITNESS: With the TMO office in San Antonio?
MR. WRIGHT: Right.
A. No, I wouldn't have had any conversation with them about that.
Q. That was an issue you took up with a different office?
A. The TMO office isn't concerned with housing allowances.
Q. That's a different department that handles that compensation?
A. It is.
Q. And, I'm sorry, which department is that?
A. I don't know which department it would be, but that's a pay matter and not a shipping matter, so I really couldn't tell you who it is in the grand scheme of things, but as far as from my

perspective, it's our administrative officer.
Q. Can you recall whether you gave the TMO in San Antonio any information that you asked to be passed along to the moving company about your shipment?
A. No, not that I recall.
Q. And just so I'm clear, my question isn't just about the physical dimensions or weight or delivery deadline, but any information at all that you considered important in the spring of '04 up until June 4th. Do you recall any information at all of any kind that you requested the TMO to convey to the mover about your shipment or about the conditions in Rhode Island that you would be in by August?
A. I don't believe so, other than the information that is contained on the enclosure 1, I believe it is. I can't think of anything else.
Q. Enclosure 1, which document is that?
A. I'm sorry, enclosure -- is it A? Or Exhibit A, I'm sorry.
Q. The application for shipping?
A. Yes, Box Number 13, Remarks.
Q. So everything that you expected the TMO to pass along to the moving companies prior to the

June 4th pick-up is reflected in Exhibit A; is that a fair statement?

A. I think so. I really didn't expect them to pass anything other than the time and location and when the pack-up and pick-up needs to occur.

Q. Between the June 4th pick-up and the August 16th delivery, was there any other information that you sought to convey to the moving company or any of its employees or agents about your shipment?

A. No. That's incorrect, I mean, other than I don't know if we had the address at this time as far as where the delivery would go, and if it wasn't, I'm sure I conveyed that to the Newport TMO office to pass onto the carrier where the delivery would occur.

Q. Have you signed any agreement with the government to pay back any part of the $40,000 that it's paid to you so far on your shipment?

A. I've not signed any agreement with them, but it is understood if any of the monies that the government paid me, if that is reimbursed through some other source, then I am to reimburse the government accordingly.

Q. Have you seen that understanding put in writing anywhere?

shipment?
A. Did I talk to Apollo -- can you restate that again. I'm kind of getting lost.
(QUESTION READ BACK)
A. I never talked to Apollo about that, no.
Q. Did you ever speak to Day or Williams about Tracy's authority?
A. No.
Q. On June 4th of '04, Mr. York, did you have any insurance on your household goods?
A. I did.
Q. And was that under a policy of insurance?
A. I had an insurance policy on my -- I had a renter's policy on my household goods.
Q. Did that policy cover the goods that were shipped on June 4th to Rhode Island?
A. It did.
Q. Do you recall the amount of that policy at the time?
A. I would have to look back, but I believe it was around $75,000.
Q. And how long had that policy been in effect?
A. I'm not really sure. I know once we determined we were moving, we talked to our insurance company and made a lot of changes to our policy because we

knew we were going to be renting, and we knew we were going to take our current home and rent it out, so I'm not sure of an exact date.

Q. Do you recall how long before June of '04 the contents of your home in Texas had been appraised for insurance purposes, and I don't mean appraised in your home in Texas, but when the last time was the contents of your Texas home had been valuated for insurance, whether in Texas or somewhere else?

A. Do you mean by someone other than myself?

Q. All right, we'll take them both. Prior to June of '04, had your household goods that were shipped up here to Rhode Island ever been appraised by any outside person or third person other than you?

A. Yes.

Q. To determine their value for insurance?

A. Yes.

Q. When did that happen?

A. I don't remember the exact date, but it was by a representative from my insurer who did it over the phone based on the description I gave her of our possessions.

Q. And who was that insurer?

A. USAA.

Q. And that was a policy in effect in June of '04?

A. Yes.
Q. Did any third person ever come to do a physical inspection of your goods for insurance valuation?
A. No.
Q. Now, you mentioned your own evaluation, when did that happen, or when was the last time you did your own evaluation prior to June of '04?
A. I considered my conversation with the USAA representative as my own evaluation because it was basically taking stock of what I had and figuring out a rough value.
Q. Did you and USAA agree on the amount of your insurance?
A. Yes.
Q. Or what it should be?
A. Yes.
Q. And was that $75,000 figure, your figure or USAA's?
A. It's USAA's figure, and I agreed with it.
Q. And this was in early '04 or shortly before the move?
A. This was shortly before the move. Well, when I say shortly, I mean within three months of the move, I'm pretty sure.
Q. Was that USAA's policy for full value or only

refer back to my notes, but I believe I was occupied from nine to noon.
Q. I don't mean that particular day, I mean from August 16th -- well, at that time what was your anticipated graduation date?
A. My anticipated graduation date on August 16th would have been sometime in June, and I don't remember the exact date, 2005.
Q. So this was a 10-month course of study?
A. Correct.
Q. And after you dropped or were dropped from that curriculum, when did you begin that class again?
A. After I was dropped from this particular part of the curriculum at the War College, which was the strategy and policy course, I did not begin that again until August 15th I believe of 2005.
Q. And have you graduated from that course yet?
A. I have.
Q. And when did that occur, in November?
A. November 16th.
Q. When was the decision made to drop the class that began on August 16, '04?
THE WITNESS: To drop me?
MR. WRIGHT: Yes.
A. It was the week following -- it was my second

week in school. I can't remember the exact day, but it would have been the week of the 22nd, sometime during that week.
Q. Of August?
A. Correct.
Q. Was that decision made by you or someone else for you?
A. Well, I really had no other options, so I guess you would say it was made by me.
Q. Why did you have no other options?
A. Well, there's no way that I could have continued to keep up with the academic requirements of the course, so really it's another Hobson's choice, I could either drop from the course or I could fail it.
Q. And at the time you made the decision in late August to drop, what was going on at that time that made you decide that you couldn't handle the academic demands?
A. The fact that -- trying to correct this situation, talking with everyone or trying to talk with everyone in both the government and the civilian carrier side had taken up all my time, in addition to dealing with the stress that it had placed on my family, I had been able to do none of

local Newport or Middletown office of
ServiceMaster, or were these other ServiceMaster
reps?
A. I'm sorry, these employees, this ServiceMaster
franchise was from Coventry, Rhode Island.
Q. Is that near Middletown?
A. No, it's not. It's that way (indicating). I
don't know.
Q. So to your knowledge the ServiceMaster people that
your wife spoke to were from its Coventry office?
A. I believe so, yes.
Q. And only Coventry?
A. That is correct, as far as I know.
Q. To your knowledge, is there any broker agreement
between the government and Day Transfer?
A. I'm not sure I understand what a broker
agreement is.
Q. Are you aware that you and Mrs. York are asserting
claims against Day Transfer alleging that it acted
as a broker?
A. Yes.
Q. And to the best of your understanding, what's the
factual base for your claim that Williams --
pardon me, Day was acting as a broker?
A. Their actions in that they never handled our

shipment at all. They contracted the labor associated with our shipment out to other people.

Q. We have looked at a Day Transfer bill of lading. Are you aware of any other written contract between Day and the government besides that bill of lading?

MR. GRADY: Objection.

A. I am not aware of any other written contracts or any written contracts between Day Transfer and the government.

MR. WRIGHT: I just want to clear up the objection.

MR. GRADY: The bill of lading, the operative bill of lading is a government bill of lading between Day Transfer and the government. The documents you referred to as a bill of lading between Day Transfer and the government, which is the Exhibit D, I guess, is a receipt, not the operative bill of lading. The bill of lading is Exhibit B, B as in boy.

Q. Let me ask the question this way, are you aware of any written agreement between Day and either yourselves as plaintiffs or the government other than Exhibit D, which is identified as a bill of lading?

Q. Do you know whether the DOD had a contract with any party to broker the transportation of your shipment?
A. I don't know.
Q. And you have not seen any such contract; is that correct?
A. I'm confused as to what a contract is and what a bill of lading is, so --
Q. Well, my question was not limited to a bill of lading contract. My question is whether you're aware of any contract between the DOD and anyone, any party, to broker the transportation of your shipment as opposed to transporting it?
A. As far as the transportation of our shipment is concerned, I'm not aware of the contracts.
Q. So based on your understanding, the fact that Day has alleged to have subcontracted the transportation to someone else, that is the basis of your claim that it acted as a broker?
A. That's my belief.
MR. PALUMBO: Objection.
MR. WRIGHT: Why?
MR. PALUMBO: That's your word, subcontract. He never used the word subcontract.
MR. WRIGHT: What was your last

A. Yes.
Q. Have you seen any broker agreement to which Williams is a party?
A. I have not seen any particular document that is described as a broker agreement, no.
Q. Do you have any reason to believe that Williams has a brokerage agreement or contract or arrangement with the DOD relating to your shipment?
A. I am not aware of any. I can only comment on what I understand of their role in our shipment that in my mind signifies them as a broker.
Q. Is your opinion or your belief that Williams acted as a broker based on any previous experience you've had with brokers?

MR. PALUMBO: Objection. With all due respect, you represent two parties, Day Transfer and Williams. One of your clients, I'm not sure which, has asserted that Williams is a broker and was a broker in this transaction, so why are we wasting time asking this witness those questions when there's been an acknowledgement by at least one of your client?

MR. WRIGHT: Can you show me where that is?

with Tracy Keller at the time your shipment was packed up and moved from your home in Schwartz (sic)?
A. In Schertz.
Q. In Schertz?
A. Yes, sir, and that's based on the assumption that Tracy Keller is the driver.
Q. And they were there for one day, Apollo Van Lines?
A. Yes.
Q. And do you know how many hours they were there?
A. I couldn't tell you. They were there pretty much all day.
Q. Is it fair to say that your conversation with Tracy Keller didn't last more than five minutes?
A. Well, I talked to Tracy Keller throughout the entire day. As I said before, if you're talking about the conversation concerning the Day Transfer bill of lading, Exhibit D?
MR. GRADY: Yes.
A. Then, yes, the conversation on that was probably about five minutes.
Q. Now, is it fair to say that your move was pursuant to a change of military duty station?
A. Yes, it was.
Q. And is it also fair to say that the move was

arranged by the personal property shipping office at San Antonio?
A. Yes, I believe it to be.
Q. PPSO?
A. Well, it was JPPSO.
Q. JPPSO?
A. JPPSO.
Q. Other than the 10 percent that you claim that you paid, 90 percent was paid by the government?
A. The 10 percent I paid of what?
Q. Maybe I misunderstood. Was the entire move paid by the United States government?
A. No, it was not. The DITY portion of my move, which I executed myself, I was reimbursed by the government for 90 percent of those costs.
Q. When you say the DITY portion of your move, what do you mean, your own person?
A. The DITY portion is what I loaded up into my personally-owned vehicle and shipped from San Antonio to Rhode Island.
Q. And your personally owned vehicle was, what, a car or an SUV?
A. There are two personally owned vehicles. It was a conversion van in this case and a pickup truck.

heading?

A. I cannot make out the first words of that.

Q. I believe it states, "Carrier, storage firm and government liability for loss or damage."

A. Okay.

Q. Your counselor was supposed to counsel you with respect to the carrier's, storage firm, and government liability for loss of damage, right?

A. I don't know.

Q. Do you remember anything about the counseling other than the form?

A. Not really.

Q. At the time that you had this counseling or prior counseling, were you ever told that the government, when it arranges a military move, always ships with insurance at the rate of $1.25 per pound times the net weight of the shipment?

A. I don't remember ever hearing that before the move.

Q. But it is possible that you were told; you just don't remember?

A. It could be possible. I don't remember it.

Q. Now, at the time that you arranged for the move, did you know that the carrier liability was limited to $1.25 per pound times the net weight of

the shipment?
A. I don't recall knowing that.
Q. And yet I believe you testified that you had conversations with your insurance company and made changes prior to the move, right?
A. Yes, I did have conversations with my insurance company and made changes to our policy.
Q. And wasn't that to make sure that you had adequate insurance coverage during the move?
A. It was, but it was also to make sure that we had adequate rental insurance for our rental that we were moving into in Rhode Island.
Q. Do you recall at the time that you had this counseling in Schertz, Texas, at the TMO or at any prior time when you had counseling, that the government would provide you with the option to buy more insurance at your own expense?
A. I remember that they did offer an option for additional insurance.
Q. And that would provide coverage that would be greater than $1.25 per pound times the net weight of the shipment?
A. That's not the way I understood it.
Q. What was your understanding?
A. I understood that instead of depreciated value

for your goods, you could buy insurance and get full replacement value.
Q. Was there any kind of a limit to that kind of coverage?
A. Well, I understand the $40,000 cap now, but I can't recall if I knew that then or if I learned that later.
Q. But is it fair to say that you were in communication with your own insurance company about this coverage problem because you didn't want to pay the amount for increased coverage from the government that you learned about at the time of this counseling?
A. No. We had -- I'm fairly certain I had received this renter's policy coverage before I went to counseling -- well, I can't say. I can't remember. But the main purpose of talking to my insurer was to change the policy on our home that we owned in San Antonio, as it was becoming a rental property versus our home that we lived in, and also concerning the renter's insurance we would need for the home that we would rent in Rhode Island.
Q. Is there any reason that you did not obtain the increased liability coverage from the government?

A. Well, from what I remember, I already had renter's insurance that would be in effect during the move.
Q. You thought the renter's insurance would cover it, and that's why you didn't get the increased coverage from the government?
A. Well, the renter's insurance would cover the loss, a covered loss, from what my representative at USAA told me.
Q. And so you had that conversation, and you had that knowledge prior to the time that the move was commenced in early June?
A. I believe so.
Q. I believe you indicated that you had the renter's policy with USAA, and I think you indicated that your personal property coverage was $75,000?
A. I believe so.
Q. Was the limit increased to $75,000 just prior to the move?
A. No, it was not. It was -- I did not have a renter's policy at all, and we initiated a renter's policy.
Q. Oh, you purchased it?
A. Right.
Q. It wasn't a renewal or a change in some of the

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JASON YORK and
MAUREEN YORK,
Plaintiffs,

VS. C.A. NO. 04-551S

DAY TRANSFER MOVING & STORAGE CO.,
APOLLO VAN LINES, INC.,
ANDREWS EXPRESS & STORAGE WAREHOUSE, INC.,
and WILLIAMS MOVING COMPANY,
Defendants.

VOLUME II

CONTINUED DEPOSITION OF JASON YORK, a Plaintiff in the above-entitled cause, taken on behalf of the Defendant, Andrews Express & Storage Warehouse, Inc., before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Partridge, Snow & Hahn, LLP, 180 South Main Street, Providence, Rhode Island, on December 16, 2005, at 9:00 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

APPEARANCES:
FOR THE PLAINTIFFS:
BY: JOSEPH R. PALUMBO, JR., ESQUIRE
294 VALLEY ROAD
MIDDLETOWN, RI 02842
(401)846-5200
FOR THE DEFENDANT:
(APOLLO VAN LINES, INC.)
LENIHAN, GRADY & STEELE
BY: THOMAS J. GRADY, ESQUIRE
6 CANAL STREET
WESTERLY, RI 02891
(401)596-0183
FOR THE DEFENDANT:
(ANDREWS EXPRESS & STORAGE WAREHOUSE)
PARTRIDGE, SNOW & HAHN, LLP
BY: ROBERT K. TAYLOR, ESQUIRE
& CAROLINE MEDINA, ESQUIRE
180 SOUTH MAIN STREET
PROVIDENCE, RI 02903
(401)861-8200

FOR THE DEFENDANTS:
(DAY TRANSFER & WILLIAMS MOVING COMPANY)
GIDLEY, SARLI & MARUSAK
BY: JAMES P. MARUSAK, ESQUIRE
ONE TURKS HEAD BUILDING
PROVIDENCE, RI 02903
(401)274-6644

ALSO PRESENT: MAUREEN YORK

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

# I N D E X


| WITNESS | PAGE |
| --- | --- |
| JASON D. YORK | |
| CONTINUED EXAMINATION BY MR. GRADY ....... | 4 |
| EXAMINATION BY MR. MARUSAK ............... | 25 |
| FURTHER EXAMINATION BY MR. TAYLOR ........ | 30 |
| fURTHER EXAMINATION BY MR. MARUSAK ....... | 34 |


# E X H I B I T S


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| (NO EXHIBITS OFFERED) | | |

(DEPOSITION COMMENCED 9:00 A.M.)

JASON D. YORK

CONTINUED EXAMINATION BY MR. GRADY

Q. Good morning, Major York.

A. Good morning.

Q. You remember who I am?

A. Yes, sir, I do.

Q. I want to clarify a couple of points that you testified about yesterday both with me and with some of the other lawyers just so I understand, and that is about the government payment for your move. We talked about the roughly 90 percent, 10 percent division, and you explained the part with respect to your own move and your own vehicles, et cetera, and how they paid you for it. Directing your attention now to Exhibit C, which you probably have in front of you in that pile.

A. Okay.

Q. On that document is written members copy in Box 25, right?

A. That's correct.

Q. And I believe your testimony was that that's a document you received at the counseling or shortly thereafter?

A. I received this document at some point, yes.

Q. And with respect to the part of the move that is covered by this document, bill of lading number ZY-711231, did the government pay 100 percent of the move?

A. I believe so.

Q. Now, also yesterday you described with some detail about the source or the cause of the damage, and I believe your testimony was such that you explained that there was in the roof line at the Andrews warehouse facility a seam between, I think you said an old roof and a new roof, and there was a leak at the seam, and it was over your storage area; is that substantially correct?

MR. PALUMBO: Objection. You can answer.

A. Yes, that is the information as I know it.

Q. And who told that?

A. I learned that from my wife.

Q. So your wife explained that to you?

A. Yes, sir.

Q. Did she tell you where she heard that story?

A. Yes, sir.

Q. And where did she hear it?

A. She heard it from Mr. O'Loughlin.

Q. So it didn't come from the driver that you

of the failure to remediate in a timely manner?
A. That's correct, that's part of it.
Q. And what's the rest of it?
A. I'm not sure I understand the question.
MR. GRADY: Well, would you read the question back, please.
(QUESTION AND ANSWER READ BACK)
A. I'm still not sure I understand.
Q. Well, when you say that's part of it; what's the other part of it?
A. The other part of what?
Q. The question that I just put to you was didn't you testify that all these losses were related to -- other than the property loss, were related to the failure to remediate in a timely manner and in a proper manner?
A. That is correct.
Q. When you talk about stress, part of the stress is the stress that the litigation brings, right?
A. Well, I would admit that the litigation brings some stress, but the root cause is not from the litigation that ensued from this event.
Q. And as I understand your testimony with respect to your failure to be promoted in a timely manner to Lieutenant Colonel, the determination of that

conclusion will not take place until 2007; is that correct?
A. I can't put an exact date on it as the requirements and the time in service commitments change from year to year based on the needs of the service, but as a ballpark figure 2007, 2008 is when I could expect to be looked at for Lieutenant Colonel.
Q. That's based on present regulations?
A. That is correct.
Q. And rules?
A. Yes.
Q. And if the rules change, we'd have a different scenario?
A. That is correct.
Q. So is it not fair to say that at this time the determination of whether or not you make or don't make Lieutenant Colonel is somewhat speculative?
A. Well, it is speculative in that it hasn't occurred, however, what is not speculative is that based on past boards and past history for promotions within the Marine Corps, I am at a lesser advantage than my peers because of the events that ensued from the defendants' action in this case.

A. For at least the second time, not that I recall.
Q. Just you and him?
A. Again, yes.
Q. At the JPPSO in San Antonio, I believe your testimony was that you watched a film?
A. As I remember, yes, a video.
Q. Was there any lecture at all or any kind of interplay between you and the female that you described?
A. Not between me and the female I described. There was another individual there that gathered us in a room before they showed the video and discussed some things. I don't remember exactly what.
Q. It wasn't just a female; there was another gentleman or a lady?
A. I believe it was a gentleman. I'm not sure.
Q. So you had contact with two different people at the time you had the counseling?
A. If we're going to call it counseling, yes, I guess you would say that.
Q. Can you explain to me generally what each did?
A. I think I've already done that. We watched a video, and I gave them information about my

Q. Now, on June 4th when Apollo was there, and the van had been loaded, I believe your testimony is that at sometime prior to that date, and probably at the counseling time, you knew that you had the option to get more insurance from the government to provide better coverage for your goods, right?
A. Yes.
Q. And you also had contacted your own insurance carrier, USAA, about changing vehicles and locations and all those particulars, and in the process of that conversation, renters insurance came up, and you were assured that there was coverage for your personal property up to $75,000 in the course of the move, right?
A. That is correct.
Q. So if that was true, why would you be concerned about getting fair value coverage for your goods at the time you met with Tracy Keller?
MR. PALUMBO: Objection.
A. I don't understand the question.
Q. You already had provided coverage for your goods through USAA, right?
A. That's correct.
Q. So why would it make any difference when you signed this form, Exhibit D, about getting fair

A. Not necessarily.

Q. Is it your contention that you are not being promoted in a timely fashion basically because you were unable to complete a particular course due to delays caused in the remediation of mold?

MR. PALUMBO: Objection. It's been asked and answered.

MR. MARUSAK: I just want to understand because I wasn't here yesterday.

MR. PALUMBO: The fact that you weren't here yesterday is not a reason why --

MR. MARUSAK: Did anybody ask that question, Joe?

MR. PALUMBO: I said objection. It's been asked and answered.

THE WITNESS: What's the question again?

(QUESTION READ BACK)

A. It is not my contention that I am not being promoted because that time has not arrived yet. It is my contention that my chances and opportunities for promotion have been dramatically reduced due to the events that ensued from the defendants' negligence in handling our predicament.

to have your goods moved from Texas to Rhode Island?
A. I think so.
Q. You received several payments from the U.S. government totaling approximately $52,000, correct?
A. Three payments, yes.
Q. There was an emergency payment of $10,000; is that right?
A. That is correct.
Q. And then was there also an emergency payment of $7,000?
A. That is correct, I believe.
Q. If you look with me at Exhibit N, you will see where I'm getting these numbers.
A. Okay.
Q. So do you see in Paragraph 2 of Exhibit N it refers to an emergency payment of $7,000; do you see that?
A. Yes.
Q. And do you agree that you received an emergency payment of $7,000?
A. Yes, I agree I received that.
Q. What about an emergency payment of $3,000; did you receive that?