# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JASON YORK and
MAUREEN YORK,
Plaintiffs,

VS. C.A. NO. 04-551S

DAY TRANSFER MOVING &
STORAGE CO.,
APOLLO VAN LINES, INC.,
ANDREWS EXPRESS &
STORAGE WAREHOUSE, INC.,
and WILLIAMS MOVING
COMPANY,
Defendants.

DEPOSITION OF JASON YORK, a Plaintiff in the above-entitled cause, taken on behalf of the Defendant, Andrews Express & Storage Warehouse, Inc., before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Partridge, Snow & Hahn, LLP, 180 South Main Street, Providence, Rhode Island, on December 15, 2005, at 10:00 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

Q. Excluding the DITY part of your move from Texas to Rhode Island, was it your understanding that the DOD would select the carrier and the party who would do your packing in Texas, the carrier who would pick you up, and the carrier who would pack you?
A. I had no understanding of it. I really never put that much thought into the process of how that occurs.
Q. Well, did you have any expectation that any party other than the DOD would be handling that for you?
A. No, I don't believe I had any expectation. I assumed the government would handle most aspects.
Q. Do you know who at the DOD in Texas did or may have selected Day Transfer to do your move?
A. I have no idea.
Q. Same question as to Lone Star, do you know who hired them?
A. I do not know.
Q. Do you know whether Lone Star was hired directly by the DOD or by somebody else?
A. From what I learned from talking to the representative from Lone Star, it was my understanding that Williams had hired Lone Star to do the packing.



Q. Do you know who at Lone Star told you that?
A. That was a Mr. Dave Stauty.
Q. And when did you have that discussion with Mr. Stauty?
A. I can't remember exactly. It was soon after August 16th when we were trying to figure out everything, but I can't remember the exact date.
Q. Did you call him, or did he call you for some reason?
A. I called him.
Q. Do you recall the reason for your call to Mr. Stauty, and what it was you were trying to find out from him?
A. I believe that his name was incorrectly passed to me by Newport TMO as the GBL shipper -- I'm sorry, carrier. When I talked to him, he directed me to Mr. Rick Williams as that person.
Q. When you had the discussion with the TMO after the move, and Mr. Stauty was identified as the GBL carrier, what did you understand that to mean?
A. I understood that to mean whoever had been hired to conduct the transportation of our household goods.
Q. When you had that discussion that led you to Mr. Sauty, what did you understand the term GBL to



stand for?
A. At that time I don't know exactly what I understood it to be, but I know now that it's the government bill of lading, but at that time, that was a term that everyone was using, so I was kind of confused.
Q. Before that term was used on June 4, '04, had you heard it before?
A. I don't believe so, no.
Q. At what point did everyone begin to use that term as you --
A. Well, when I started talking to -- I'm sorry, I interrupted you.
Q. My question was if you don't recall hearing it before June 4, '04, at what point did you begin hearing it repeatedly?
A. After discussions with the Newport TMO, and I don't remember the exact time, but that's who they referred to as the responsible party for our shipment is the GBL carrier.
Q. Do you recall asking anyone at TMO at that time what the letters GBL stood for?
A. I don't recall.
Q. Do you recall ever asking anyone what that abbreviation means?



A. No, I don't.
Q. Am I correct then on June 4th, '04, you didn't ask the Apollo driver what the letters GBL stand for?
A. I don't believe so, no.
Q. At the time that you received Exhibit D, which is the Day bill of lading on June 4th, can you recall reading any part of that bill of lading before you signed it?
A. No, I never received this. It was just presented to me for signature, and I did not read it before I signed it.
Q. Did there come a time after June 4th of '04 when you received a copy of it?
A. It was only from you (indicating Palumbo).
MR. PALUMBO: I can't answer. Don't guess.
A. No.
Q. Did you request a copy of Exhibit D from the driver when he presented it to you for signature?
A. No, I did not. I assumed that it would be a part of the documents that I received from him.
Q. Do you recall anything else about your discussion with the Apollo driver that day that you haven't described already?
A. No, I can't really think of anything else that

A. I remember meeting with TMO to give them the specifics on what I required to move my household goods.
Q. And isn't this form the form that would have been produced as a result of that session?
A. Yes, it was. This contains some of the information that I gave them regarding my shipment.
Q. In fact, in Paragraph 13 it states in the past tense, "Group counseled per DD 1797"?
A. It says that. I do not know what that means.
Q. You don't know what DD 1797 is?
A. I do not.
Q. But you've had four prior moves?
A. I have.
MR. GRADY: Can I have that marked for identification, please.
(DEFENDANT'S EXHIBIT R MARKED FOR IDENTIFICATION)
Q. Have you seen such a form?
A. I have seen something like this before.
Q. Not new to you, right?
A. I can't say for sure that this is the exact same thing that I've seen, but I know what you're talking about.
Q. This is the form that the counselor was referring



to when she prepared the entry in Block 13 on Exhibit A, and she said, "Group counseling per DD 1797," right?
A. Yes, that's what she says on that form.
Q. So this new Exhibit R would have been the form that she would have used to group counsel you, right?
A. It's possible. I can't remember.
Q. You signed papers the day you were in the counseling office, right?
A. I'm sure I did.
Q. And do you remember signing the DD form 1797?
A. I don't remember signing this specifically, no.
Q. Directing your attention to the second page, Paragraph VII with the heading Liability, Claims, Protection; do you see that clause?
THE WITNESS: I'm sorry, where is that?
MR. GRADY: Part VII, Liability, Claims, Protection?
A. My Part 7 says Checklist. Am I looking at the wrong thing? Oh, I'm sorry, I was looking at the top line. It says 7 Checklist. You're talking about Roman numeral VII, yes, I see that.
Q. Can you make out Subparagraph 1 under that



heading?
A. I cannot make out the first words of that.
Q. I believe it states, "Carrier, storage firm and government liability for loss or damage."
A. Okay.
Q. Your counselor was supposed to counsel you with respect to the carrier's, storage firm, and government liability for loss of damage, right?
A. I don't know.
Q. Do you remember anything about the counseling other than the form?
A. Not really.
Q. At the time that you had this counseling or prior counseling, were you ever told that the government, when it arranges a military move, always ships with insurance at the rate of $1.25 per pound times the net weight of the shipment?
A. I don't remember ever hearing that before the move.
Q. But it is possible that you were told; you just don't remember?
A. It could be possible. I don't remember it.
Q. Now, at the time that you arranged for the move, did you know that the carrier liability was limited to $1.25 per pound times the net weight of



the shipment?
A. I don't recall knowing that.
Q. And yet I believe you testified that you had conversations with your insurance company and made changes prior to the move, right?
A. Yes, I did have conversations with my insurance company and made changes to our policy.
Q. And wasn't that to make sure that you had adequate insurance coverage during the move?
A. It was, but it was also to make sure that we had adequate rental insurance for our rental that we were moving into in Rhode Island.
Q. Do you recall at the time that you had this counseling in Schertz, Texas, at the TMO or at any prior time when you had counseling, that the government would provide you with the option to buy more insurance at your own expense?
A. I remember that they did offer an option for additional insurance.
Q. And that would provide coverage that would be greater than $1.25 per pound times the net weight of the shipment?
A. That's not the way I understood it.
Q. What was your understanding?
A. I understood that instead of depreciated value

Page 226

for your goods, you could buy insurance and get full replacement value.
Q. Was there any kind of a limit to that kind of coverage?
A. Well, I understand the $40,000 cap now, but I can't recall if I knew that then or if I learned that later.
Q. But is it fair to say that you were in communication with your own insurance company about this coverage problem because you didn't want to pay the amount for increased coverage from the government that you learned about at the time of this counseling?
A. No. We had -- I'm fairly certain I had received this renter's policy coverage before I went to counseling -- well, I can't say. I can't remember. But the main purpose of talking to my insurer was to change the policy on our home that we owned in San Antonio, as it was becoming a rental property versus our home that we lived in, and also concerning the renter's insurance we would need for the home that we would rent in Rhode Island.
Q. Is there any reason that you did not obtain the increased liability coverage from the government?

Page 227

A. Well, from what I remember, I already had renter's insurance that would be in effect during the move.
Q. You thought the renter's insurance would cover it, and that's why you didn't get the increased coverage from the government?
A. Well, the renter's insurance would cover the loss, a covered loss, from what my representative at USAA told me.
Q. And so you had that conversation, and you had that knowledge prior to the time that the move was commenced in early June?
A. I believe so.
Q. I believe you indicated that you had the renter's policy with USAA, and I think you indicated that your personal property coverage was $75,000?
A. I believe so.
Q. Was the limit increased to $75,000 just prior to the move?
A. No, it was not. It was -- I did not have a renter's policy at all, and we initiated a renter's policy.
Q. Oh, you purchased it?
A. Right.
Q. It wasn't a renewal or a change in some of the

Page 228

particulars of the policy?
A. I can't remember specifically, but when I'm talking to USAA about our house, we go into our car insurance because we're changing addresses and everything else, and the renter's policy was one of the things that came up, which they did.
Q. And they brought it up?
A. Yes, they did.
Q. And so one of the things that you inquired about was coverage with respect to your goods in the process of the move?
A. Yes.
Q. And, of course, you never thought that there would be damage from mold, so you never talked about that, right?
A. Well, no, we didn't talk about mold specifically.
Q. But if the damage had occurred in some other way other than through mold, there would have been coverage from USAA for your goods?
A. Well, I had coverage from USAA for mold anyway. Mold was not the issue. The issue was the circumstances of the loss as to why my renter's policy did not cover this loss.
Q. Did you understand specifically what that issue

Page 229

was?
A. The issue was the cause of loss was gradual seepage, is what my insurance company determined. Whereas if it was a flood, I would have been covered, but because it was due to the neglect of the facility where they were stored, and it was caused by a leak through the roof, they termed that as gradual seepage, which made it a noncoverable loss.
Q. Okay. So is it fair to say that at the time that you arranged for this shipment and began the shipment in June of 2004, you believed that your renter's insurance covered damage to your goods in the process of the move?
A. Yes.
Q. Now, directing your attention to Exhibit D, as in dog, in the lower left-hand corner, in the shaded area beside the X that you indicated Tracy Keller put on the form, appears the handwritten entry per GBL; do you see that?
A. I do see that.
Q. Did you write that or did Tracy Keller write that?
A. I wrote that.
Q. That's your handwriting?
A. Yes.

Q. And tell me exactly what Tracy Keller said?
MR. PALUMBO: Objection, asked and answered.
A. I think I went over that two times all ready.
Q. Well, I just want to clarify it because I'm not sure. You state and a lot of your testimony was about your understanding. I'm not interested in what your understanding is. I'm interested in the words that Tracy Keller said.
MR. PALUMBO: Objection. It's been asked and answered. You can answer for the last time.
A. The words that Tracy Keller said, Tracy Keller told me that if I did not know the value of my property, I could write per GBL in that space.
Q. And that's all he said?
A. And then I asked him, so that covers everything in the inventory, or words to that effect, and he nodded or made a signal in the affirmative.
Q. So he said what he said about the per GBL, and you said he nodded in the affirmative? He didn't say yes; he just nodded in the affirmative?
A. I think he also said yes. I can't recall for certain, but the impression or what I took from him was that, yes, I was correct in my statement.



Q. Now, I believe you indicated in testimony and the documents indicate you received fifty-two thousand and change from the government for this loss; is that right?
A. That is correct.
Q. And Mr. Wright inquired, and I think he was trying to get at the basis for the depreciation.
MR. GRADY: I would like to have this marked for identification, please.
(DEFENDANT'S EXHIBIT S MARKED FOR IDENTIFICATION)
Q. The first page of Exhibit S is the letter from the Commandant of the Marine Corps to you dated May 13, 2005. I believe that's already in evidence in another exhibit, but I'm concerned about the attachments, and they may be attached to the wrong letter. It may have been attached to another letter, but do you see the attachments here?
A. Yes.
Q. Is it a fair statement that these attachments, the whole quarter inch of them, represent in the first instance your claim of January 3rd 2003 that you made to the government?
MR. PALUMBO: Did you mean 2003?
MR. GRADY: Maybe that's the wrong date. It's dated 2003 at the top, but that's the



form date, I guess.
MR. PALUMBO: I would think so.
THE WITNESS: That's the date of the form.
Q. Is it June 4th? That's the pick-up date. I don't know what the form is dated. This is the claim that you made to the government, right?
A. This is a portion of the claim I made to the government.
Q. And the handwritten entries on these pages are entries made by the adjudicator in the valuation of your claim, right?
A. That is correct.
Q. So over in the right-hand columns, they make notes about depreciation and the caps that you described, right?
A. That is correct.
Q. So these are the actual, if you will, both your claim and the adjudicator's notes in determining the amounts of the money that you received that you already testified to; is that correct?
A. That's correct.
Q. Is it fair to say that these documents here that are represented in Exhibit S, at least Page 2 on, represent damage to your household goods?



A. Yes, it does represent damage to my household goods.
Q. Are you able to tell me of the $52,000 how much was paid to you for damage to your household goods?
A. Well, if you take away the -- let me correct myself. All of it was concerning damage to our household goods. There was $10,400 as part of that $52,000 that was paid for services to clean some of our goods.
Q. So if you take away the $10,400, the rest of it has to do with payment for depreciated value of your household goods?
A. Correct.
Q. So you received about $42,000, plus or minus, for the damage to your household goods?
A. That is correct.
Q. Please bear with me, I'm going to go through my notes. Did I understand you correctly that the claim against these defendants is not only for your own personal injuries and your wife's personal injuries, but also for your children's personal injuries?
A. Well, it's for my family, so my children would be inclusive in that.