# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JASON YORK and MAUREEN YORK,<br>Plaintiffs,<br><br>v.<br><br>DAY TRANSFER COMPANY,<br>APOLLO VAN LINES, INC. and<br>ANDREWS EXPRESS & STORAGE<br>WAREHOUSE, INC.,<br>Defendants,<br><br>v.<br><br>WILLIAMS MOVING COMPANY,<br>Third Party Defendant. | C.A. No. 04-551 S |

**ANDREWS EXPRESS & STORAGE WAREHOUSE, INC.'S**
**RULE 12.1 STATEMENT OF UNDISPUTED FACTS**

Pursuant to Local Rule 12.1, Defendant Andrews Storage Warehouse ("Andrews") submits the following statement of undisputed facts.

1. Andrews is a family-owned moving and storage business with its office in Newport, Rhode Island. Exhibit A, Deposition of Harry Andrews (hereinafter "Andrews Depo.") at 5-8. In August 2004, Andrews was a government-approved storage in transit facility for household goods belonging to military personnel assigned to Newport, Rhode Island. Exhibit B, Deposition of Rick Williams (hereinafter "Williams Depo.") at 40, 44; Exhibit A, Andrews Depo. at 15-17.

2. Andrews stored between 100 and 150 lots of household goods during the summer of 2004. Exhibit A, Andrews Depo. at 27-29. All but one lot was delivered to its destination with minimal or no damage. *Id.* at 29.

3. Plaintiff Jason York (hereinafter "York") was commissioned as an officer in the United States Marine Corps in May 1992. Exhibit C, Deposition of Jason York (hereinafter "York Depo.") at 10. From 2001 to 2004 he served as an Inspector-Instructor providing training to National Guard troops in San Antonio, Texas. *Id.* at 12. In early spring, 2004, he was reassigned to the Naval War College in Newport, Rhode Island for training courses commencing in August, 2004. *Id.* at 15-16. York could have arranged to move his household goods to Newport himself, but instead elected to have the government move the goods at government expense. *Id.* at 22.

4. York contacted the military transportation management office ("JPPSO") in San Antonio, Texas, the entity responsible for arranging the delivery of his household goods from Texas to Rhode Island. Exhibit C, York Depo. at 16. York met with a JPPSO representative, who counseled York about the steps in the move. *Id.* at 17. York watched a military video explaining the process, and reviewed and signed several forms. *Id.* at 17-20. The counseling included information on the limitation of liability that would apply to the shipment, $1.25 per pound. *Id.* at 225; Exhibit D (Ex. R to York Depo., Form DD 1797). It was the fourth time York had used government-provided moving services since he joined the military. Exhibit C, York Depo. at 21, 137-138. York had also used the "DITY" (do it yourself) move program, under which he packed and shipped his own goods and was reimbursed by the government for it. *Id.* at 22.

5. York was aware in early 2004 that he could purchase additional insurance from the government for damage to his goods during the move to Rhode Island, but did not do so because he thought his renter's insurance would cover any loss. Exhibit C, York Depo. at 226-229.

6. After counseling York, JPPSO on behalf of the United States contracted with Day Transfer Company ("Day") to transport York's goods from Texas to Rhode Island under a government bill of lading ("GBL"). Exhibit C, York Depo. at 22 (government hired the carrier and paid for the move).

7. Shipments of personal property for military servicepeople arranged by the government are shipped pursuant to Domestic Personal Property Rate Solicitation D-8 ("R.S. D-8"). R.S. D-8 provides that shipped goods are subject to a release value for liability purposes of $1.25 times the net weight of the shipment in pounds. Exhibit E (R.S. D-8 at Item 306).

8. The GBL governing York's household goods expressly referenced R.S. D-8 as the applicable tariff or special rate authority. Exhibit F (GBL).

9. York had the opportunity at his counseling session to request a greater limit of liability (which he would have had to pay for), but as with his prior moves chose not to. Exhibit C, York Depo. at 159-160. The net weight of York's goods was approximately 12,000 pounds, resulting in a limitation of liability of $15,000. Exhibit F (GBL block 28 relates to weight of shipment); Exhibit C, York Depo. at 42-43. York reviewed the GBL, but had no questions about it. Exhibit C, York Depo. at 44-45. York did not give JPPSO in San Antonio any information that he asked to be passed along to the moving company. *Id.* at 177-178.

10. Pursuant to an agreement with Day, Williams Moving Co. arranged to have the goods packed by Lone Star Relocation Services and transported from Texas to Newport by Apollo Van Lines, Inc. Exhibit C, York Depo. at 30-37. The goods arrived in Rhode Island on or about June 16, 2004. Andrews stacked the boxes together in its warehouse. Andrews wrapped the furniture in blankets and stored it with the boxes. Exhibit A, Andrews Depo. at 19-20.

11. York and his family arrived in Rhode Island in late July 2004. Exhibit C, York Depo. at 28. On a visit to Rhode Island in March 2004, York had rented off-base housing near the

beach in Newport. *Id*. at 25-26. The house was not available until mid-August. *Id.* at 27. Because York was not yet occupying his off-base rental house when his goods arrived in Rhode Island in June 2004, the U.S. Navy Transportation Office in Newport ("Newport TMO") directed that the goods be stored temporarily in Andrews' warehouse. Exhibit A, Andrews Depo. at 16-17. The Newport TMO notified Andrews of the date that the goods should be delivered to York. Exhibit C, York Depo. at 54; Exhibit A, Andrews Depo. at 31-32.

12. While in storage, some of the goods became wet and moldy. Water entered the warehouse through a small leak in the roof. Exhibit A, Andrews Depo. at 29-30. The leak did not affect any other lots in storage and was not noticed by Andrews' employees. *Id.* at 29, 42-43. The mold was not discovered until the government instructed Andrews to remove the goods from storage and deliver them to York's rented house. York's wife, who was at the house supervising the movers, observed that some of their items were water damaged and that there was mold present on some of their things. Exhibit C, York Depo. at 56-57. York returned while the movers were still unloading and observed several boxes which were crushed and water damaged, and some film on the outside of furniture items that had been unwrapped. *Id.* at 57. York did not ask the movers to stop unloading. *Id.* at 73.

13. York's wife contacted the Newport TMO and a cleaning company. Exhibit C, York Depo. at 60. The cleaning company, Indoor Air Quality Management, arrived the same afternoon and told York that his goods were "infested with mold, and it's going to be hard to salvage them." *Id*. at 66, 84 ("most was lost"). The Newport TMO initially directed York to "just call someone to come clean everything and send a bill later." *Id.* at 71. York's wife called back later to say that a specialist was needed, and was directed to call the Marine Corps Personal Property Office in Quantico, Virginia. *Id*. That office told York's wife to have the Newport TMO conduct an inspection and file a report. *Id.*

14. Representatives of the Newport TMO inspected the goods and, after consultation with York, asked Williams to hire a mold removal company. Williams promptly contacted ServiceMaster, which was approved by the Transportation Officer. Exhibit C, York Depo. at 86-87. ServiceMaster inspected the house on August 20, 2004 and issued a quote the next day. After discussions with Newport TMO and Marine Corps headquarters, Williams agreed to pay to clean York's goods, and for one-half the cost of cleaning the house, which was found to have significant amounts of pre-existing mold in the basement. *Id.* at 94-95, 115-116; 201 (only contract of which he is aware is agreement to remediate); 207 (Williams agreement to remediate was a separate agreement with the government). Williams further agreed with the Newport TMO to reimburse York's out of pocket expenses, up to a total cost (including remediation) of around $15,000, the limit of Williams' liability under the GBL. Exhibit G (letter from Williams to Vars with agreement terms).

15. Andrews offered to immediately remove the moldy household goods from York's house and return them to storage, but that offer was refused. Exhibit A, Andrews Depo. at 36. Andrews also contacted SmokeClean and had a representative prepare an estimate, but neither York nor Williams wanted to use SmokeClean. Exhibit C, York Depo. at 80; Exhibit A, Andrews Depo. at 36. Andrews looked to Williams, the carrier, to be responsible for any cleaning. Exhibit A, Andrews Depo. at 36-39. Andrews did not do anything to remediate the damage to York's household goods or the rental house. Exhibit C, York Depo. at 84. Andrews told York that he had to make his claim through the Newport TMO. Exhibit A, Andrews Depo. at 34, 43-44.

16. York and his wife initially refused to allow ServiceMaster to clean. Exhibit C, York Depo. at 86, 91-93. The Newport TMO told York that he had no choice in selecting the cleaning company, and that he could either take what was being offered or pay for it himself. *Id.*

at 87, 92-93. In early September, 2004, York dropped his objection and ServiceMaster began the work. ServiceMaster removed the moldy goods from York's rental house and cleaned them; it also cleaned the vacant house. Exhibit H, Deposition of Christopher Vamvaketis (hereinafter Vamvaketis Depo.") at 57; Exhibit I (ServiceMaster proposal); Exhibit J (ServiceMaster letter describing services performed). The house was found to have significant amounts of pre-existing mold in the basement. Exhibit C, York Depo. at 90; Exhibit H, Vamvaketis Depo. at 82-87. York would not have moved into the house if he had known of the mold in the basement. Exhibit K, York Depo. Vol. II at 36.

17. York never occupied the rental house. Exhibit C, York Depo. at 97. York and his family spent a few nights in a local hotel. They then moved into base housing on or around September 1, 2004. *Id.* at 96, 212. York dropped out of the first trimester of his courses at the Naval War College because he believed he would fail if he continued. *Id.* at 194 ("talking with everyone in both the government and the civilian carrier side had taken up all my time").

18. ServiceMaster finished cleaning the rental house on September 20, 2004, and the rental house has since been occupied by other tenants. The landlord has never questioned ServiceMaster's work. Exhibit C, York Depo. at 97-98, 100; Exhibit H, Vamvaketis Depo. at 109. York paid rent for only three months of his one year lease. Exhibit C, York Depo. at 99.

19. York was not satisfied with ServiceMaster's efforts to clean his household goods, and ultimately claimed to the U.S. Government that the shipment was a total loss. Exhibit C, York. Depo. at 109-110. The U.S. Government paid Major York $52,665.07 for his damaged goods and out of pocket costs. *Id.* at 104-105, 127. Following receipt of this compensation, Major York nevertheless removed some of the goods from a locked storage facility and transported them out of Rhode Island. *Id.* at 105-107.

20. Williams paid ServiceMaster for cleaning York's goods. Exhibit C, York Depo. at 116. When York refused to pay for one-half the cost of cleaning the house, as agreed, Williams paid for that too, but deducted the amount from the out of pocket reimbursement it provided York. York did not pay any remediation costs. *Id.* at 119.

21. In late August 2004, York prepared an application to request MAST, a military procedure to speak directly with a commander. Exhibit C, York Depo. at 111. York wanted to go directly to the Secretary of the Navy. *Id.* The request MAST criticized the actions of the Newport TMO and the Installation and Logistics Division at Marine Corps Headquarters in addressing the damage to York's household goods. *Id.* at 112-114 ("they didn't do anything for us, and they just redirected us to other people initially, and it took several weeks before I was able to talk to somebody and find out what they could do and get them to do something"); Exhibit L (the MAST request) ("we were either stonewalled or redirected by almost everyone we have spoken to, from both the civilian carrier and military side."). A request for MAST is an unusual occurrence for Marine Corps officers. Exhibit C, York Depo. at 118. York subsequently withdrew the Request MAST, advising his superiors in writing that he had been advised of its likely disposition, and was now satisfied with the action taken by the Newport TMO and Marine Headquarters in declaring his household goods shipment a total loss. *Id.* at 119-121; Exhibit M (York Depo. Ex. L, withdrawal of MAST request).

22. York completed his studies at the Naval War College in November 2005 instead of June 2005 as originally planned. Exhibit C, York Depo. at 195-196. He is currently assigned as an Inspector Instructor in Montgomery, Alabama. In early 2004, York expected to be considered for promotion to lieutenant colonel sometime in 2007 or 2008. *Id.* at 140. He will be considered for promotion to Lieutenant Colonel in November 2007. York agrees that at this point it is unpredictable whether he will be promoted to lieutenant colonel, and when. *Id.* at 143-

144; Exhibit K, York Depo. Vol. II at 15 (at this time determination of whether he will be promoted is "speculative in that it hasn't occurred").

23. York and his wife did not suffer emotional distress from losing their household goods. Exhibit C, York Depo. at 211.

24. Andrews was never paid for storing the York's goods. Exhibit A, Andrews Depo. at 39. Andrews' storage and transportation charges for the York's household goods were fixed by Rate Solicitation D-8. Exhibit B, Williams Depo. at 49, 54.

25. York's wife has not received any medical treatment in connection with alleged stress arising out of the incident. Exhibit C, York Depo. at 133.

ANDREWS EXPRESS & STORAGE
WAREHOUSE, INC.

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

/s/ Robert K. Taylor
Robert K. Taylor (#6514)
Carolyn P. Medina (#7109)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX

DATED: August 25, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of August, 2006, I electronically filed the foregoing ANDREWS EXPRESS & STORAGE WAREHOUSE, INC.'S RULE 12.1 STATEMENT OF UNDISPUTED FACTS with the Clerk of the United States District Court for the District of Rhode Island. The following participants have received notice electronically:

Joseph R. Palumbo, Jr., Esq.
James P. Marusak, Esq. / Gidley, Sardi & Marusak, LLP
William Grimm, Esq., Mitchell Edwards, Esq. / Hinckely Allen & Snyder, LLP

and I hereby certify that I have sent by prepaid first class mail a copy of this documents to the following non CM/ECF participant:

George W. Wright, Esq.
George W. Wright & Associates, LLC
Continental Plaza
401 Hackensack Avenue, 7th Floor
Hackensack, NJ 07601

/s/ Robert K. Taylor

870469_1/4004-2