UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

**************************
JASON YORK AND MAUREEN YORK*
*
Vs. * No. C.A. NO. 04-551S
*
DAY TRANSFER COMPANY, *
APOLLO VAN LINES, INC., *
AND ANDREWS EXPRESS & *
STORAGE WAREHOUSE, INC. *
Vs. *
WILLIAMS MOVING COMPANY *
**************************

DEPOSITION OF HARRY ANDREWS, a Witness in the above-entitled cause, taken On behalf of the Plaintiff, pursuant to Notice, before Linda J. Faria, a Notary Public in and for the State of Rhode Island, at the office of Joseph R. Palumbo, Jr., 294 Valley Road, Middletown, Rhode Island, On Thursday, February 23, 2006 at 2:00 p.m.

APPEARANCES:

FOR THE PLAINTIFF:
BY: Joseph R. Palumbo, Jr., Esq.

FOR THE DEFENDANT:
GIDLEY, SARLI & MARUSAK, LLP
BY: James P. Marusak, Esq.

FOR THE DEFENDANT:
PARTRIDGE, SNOW & HAHN, LLP
BY: Robert K. Taylor, Esq.

FOR THE DEFENDANT:
HINCKLEY, ALLEN, SYNDER, LLP
BY: Mitchell R. Edwards, Esq.

FILE COPY

Q Do you consider the home in Portsmouth to be your primary residence?
A Florida.
Q So you're a Florida resident actually?
A Yes.
Q Had either you or any business that you are affiliated with ever been involved in any lawsuits?
A Not to this extent. I think we've had small claims.
Q Small claims?
A Cases in court, yes.
Q When you say small claims, in the local District Court here in Newport?
A Yes.
Q And were those claims involving claims brought by various customers of yours against your company or vice versa?
A There were some with customers, yes.
Q Having to do with -- anything to do with the storage of their goods?
A I'm not -- I don't remember exactly. It was damage to articles. I'm not sure where we stored them or if we just moved them.
Q When is the last time -- and which company

Q And before that, who else besides you owned stock in the corporation?
A There was a few people. My dad owned a majority, up to about 66, I believe. And there was another lady that her husband worked for us, and she owned five shares, and that's the one who I bought out about five or six years ago.
Q Anybody else?
A No, not since '66. Back in '66, my sister owned stock and stuff like that but...
Q And are you the president of the company?
A Yes.
Q Are there any other officers?
A Yes.
Q Who are they?
A William O'Loughlin is vice president.
Q How long has he been vice president?
A Probably, around, five years.
Q And is there a secretary?
A She passed away this year. Jean Carter, C-A-R-T-E-R.
Q How about treasurer? Is there a treasurer?
A I hold that title also.
Q Is Andrews Express affiliated with any other

Mr. O'Loughlin's responsibilities?

A Well, that's complete responsibility of anything that we take in. Seeing that things get put away and stuff.

Q Well, let's take it from soup to nuts. What is he, as far as you're concerned, what is he supposed to do if someone wants to store their goods at your facility?

A First discuss what they have and if they're not sure what they have, like some people have a whole house. Some people have two rooms. He's responsible for going out and doing the survey of what they have and giving them an idea of what it's gonna cost them. He's a dispatcher, too. So he'll dispatch it to go out and pick it up. And being the salesman, he tries to sell the job because a lot of people call us looking for storage space and they go elsewhere, too.

Q That's if somebody makes a direct contact to store their own household goods or goods at your facility, right?

A Right.

Q What about situations where goods are being transported say for military personnel from some

point in the country to Newport. What, if any, responsibilities does Mr. O'Loughlin have in that instance?

A If a driver calls us and he says he's got like 9,000 pounds of military stuff, he comes into us and we take the paperwork that he has. We call the base at NETC and ask them if the shipper has a house, or are they gonna offer us storage for it or what they want to do with it because the base is who's responsible for the goods. Actually, anything Government actually belongs to the base. It doesn't belong to the owner. We have to contact the base, and all our contact is with military. In this case, it's NETC.

Now, occasionally, we'll get a job in that it's Coastguard, and then we have to call First Coastguard in Boston.

We also do work for Groton, Connecticut, and then we have to call them.

But there's a regular GBL that comes with it and tells us who to call and who's responsible. They call TO, transportation office, for each job, and it's our responsibility to call them before we do anything with them. Get permission to set it off or

find out if the shipper called and has a house already.

Q Let's assume that you get a call from that driver of that truck and says he has 9,000 pounds of goods and the contact has been made with the Government. In terms of what's actually done in terms of taking it from the truck and storing it in the warehouse, can you describe that process?

A The driver will start unloading, and each piece will have an inventory and an inventory tag on them. We check the numbers off to make sure we received all the pieces. And then the men will take it and wrap it and put it away into storage.

Q Now, to what extent, based on your experience, does a driver -- when you say the driver, you mean the driver of the truck that transported the goods to your facility?

A From where ever, yes.

Q To what extent does the driver typically involve in moving the goods from the truck into the warehouse?

A He takes it from the truck and just puts it on the dock.

Q He puts it on the dock?

A Right.
Q Say if there's a large item of furniture, what do you routinely do after it's checked in terms of then taking it and storing it in the warehouse?
A Depends on how big it is. We might use a hand truck. It might just be two men picking it up and carrying it. And we get whoever is gonna store it, get it wrapped.
Q When you say it's wrapped, meaning wrapped with what?
A We have cloth blankets, and we have paper bags.
Q You have what?
A Cloth blankets.
Q Oh, okay. So are all items, like furniture items, that sort of stuff that's not boxed routinely, wrapped either with cloth blankets or bags?
A Well, it's a paper pad. It's not actually a bag. It's a 60-inch by 72-inch piece of paper that's tripple or four or five layers.
Q But the process -- I mean, routinely, these items are supposed to be wrapped with something?
A Right.
Q Either cloth or with some kind of plastic or

paper; is that right?

A Yes.

Q Now, while the goods are in storage, who's responsible for the -- during that period of time, who is responsible for the warehouse, Mr. O'Loughlin?

A Normally, yes.

Q Does he have people that work under him --

A Yes.

Q -- who are also responsible for the work warehouse?

A Yes.

Q And what do they do?

A Whatever he tells them to do.

Q Okay. I assume that there are people that help in off loading the goods -- taking the goods from the loading dock into the warehouse, right?

A Right.

Q Once the goods are in the warehouse, are there any people that have any responsibilities inside the warehouse during the time the goods are stored?

MR. TAYLOR: I object to the form of the question. I'm not sure it's clear what you're asking.

they came to your office, you wouldn't be able to tell them right offhand which building their goods were in?

A Yeah, we could show them right where the goods were.

Q How would you do that?

A There is a list on their folder saying where it was put and when it came in.

Q I assume then you have a similar record for anybody else's goods that were stored at Ten Fir Street?

A If we pulled out everybody's folder, I guess we could reconstruct these records.

Q Do you keep these folders in the ordinary course of your business?

A Yes.

Q And would you have the folders for all the people who had their goods stored at your premises say between June and September of 2004?

A We would still have those records.

Q Approximately, how many lots of goods would you say were stored at your premises during that period of time?

THE WITNESS: In that actual building?

that's been brought in this action has to do with a claim that the goods were allegedly damaged by moisture or water?

A Right.

Q And has anyone else brought to your attention a claim of water damage or moisture damage to their goods that were stored at Ten Fir Street during the June through September time period of 2004?

A No.

Q This is the only one?

A Right.

Q Did you come to discover that there was a leak in the roof at Ten Fir Street?

A Yes.

Q And when did you discover that?

A I don't know what date it was.

Q Well, what year?

A It was in 2004.

Q And how did it come to your attention?

A We checked the roofs after the stuff went out, and it was brought to our attention that he had water damage.

Q He being?

A Mr. York.
Q Okay. When you say we checked the roofs out, how did you check the roof out?
A Somebody went up on the roof and checked it.
Q Who did?
A I believe it was Mr. O'Loughlin went up and checked it.
Q And were there any pictures taken of that part of the roof?
A Not to my knowledge.
Q You never saw the actual part of the roof where the damage was?
A Yes, I did go up there after the fact.
Q Can you describe what you saw?
A Well, it was patched at that time, but it looked like there had been holes in it.
Q When you say holes, how big were these holes?
A It's hard to tell because it was already patched.
Q Mr. O'Loughlin saw it before it was patched?
A Right.
Q At some point the goods were moved from your storage warehouse to 505 Wolcott Avenue in

Middletown? I think it was 505.

A I heard that number before. I believe it was.

Q Okay. And who actually transported the goods from the warehouse to the home?

A I don't know who took them out. It was somebody from our company.

Q And how did that come about that your company transported the goods from the warehouse to the residence?

A Somebody from NETC would call us up and tell us that Mr. York had a residence, and they would setup a date for us to deliver it to his residence.

Q So let me understand this. Just going back a little bit. Routinely, there would be a call from a driver of whatever truck was transporting these goods from some state say to Newport saying, "Hey, we've got 8,000 whatever the heck it is pounds of goods, and we need to store them," if I understand your testimony. And then your company would make some contact with NETC, right?

A Right. We have to contact them.

Q You have to contact them, what, to get permission to have them stored at your facility?

A Right.

Q So then the permission is given and you know the goods are off loaded, checked and then they're stored, right?

A Right.

Q And then when is the arrangement made with NETC to then transport, for your company to transport the goods from your facility to the house?

A Mr. York calls NETC and says I found a house and I would like it delivered on such and such a date. The base would call us and ask us if we can do it on that date. If not, what's the closest date to that date we could do it, and then we tell the base what date, and we do it on that date or some other date.

Q Okay. You never went to the 505 Wolcott Avenue residence?

A I had driven by the 505 Wolcott Avenue.

Q Okay. But, I mean, at or about the time that the goods were transported from the warehouse to that address, you didn't go there?

A No, I did not.

Q Now, besides Mr. O'Loughlin going up to inspect the damage, did anyone else go up to assess

A Not personally I don't, no. I did find one piece of steel up there from like an edge blade. If that actually did it or not, I don't know.

Q Have you ever had any conversation or conversations with my clients, Mr. and Mrs. York?

A Mr. York called me one day, and I'm not sure when it was. It was definitely after the move.

Q Describe or tell us what the conversation was?

A He demanded we give him all brand-new furniture and a free house for him to move into.

Q And this was over the telephone?

A A three-bedroom house. This was over the telephone, yes.

Q What did you say?

A I said that he has to make his claim through NETC. It's their responsibility. They are the ones that ordered the stuff into our warehouse. They ordered it out, and all claims have to be handled through them. We can't directly handle the claim, and I referred him to the military, and he said he had already contacted them. And that was the gist of the conversation.

Q And other than that, did you ever have any

off on the way back. And I took it to Florida and dropped it off on the way back. And when I came back, the shipper still didn't want it.

Q Did you talk to Tina Vars about anything else having to do with this claim?

A She had called up asking about getting it cleaned, and I told her to contact Mr. Williams because he was in charge of it for the carrier's responsibility of it.

Q Did your company ever make any efforts to get a cleaning company to do any work?

A We had a cleaning company that would come out that same day that we delivered it.

Mr. O'Loughlin had contacted somebody and they were going out the same day and try to clean it and take the stuff out of the house so it wouldn't get contaminated. But the Yorks said, what was related to me, that they had their own cleaning company that they wanted to come in now. I don't know how they had their own cleaning company when they just moved here but...

Q All right. You've mentioned Williams a couple of times. What was your relationship with Williams in this transaction?

A He was -- I don't know who he was to tell you the truth. He was the gentleman that sent the goods this way, I guess, and he was handling the claim for the carrier.

Q Had you ever had to deal with -- when you say -- was it Mr. Williams?

A I believe it was Rick Williams.

Q Had you ever dealt with him or ever had any dealings with him before?

A No.

Q Did you ever have any conversations with Mr. Williams about this matter?

A Yes.

Q When was the first time?

A I have no idea what date or anything.

Q Approximately, when in relation to when you found out the goods were damaged?

A I would say within the week.

Q And what do you remember about that conversation?

A He said that he was handling it directly with Tina and that he was gonna see what he could do about getting it settled or worked on or whatever. In fact, I talked to him two, possibly three times.

One time he told me he talked to Tina and he had made arrangements to have somebody clean it. Made arrangements to have somebody clean the house and that was probably the last time I talked to him.

Q And when he told you that he had made arrangements to have somebody clean it approximately when was that, if you recall, in relation to when you found out about that the goods had been damaged?

A I have no idea.

Q Was it within a few days after --

MR. MARUSAK: Objection.

Q -- if you remember?

THE WITNESS: I think somebody said something over here.

MR. PALUMBO: It was an objection. There's no judge here so we have to put it on the record.

THE WITNESS: Oh, okay. Can you repeat the question.

Q Do you recall whether that conversation where he said he was gonna, what, clean or attempt to clean the goods?

A He said he had talked to Tina, and he had made arrangements to pay somebody to clean the goods,

pay somebody to clean the house, and I agreed at that time I would move the stuff to the new house after they cleaned it, if he wanted me to.

Q At no charge?

A Yes, at no charge. This was between me and him. I don't know when that date was. I know it was around the time that he was going to Cancun. I believe it was before he left, but I don't precisely remember because I talked to him before he left and after he got back.

Q But it was around that time?

A It was around that time.

Q Did your company get paid for the storage of the York's goods at your warehouse?

A No.

Q Did your company get paid for transporting the goods from the warehouse to the 505 Wolcott Avenue address?

A No.

Q Did you ever have any conversations with anybody from Day Transfer Company about this matter?

A Not unless Mr. Williams -- the only one I had talked to was Mr. Williams. I'm not even sure who he represents.

yourself, but I had no idea who you represented. I know who he represents --

MR. MARUSAK: I represent Williams.

THE WITNESS: -- because I got all kinds of paperwork from him.

MR. MARUSAK: I represent Williams.

THE WITNESS: Okay. I talked to Williams. Right.

Q My only question is, do you recall when it was that you first learned that there was some allegation that the Yorks were claiming that the goods were damaged?

A I don't know precisely when I was notified of it.

Q And did you have any prior knowledge whatsoever of the goods being wet or effected in any fashion prior to the time that you were notified by Mr. York?

A I don't think Mr. York was the first one to notify me.

Q Well, whoever it was after --

A I think Mr. O'Loughlin notified me, but prior to the time, I was notified by him. I had no knowledge of it.

Q Do you know if Mr. O'Loughlin knew that there was any damage to the York goods allegedly from moisture or mold prior to the time that Mr. O'Loughlin was told by Mr. York of the damage?

A He told me he didn't know nothing until he was called that day and he went out to the house.

Q One thing you said earlier that peaked my interest. You said that the Government in your estimation, I think you said, was the owner of the goods?

A That's what they tell us. We are not even allowed to talk to the Yorks. Like, if Mr. York came in and says, I've got a house that I want you to deliver goods on Friday. We're not even allowed to discuss that with him. We have to send him to NETC and they handle everything over there.

Q Where did you learn that?

A This has been practice in all the years that we've been in business.

Q I mean, was that conveyed to you by the Government itself?

A Right. The Government says once it's on their GBL, they are the owner of it.

Q So if Mr. York -- I think you said that if

Mr. York had come in to you and said I want my goods stored at your facility, you couldn't just do that. If you learned that it was in fact something heading to the base, you'd have to get NETC to approve it?

A If Mr. York came into us and said, I've got 9,000 pounds coming from Texas, I want to store it at your facility, we would talk to him. If he said that there was a Government shipment, I would tell him that we could store it but you'd have to check with NETC and tell them that you want us as a destination storage agent.

Q And this particular shipment was considered to be a Government shipment; isn't that correct?

A Yes.

Q And what is it that indicates to you and to your corporation that it was in fact a Government shipment that places it in the category that you were telling us about?

A It has the Government label on it.

MR. MARUSAK: Okay. No further questions. Thank you.

MR. PALUMBO: Nothing further. Thank you very much.

(DEPOSITION ADJOURNED.)

C E R T I F I C A T E

I hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to Rules of Civil Procedure of the Superior Court, especially but without restriction thereto, under Rule 30 (e) of said Rules; that the witness was first sworn by me; that the transcript contains a true record of the proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of March 2006.

________________________

LINDA FARIA

CERTIFIED SHORTHAND REPORTER

NOTARY PUBLIC

My commission expires on April 26, 2009.

I.D.#48027