UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JASON YORK and
MAUREEN YORK,
Plaintiffs,

VS. C.A. NO. 04-551S

DAY TRANSFER MOVING &
STORAGE CO.,
APOLLO VAN LINES, INC.,
ANDREWS EXPRESS &
STORAGE WAREHOUSE, INC.,
and WILLIAMS MOVING
COMPANY,
Defendants.

DEPOSITION OF JASON YORK, a Plaintiff in the above-entitled cause, taken on behalf of the Defendant, Andrews Express & Storage Warehouse, Inc., before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Partridge, Snow & Hahn, LLP, 180 South Main Street, Providence, Rhode Island, on December 15, 2005, at 10:00 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

A. I was promoted to Major in March of 2003.
Q. Before you arrived at 505 Wolcott Street in Rhode Island, where did you live?
A. Before that my last residence was San Antonio, Texas -- I'm sorry, Schertz, Texas, which is right north of San Antonio, and the address was, if I'm remembering correctly, 2721 Ashley Meadow.
Q. And how long had you been at that address?
A. I was there for three years.
Q. And were you in the military at that time?
A. I was.
Q. What was the nature of your responsibilities in the military during those three years?
A. During those years I was the inspector instructor for a reconnaissance unit in San Antonio with the United States Marine Corps, as well as the operations officer for the 4th Reconnaissance Battalion.
Q. When did you join the military?
A. I was commissioned in the Marine Corps in May of 1992.
Q. Could you walk me through your jobs in the Marine Corps since 1992 up until the summer of 2004, please?
A. Sure. Initially I went to officers candidate

I was a student during that time. Upon graduation I was assigned to the 4th Reconnaissance Battalion in San Antonio, Texas, and while there, I served as an inspector instructor for Charlie Company, Alpha Company, and H & S Company, as well as being the operations officer for the battalion. Once my tour was completed there, I was reassigned to the Naval War College in Newport, Rhode Island, as a student, and that takes me to the summer of 2004.

Q. Why were you reassigned to the Naval War College?

A. Well, the Naval War College is what we refer to as intermediate level school. It's a year-long Masters program that is required, professional military education, for marine officers to advance in rank and responsibility. There are different kinds out there. The Naval War College is just one of the several schools available. I put in my request to be assigned to intermediate level school, and I was assigned to the Naval War College.

Q. What does the program at the Naval War College that you went through involve?

A. Well, the program awards a degree in national security and strategic studies, and it's broken into three trimesters. The first trimester

available to me for assignment had I been able to graduate on time. The primary of which is joint duty, which is one of the key ingredients for progression in today's armed forces as an officer.

Q. And what's the significance of completing your studies in June in terms of getting into that kind of program?

A. Well, those billets typically move in the summertime. That's when people rotate and go to new duty stations and billets become open. When you get off of that schedule, those billets are no longer available to you.

Q. When were you assigned to Alabama?

A. Why was I assigned?

Q. When?

A. When? Well, it was April of 2005.

Q. And how long do you expect that assignment to last?

A. I expect it to last at least three years, and that's from the date I reported in, which would have been November of this year.

Q. When did you learn that you would be attending the Naval War College?

A. I learned in the spring, early spring of 2004.

Q. And did you take any steps at that time to start

planning for a move to the Rhode Island area?
A. Absolutely.
Q. What did you do?
A. I contacted -- once I received my orders, I contacted the local Transportation Management Office to set up a time to ship my goods.
Q. What is the Transportation Management Office?
THE WITNESS: What is it?
MR. TAYLOR: Yes.
A. That is the office on the base where I was stationed that deals with personal property shipments as well as other things, I don't know what that is, but for me it was personal property.
Q. And was there a procedure that you went through with the TMO in order to have your goods moved?
A. Yes. I had to have a copy of my orders, which I turned in to them, and I had to establish a date for them to pick it up.
Q. Did you meet with representatives of the TMO in the early parts of 2004?
A. Yes.
Q. And on how many occasions?
A. Just once.
Q. Do you remember who you met with?
A. No.

Q. Do you remember what happened at that meeting?
A. At that meeting we were shown a video, and basically they walked us through line by line filling out our paperwork to get a move.
Q. You say us, was there someone else with you?
A. There were some other people there. I don't know who they were.
Q. Were you married at the time?
A. Yes, I was.
Q. When did you get married?
A. I was married in 1996, on the 10th of August.
Q. What do you remember about the video they showed you?
A. Not much really.
Q. And what paperwork did you fill out when you went to the TMO?
A. I really couldn't tell you. I don't remember other than just the dates, the primary dates when we wanted to have our shipment packed up and picked up.
MR. TAYLOR: Mark this, please.
(DEFENDANT'S EXHIBIT A MARKED FOR IDENTIFICATION)
Q. Showing you what's been marked as Exhibit A to your deposition, have you ever seen this document before?

A. I have.
Q. Can you tell me what it is?
A. This is an application for shipment and/or storage of personal property.
Q. And did you participate in the preparation of this form?
A. I believe so. I don't remember specifically.
Q. What do you know about the way that this form was prepared?
A. Well, I believe the TMO office prepares this form, and I simply provide them with the information that they put in.
Q. When you met with the TMO office, do you remember discussing with them the nature of the goods that were going to be shipped?
A. The nature of the goods? Could you be more specific.
Q. Did you have any discussions about how much was going to be shipped in terms of quantity?
A. Yes, I do. Weight was a consideration because you were limited in the amount of weight that you could ship.
Q. So do you remember discussions about quantity with the TMO?
A. Yes, I do.

Q. What do you remember about the discussions?
A. I remember that by your pay grade in the military you are limited to a certain amount of weight, and anything over that weight, then the government will not pay for.
Q. And were you asked questions about how much you were going to be shipping in terms of weight?
A. Yes, we were asked to estimate how much weight, and they had a formula, but I don't remember exactly what it was.
Q. Did you provide some information about the amount of goods that you would be shipping?
A. Yes, I estimated my weight according to their formula.
Q. Did you have any discussions with the TMO about particular items that you were going to be shipping?
A. Yes.
Q. What do you remember about those discussions?
A. Just that if you were going to ship any items that were -- or that you couldn't ship any items that were dangerous or flammable or explosive, and you should also identify any firearms was one thing. There were some other categories. Things that were particularly valuable, if I remember,

such as jewelry and stuff like that, they recommended not shipping.

Q. Did you have discussions with the TMO about any items that you had that would be particularly valuable?

A. Did I discuss with them any of my items? No.

Q. You didn't advise them that you had any items that were of particular value?

A. Not in conversation. I think on the forms that they asked to be -- or the information we had submitted to them, I wrote down that I did have firearms.

Q. Do you remember writing down on any of the forms that you had any particularly valuable items?

A. No, but they didn't ask us to put down the value of any items, as I recall. It was more concerned with items that were large that would require special preparation, if I remember correctly, such as a piano or a water bed, that sort of thing.

Q. You said you recognized Exhibit A; is that right?

A. I do. I have seen that before.

Q. Do you remember seeing it at the time that it was prepared?

A. I don't know.

Q. Were you given copies of forms that were prepared in connection with your move back in the beginning parts of 2004?
A. Yes, we were.
Q. The TMO gave you copies of the forms that they prepared?
A. I believe so, yes.
Q. Was the spring of 2004 the first time that you had gone through a move during the course of your service with the military?
A. No, it was not.
Q. So had you gone through the moving process with the military on prior occasions?
A. I had, but the military has used so many different programs, it's kind of different every time.
Q. How many times had you moved prior to the summer of 2004?
A. Where I've utilized government services, I believe it's four times.
Q. Since 1992?
A. Yes.
Q. Would you agree that it's common for military families to move every couple of years?
A. You bet ya.

Q. Now, when you say that this move was utilizing government services, what did you mean by that?
A. Whereas I had the government provide an outside party to ship my stuff, many times previously I've utilized what is the known as the DITY move program, which is do it yourself, wherein in that case I pack and ship my own goods and get reimbursed by the government for it.
Q. But in the case of the move that you were planning in the beginning of 2004, it was going to be a government move, correct?
A. It was.
Q. The government was paying for it?
A. Correct.
Q. The government was hiring the carrier?
A. As far as I know, yes.
Q. You didn't hire a carrier for that move; did you?
A. I did not.
Q. Did your wife participate in discussions with anyone from the military relating to the move?
MR. PALUMBO: When?
MR. TAYLOR: In the spring and summer of early 2004.
A. In the spring and early summer of 2004 did my wife participate? I'm not sure I caught the

A. I don't remember, 10 or more.
Q. How long were you in Newport doing this?
A. I can't remember exactly, but I believe it was three or four days.
Q. Was one of the houses you visited located at 505 Wolcott Street?
A. It was.
Q. How did you go about visiting that house?
A. Well, I contacted the owner and told them that I would like to see it. Someone was living in it at the time, so they contacted the current tenant and arranged a time for me to go over and see it.
Q. Did you go in the house?
A. I did.
Q. And what time of year was this?
A. This was, I believe, March. I don't remember the exact dates, 2004.
Q. Were you assisted by a real estate agent?
A. I was not.
Q. After you visited 505 Wolcott Street, did you take any further steps regarding that property?
A. I did.
Q. What did you do?
A. Once I determined that that was the property that we wanted to get, I signed a lease securing

it, and I also took some pictures and measurements of the inside.
Q. Did you visit the house on more than one occasion?
A. Well, I had an initial visit, and then I had a second visit just to take some pictures and get some measurements of the home.
Q. Both visits took place in March of 2004?
A. They did.
Q. Did you talk with the residents at the time?
A. I did.
Q. Did you ask any questions about the house?
A. I did.
Q. What did you ask them?
A. I can't remember all the specifics, but it was mainly how did they enjoy the house, had they had any problems with the landlord, what were the local schools like, what were their utilities bills on average, other questions in that vein mostly about the local area and about the house. I can't remember the specific questions.
Q. Did they tell you that they had any issues with water in the basement?
A. No.
Q. Did you sign a lease for 505 Wolcott Street?
A. I did.

Q. And when did you sign that?
A. It was in March of 2004.
Q. What was the period that the lease was going to run?
A. It was going to run from August of 2004 until June of 2005.
Q. What was the rental amount?
A. The rent was, if I remember correctly, $1,100 a month.
Q. Was there some reason for selecting that rental period?
THE WITNESS: Was there some reason that I selected that rental period?
MR. TAYLOR: Yes.
A. Yes.
Q. What was it?
A. Because that was the only time it was available.
Q. The house wasn't available until August of 2004?
A. That's correct.
Q. In the spring of 2004, when were you anticipating that you'd start your courses at the Naval War College?
A. They did not have an exact date established at that time but mid-August was the historical

pattern.
Q. And were you required to arrive in Newport before the courses started?
A. Yes.
Q. How much in advance?
A. I can't remember the exact date, but the senior marine who was present at the course had established I think a date of July 30th, but I'm not sure on that, but it was before the beginning of August, I remember that.
Q. When did you arrive in Newport?
A. I can't remember the exact date, but it was, I believe, the last week in July.
Q. And did your family arrive at the same time?
A. They did.
Q. Where did you stay when you arrived in Newport when you first got there?
A. When we first arrived in Newport, well, we actually stayed in Portsmouth. I don't remember the address, but there was a home that was for rent during the summer, and we stayed there for a period of two to three weeks. I can't remember specifically, but it was right up until we were scheduled to move into the 505 Wolcott address.
Q. Okay, let me take you back to Texas and the period

pick-up date or both?
Q. Well --
A. The day I moved out of my home?
Q. Who packed up your goods in order to move them to Rhode Island?
A. It was a company called Lone Star Relocation Services.
Q. And did you select Lone Star Relocation Services?
A. I did not.
Q. They were selected by the military; is that right?
A. I have no idea who selected them.
Q. Did they pack all of your goods?
A. No.
Q. Who else was involved in packing your goods?
A. Apollo Van Lines was involved in packing some of our goods, and that was it.
Q. Did you or your wife pack any of your goods?
A. No, we're not allowed to.
Q. You packed nothing?
A. No.
Q. Your wife packed nothing?
A. Other than what we were carrying with us.
Q. When the company came in to pack up your goods, what did they do?
MR. PALUMBO: Which company?

MR. TAYLOR: I think he's said Lone Star.

A. Well, there were two companies involved in the packing. You had Lone Star and Apollo.

Q. Let's start with Lone Star. When Lone Star came in, what did they do?

A. There were two individuals, and they came in and surveyed the area, the different rooms where stuff was sitting, and then they proceeded to bring in boxes and paper and packing material, and they worked from room to room and packed up basically our smaller items.

Q. And how long were they there doing that?

A. I don't remember specifically, but it took up pretty much the whole day.

Q. And were you present in the house during that day?

A. I can't remember exactly. I wasn't present there the whole time, I believe. I was in and out of the house doing other things.

Q. And was your wife present in the house while they were packing up?

A. I believe she was present there most of the day, but I can't say for sure, since I wasn't there all the time.

Q. And did you have any concerns about the way that

the packing was being done?
A. No, I can't say that I did.
Q. Did your wife ever discuss with you whether she had any concerns about the way the packing was being done at that point in time?
A. Not that I recall.
Q. As far as you can tell, the packing was being done appropriately?
A. Sure, from my layman's vantage point it looked okay to me.
Q. Now, in addition to Lone Star, you said Apollo was involved in packing?
A. Yes, they were.
Q. What did they do?
A. Well, when Apollo came, all of the larger items and some items which were apparently not packed by Lone Star, they pretty much did the same procedure. They brought in boxes and tape and boxed those items up, or in the case of furniture or other things, wrapped them in blankets, that sort of thing.
Q. So Apollo came in after Lone Star?
A. They did.
Q. How long were they in the house?
A. I can't remember specifically, but they were

there pretty much all day.
Q. Were you present for that period of time?
A. For the period of time that Apollo was there, yes, I was present.
Q. Was your wife there also?
A. Yes, she was.
Q. And did you observe the work that they were doing to pack up your possessions?
A. Well, from what I could. There was more than one individual there, so I mostly stayed with the driver throughout the packing process.
Q. Did you see anything that concerned you that day about the way that your goods were being packed up?
A. There were a couple of things in regard to my tools, which I thought they could have done a better job with, but other than that, most of it looked pretty good.
Q. And did your wife share with you any concerns that she had about the job that Apollo did packing up your possessions?
A. As far as the packing is concerned, not that I recall.
Q. Was there anyone from the military that was present for any of the packing process?

A. Well, I'm in the military, and I was there.

Q. You're right. Let me ask a better question. Was there anyone from the TMO that came out while the packing was going on?

A. While the packing was going on, not that I recall.

Q. Was there anybody else who was present for any of this packing process who was affiliated with the military other than you?

THE WITNESS: Was there anybody else affiliated with the military there during the packing process?

MR. TAYLOR: Yes.

A. Besides myself, not that I recall.

Q. Were you in communication with anyone from the TMO about the packing process?

THE WITNESS: You're talking about the day that Apollo was there packing up our stuff?

MR. TAYLOR: At that period of time, yes.

THE WITNESS: During our pack-out from San Antonio?

MR. TAYLOR: Yes.

A. I can't recall, although it's possible I may

have called TMO if the movers weren't there on time, but I don't remember specifically.

Q. Do you recall that there was any problem with the pack-up in San Antonio?

A. Well, the problems I had were the excessive notations of preexisting damage that Apollo put on many of our items.

MR. GRADY: Could I have the answer read back, please.

(QUESTION READ BACK)

Q. Could you explain a little bit more what you meant by that?

A. Well, the driver from Apollo, and I went around with him, he would -- part of their process, I guess, is to note any imperfections on any item, and they do it through a system of numbers and letters. So when the driver would call out the numbers and the letters noting some sort of imperfection, I would ask him to point it out to me. And I argued with him on several points of things that he was pointing out, especially on furniture which had a distressed look, which is part of the natural look of the furniture. So that was my major problem with them at the time.

Q. Any other problems with anything that Apollo did

at the time?
A. During the packing of our goods, no.
Q. And how about with Lone Star, did you have any problems with any of the work they did at the time?
A. At the time, no, I did not.
Q. Did you have any communications with anyone from the TMO about Apollo at the time?
A. At the time of the pack-out, I did not have any conversations with TMO.
Q. After your goods were packed up, someone came and moved them; is that right?
A. Yes.
Q. Who was that?
A. The movers were Apollo Van Lines.
Q. And walk me through, if you would, just what happened. There was a couple of days of packing up; what happened next?
A. After the goods were packed, Apollo arrived, and I can't remember if it was the next day or if there was a lag in between there, but they arrived. The driver came in and introduced himself, and we proceeded to go through the house and identify the items that had not been packed by Lone Star, which he would be packing, and once

that was completed, he and his crew proceeded to load our items on the truck.

Q. That all happened the same day?

A. It did.

Q. And did you have an understanding of where the goods were going to be sent?

A. Yes.

Q. And what was that understanding?

A. My understanding was that the goods would be sent to Newport, Rhode Island.

Q. What was your understanding of what was going to happen to them there?

A. My understanding is that they would be kept by someone until we were ready to receive them.

Q. Because you didn't have a place to deliver them until August; is that right?

A. That's correct.

Q. So you knew that they had to be stored somewhere until your house was available?

A. Well, I didn't know that because I didn't know when they would arrive in Newport. So ideally I knew that I wouldn't be up there until August 16th with a place to live, but I don't know how long it takes to get them up there or what happens in between. I'm pretty much a neophyte to the whole

move.

Q. So when you did those moves in the past, was there a moving company involved?

A. There was no moving company involved at least when I've done it. I know other people may -- well, I don't know. I've never used a moving company.

Q. Now, in the middle of the page of Exhibit B you see there's some numbers written in handwriting?

A. There are.

Q. And do you know what those numbers are?

A. No.

MR. PALUMBO: Are you talking about -- can you just point to what you're referring to because there are some other things.

MR. TAYLOR: I'm referring to the numbers that are underneath --

THE WITNESS: Block 28?

MR. TAYLOR: Block 28.

A. Oh, okay, I was looking at Block 25. Block 28, yes, I see those handwritten numbers.

Q. Do you know what those handwritten numbers relate to?

A. I believe they relate to the weight of the shipment.

Q. And what does the number in the box marked gross refer to?
A. I don't know.
Q. How about the number underneath it?
A. I don't know.
Q. And what about the number in the box marked net, what do you know about that?
A. Just from my math skills, I would assume that's the difference between the other two.
Q. Do you have any understanding about how that number was arrived at?
A. Well, it looks like they subtracted the tare from the gross to come up with the net.
Q. And is it your understanding that that is the net weight of the goods that were being shipped from San Antonio to Newport?
A. I don't know.
Q. Do you recall asking the San Antonio TMO any questions about this document?
A. No, I did not. I think I should also note that I don't believe those numbers were there, any of this handwritten stuff, was there on the copy that I received.
Q. What do you know about how this document was prepared?

A. I don't know anything about how it was prepared.

Q. Do you know whether it was prepared by somebody in the TMO in San Antonio?

A. I don't know. That's who I received it from, but I don't know how it came into existence.

Q. But it was your understanding that this bill of lading was part of the documentation that related to the shipment of your goods from San Antonio to Newport?

MR. PALUMBO: Can we have that question read back, please.

(QUESTION READ BACK)

MR. PALUMBO: Did you mean it was his understanding back then?

MR. TAYLOR: At that time.

MR. PALUMBO: Okay, thank you.

A. At the time when I received this, yes, I assumed it had something to do with my shipment, since I got it from TMO.

Q. Did you review this document when you received it from TMO?

A. I'm sure I did, but unless it had the dates on it -- yes, it did have the dates, so, yes, I reviewed it to find the dates.

Q. And do you recall having any questions about this document?
A. No, because the dates were what I had requested, so that was all I was looking for.
MR. TAYLOR: Mark this as C, please.
(DEFENDANT'S EXHIBIT C MARKED FOR IDENTIFICATION)
Q. Showing you what's been marked as Exhibit C. Have you seen this document before?
A. Yes.
Q. And what is this document?
A. I believe this is the document that was given to me by TMO, which is the same document in Exhibit B.
Q. And do you see in the middle of the page there's some handwriting?
A. Yes.
Q. Would you agree with me that that handwriting appears to say member's copy?
A. I would agree with that.
Q. Do you believe this was the document that was given to you by San Antonio TMO?
A. I believe so.
(DEFENDANT'S EXHIBIT D MARKED FOR IDENTIFICATION)
Q. Showing you what's been marked as Exhibit D to your deposition. Have you ever seen this document

basically confirmed that they would be out on the 16th.
Q. Do you remember who you talked to from Andrews?
A. I do not. They did not give me their names.
Q. Any other contacts with any of the companies involved prior to the delivery --
A. Prior to the 16th?
Q. Prior to delivery of the goods?
A. No.
Q. So as far as you knew you talked to the government, and they arranged for the delivery; is that right?
A. Yes. As far as I know I contacted the TMO office, and they were the coordinator with the carrier as far as arranging transportation of our goods.
Q. Were you at 505 Wolcott Street when your goods were delivered on the 16th?
A. Yes, I was.
Q. And what time of day was it?
A. I don't remember exactly, but I believe that the truck showed up around 08. I can't remember for certain.
Q. 8 in the morning?
A. Yes, 08.

ramps that they pull out from underneath the truck, set those up, open the doors, get out all of their equipment that they use to move. I'm not sure if they laid down protective covering for the floors inside the house so that they won't mar anything. Basically just setting up so they could move our items into the home.

Q. All right, and then at what time that day did you return to the house on Wolcott Street?

A. As I said previously, I can't remember exactly, but I believe I returned around noontime.

Q. And what did you find at that point?

A. Well, when I got there, my wife was on the front yard, and she explained to me that there was some problems with the shipment.

Q. What did she say?

A. I don't remember her exact words, but basically that some of our items were water damaged and there was mold present on some of our things, in addition to I believe some of the boxes were crushed and in pretty poor condition.

Q. And did you look at any of the boxes or goods at that point in time?

A. I did.

Q. What did you observe?

A. I observed several boxes which were crushed, coming open, looking like they had been water damaged, and that they had gotten wet and dried and sort of started coming apart in places. I observed some film on the outside of our furniture, those that had been unwrapped. A lot of them were still wrapped up in blankets inside the house.

Q. When you say some of the boxes looked crushed, can you give me a number?

A. I can't.

Q. Can you give me a percentage? Was it half?

A. I wouldn't want to hazard a guess at that. I would just say that there were many, and again at this point I don't remember how much. I mean, we had boxes all over the house at this point, so I'm not sure exactly, and I was only in one room before I went to change out of my uniform and get into regular clothes so I could assist my wife.

Q. Now, did you spend the rest of the day at the house then?

A. Yes.

Q. And when you got back, was the unloading completed?

A. No, it wasn't.

the day then?
A. Again, I don't remember a lot about it other than my wife had already contacted the TMO office, as I recall, as well as I believe she had contacted by this point a mold remediation company to come and give us an estimate, but we spent a lot of time on the phone talking to people, both she and I. Like I said, the move was almost finished by the time I returned. So once everything was in the house, I went around with the driver from Andrews and basically started trying to find items which had not been marked off on her checklist, items we should have had which weren't there. And some of those we found, and some of those we didn't, which I believe he was going to put a tracer in, whatever that is, to try to locate those to see if they were back in the warehouse, and then I began noting obvious damage, and that was noted on -- I believe it's form 1840, and filling that out, but we were kind of waiting for the base inspector to come out and file a report before we released the drivers.
Q. Did you have any discussions with the driver from the moving company about the cause of the damage to your goods?

they took a harder look at our furniture and other large items which were openly visible.

Q. Did they give you any report on the condition of those items?

A. They're infested with mold, and it's going to be hard to salvage them.

MR. TAYLOR: Exhibit E, please.

(DEFENDANT'S EXHIBIT E MARKED FOR IDENTIFICATION)

Q. Looking first at the first page of Exhibit E, have you ever seen this before?

A. Yes, I have.

Q. Can you tell me what it is, please?

A. This is, and I forget the nomenclature, it's either the form 1840 or 1840R, which is the document that's required to be presented within a certain time period. I believe it's 70 days after completion of the move. Showing the damage that you have sustained through the move.

Q. And where did you get this form?

A. Where did I get this form? I believe it was provided to me by the movers at the time of delivery. I can't recall for sure.

Q. And is that your signature at the bottom of this page?

A. At the bottom of the first page.

Q. Do you recall whether or not your wife spoke to her that day?

A. I know my wife spoke to her on that day.

Q. Did your wife tell you what she and Miss Elder talked about?

A. Yes, she did.

Q. What did she tell you about that?

A. Well, from what I recall, she had initially talked to the Newport TMO office, and the inspector who filed this report is the person that she had talked to, and he had initially directed her to just call someone to come clean everything and send a bill later, and that was pretty much the extent of it. My wife called him back later and told him this was a far bigger situation than what he apparently thought it was, and that we needed to get a specialist out here to look and see how much this was going to cost, and he had directed her to Marine Corps office at that time to Mrs. Elder, and my wife contacted Mrs. Elder and Mrs. Elder advised her to get the Newport inspector out there immediately to file a report. That's what I recall.

Q. Did you see Exhibit F at or around the time that it was prepared?

the middle of the day on the 16th?
A. I would say, yes, in that there was some pieces that were wrapped. There were some pieces that were unwrapped when I arrived back.
Q. Did you ask the movers to stop unpacking anything that day?
A. I did not.
Q. Now, on Exhibit F, again those remarks under Box 25 continue, "Two nightstands in master bedroom badly water damaged." Do you see that?
A. Yes.
Q. Do you agree that was the case?
A. Yes, I agree.
Q. And then it continues, "Almost all cartons crushed. Some cartons water damaged." Do you see that?
A. Yes.
Q. Would you agree with that?
A. I would agree with that.
Q. And then it continues, "Guest bedroom furniture has white film on it." Do you see that?
A. And I agree with that.
Q. On the second page there is some additional remarks. Do you see those?
A. Yes.

A. Yes.
Q. When was that?
A. I don't remember the exact day, but I think it was the 18th when -- August the 18th when Mr. O'Loughlin showed up with SmokeClean Mold Remediators for them to do an estimate of cleaning our home and our household goods.
Q. And did you talk with Mr. O'Loughlin on that date?
A. Nothing beyond introductions on my part.
Q. You didn't ask him any questions about what had happened to your goods?
A. No, I didn't. I mean, it was pretty well established in our mind by this point from anyone else involved that we knew what had happened.
Q. At that point in time what did you think had happened?
A. At that point I had come to understand that there was a leak in the roof of the warehouse where our goods were stored by Andrews, and that during the time that they were there, they got wet, and due to lack of climate control, they stayed wet and became infested with mold.
Q. Did you talk to the representative of SmokeClean on that day?
A. I did.

Q. And, to your knowledge, did Andrews do anything to remediate your home?
A. As far as I know, no.
Q. To your knowledge, did Andrews do anything to remediate any damage to your goods?
A. As far as I know, no.
Q. And has Andrews paid for any of your costs in connection with this move?
A. Andrews has not paid us anything, no.
Q. Has Andrews done anything to respond to the situation, as far as you know?
A. Other than giving us incorrect phone numbers, no, they haven't given us anything.
Q. Drawing your attention back to the first page of Exhibit G, about two thirds of the way down there's an entry that appears to say, "Mold guy showed up and surveyed the situation. Told us most was lost." Do you see that?
A. I see that.
Q. Were you there for discussions with the mold remediation person on August 16th?
A. I was there.
Q. And does this fairly capture what he was telling you that day?
A. Yes, it does.

ServiceMaster?
A. They were familiar with ServiceMaster as a franchise, yes.
Q. Did you have any discussions with representatives of the Newport TMO about using ServiceMaster to clean up Wolcott Street?
A. I did.
Q. Who did you have those discussions with?
A. Tina Vars.
Q. And describe generally for me what those discussions involved?
A. Well, they basically involved I did not want ServiceMaster to be used or be the company that remediated our home and our belongings.
Q. And why was that?
A. Well, I had been present for their inspection when they provided their estimate, as well as with SmokeClean and with Indoor Air Quality Management, and they were the company I was least impressed with as far as their professionalism in assessing the situation.
Q. And what did Miss Vars have to say about the selection of ServiceMaster? How did she respond to your concern?
A. She responded that she had heard that they were

a good company. They had done work before. She was speaking in terms of the franchise and not the specific -- I guess I'm speaking wrong. The brand name ServiceMaster, not the particular franchise that was involved in this, and that they had used them before for these types of situations, and that we had no choice whatsoever in selecting the company to clean our home. We could either take what was being offered, or we could pay for it ourselves.

Q. And by we, you mean you and your wife; is that correct?

A. That's correct.

Q. Did you participate in any conversations with Mr. Williams and Miss Vars about the selection of ServiceMaster?

A. I don't know if I participated in any with Mr. Williams about ServiceMaster. I think the decision had already been made by the time I talked to him after a company was decided upon. Does that answer your question?

(DEFENDANT'S EXHIBIT H MARKED FOR IDENTIFICATION)

Q. Showing you what's been marked as Exhibit H to your deposition. Have you seen this document before?

He did note that there were probably an 8 by 10 area of carpet tiles in the basement and underneath those he had noted some mold.

Q. Did you observe that also?

A. I did.

Q. During the couple of days that you were in the Wolcott Street house, did you -- let me start that question again. During the time that you visited the Wolcott Street house before August 16th, had you ever been in the basement?

A. I had.

Q. And had you ever observed any moisture in the basement?

A. I had not.

Q. Had you ever smelled any smell of moisture in the basement?

A. I don't know what the smell of moisture is, but it smelt like any basement you would go to, not out of the ordinary at all.

Q. There was nothing remarkable to you about the smell of the basement?

A. There was nothing remarkable, no.

(DEFENDANT'S EXHIBIT I MARKED FOR IDENTIFICATION)

Q. Showing you what's been marked as Exhibit I to your deposition. Have you ever seen this document

before?
A. I have.
Q. What is it?
A. This was an e-mail between my boss at the War College, Colonel Rushworth and Mr. Gary Good, who was -- I think his title is down there. He's with the Installation & Logistics Department at Headquarters Marine Corps.
Q. And how do they get involved in this matter?
A. Well, I informed my boss immediately on the 16th what was going on, as any marine does, keeping his chain of command informed. So that's how he initially got involved.
Q. Now, the top e-mail on this document contains a statement that, "Major York does not want to accept the cleaning company the carrier wants to use." Do you see that statement?
A. Yes.
Q. Is that accurate?
A. That is a true statement.
Q. Who did you want to use?
A. I wanted to use the company that we had initially brought in, which is Indoor Air Quality Management of New England.
Q. And at what point in time were you first told that

there is a possibility that ServiceMaster would be the cleaning company?

A. I can't remember exactly. I couldn't tell you.

Q. It was before August 30th though?

A. What's the date on this? Yes, it would have been before August 30th.

Q. Before August 30th did you resist having ServiceMaster do the cleaning?

A. Well, as much as I could in the situation I was in. I made it known to everyone involved that I did not think that they were the company that should be chosen for this specific job; that this was not a job for just the lowest bidder; that there were health risks involved, and from my view from what I had seen, ServiceMaster was not the best company to do the job.

Q. So you objected to having ServiceMaster do the work?

A. I did.

Q. And at some point did the rep. from the Newport TMO tell you that you needed to accept ServiceMaster?

A. The representative from Newport TMO, that would be Tina Vars, yes, and we basically had no choice; that we could accept ServiceMaster, or we could do

it ourselves, which it was beyond our financial means to do. So it was really a Hobson's choice there.

Q. So at that point you agreed to have ServiceMaster come in and do the cleaning, correct?

A. Yes. Faced with the alternative that's what we agreed to.

Q. Were you aware of discussions between Tina Vars and Rick Williams about who was going to pay for the cost of the remediation?

A. I became aware at some point. I don't remember when.

Q. Did you participate in any discussions between Tina Vars and Rick Williams about who was going to pay for the cost of remediation?

A. I did.

Q. What do you remember about those conversations?

A. The one time I remember, and I don't remember the exact date, I was in Tina Vars' office, and she was talking to Rick Williams on a conference call, but Rick Williams had stated that he would only pay for 50 percent of the cleaning costs for the house because of a preexisting condition. In which I argued the point that the preexisting condition was not relevant, and even if it was, it

was not enough to take 50 percent of the cost.
Q. Was Miss Vars talking to you about her discussions with Rick Williams?
A. Yes, she told me about some of them.
Q. And was it your understanding that initially Williams was not willing to pay for remediation costs?
A. Well, yes, when I talked to Rick Williams initially, he denied any responsibility for cleaning our home, and -- well, he denied any responsibility, keep it at that.
Q. Did you talk to them about paying to have remediation done?
A. I'm sure I did. I don't remember specifically. When I was talking to Rick Williams initially, I was more concerned about paying our inconvenience expenses from the loss of our home because we had no place to live, and we were running out of money living off of the Newport economy during the summertime. So that was my main concern, although, of course, the remediation of our home so we could move back into it as well as our goods was also important.
Q. And did Williams initially agree to pay for some of the inconvenience?

A. Well, I don't really know how to put that. He offered to divert money from Andrews to us for -- I don't know if he used the word inconvenience or not, but for our troubles, but as far as paying the actual cost of what we were enduring from this entire incident, he made it clear he wasn't going to do that.
Q. At least initially he indicated that he would not undertake any remediation; is that right?
A. Initially, right.
Q. But subsequently Williams did agree to pay for at least a portion of the remediation cost; is that right?
A. Yes.
Q. And how did that come about?
A. I'm not sure exactly how it came about. There were conferences between Tina Vars' folks at Headquarters Marine Corps and Mr. Williams, and it was during those at some point that it was agreed.
Q. Did anyone from Newport TMO ever tell you that they were putting pressure on Williams' company to make some sort of payment?
A. I don't know that anyone at Newport TMO told me they were putting pressure on Williams.
Q. Did anyone outside of Newport TMO tell you that?

A. Yes. I can't remember exactly who. It may have been Mr. Fishburn at the SDDC, that's Strategic Deployment & Distribution Command, I think.

Q. What's the involvement of the SDDC in this matter?

A. From what I understand, SDDC is the senior Department of Defense agency that coordinates the personal property shipments of U.S. service members among their other duties.

Q. And who was Mr. Fishburn?

A. He is an employee of SDDC. As far as his actual job title and what he does, I'm not sure exactly.

Q. And what did he tell you about there being some sort of pressure put on Williams?

A. He said, from what I recall, if Day Transfer Company did not correct this problem that was with us, which was their responsibility, then they could look at putting that carrier before a carrier review board.

Q. Did Mr. Fishburn ever tell you that Williams might be prevented from doing any more work for the government if they didn't take some steps?

A. I don't know if he ever told me that, but that's what I understood it to mean, since that's

mainly what he does is work on contracts for government shipments. I don't think they were going to review him and give him an award.
Q. After August 16th, you and your family moved into a hotel for awhile; is that right?
A. After August 16th, yes, we were in a hotel.
Q. And then after that you moved to a new house; is that right?
A. Well, we moved to another hotel, and then once we ran out of money, we were forced to move onto base housing.
Q. That's the Jones address you gave me before?
A. It is.
Q. And who pays for base housing?
A. Who pays for base housing? The taxpayer, I would guess. It's the U.S. government.
Q. After the 16th of August, did you ever move back into Wolcott Street?
A. No, I did not.
Q. To your knowledge was the building remediated for the presence of mold?
A. ServiceMaster stated that they completed remediation of the building, but there was no test done or anything else.
Q. And are you aware of any complaints from anybody

about the remediation of the building by ServiceMaster?
A. Not that I'm aware of. No, I'm not aware.
Q. Once the house was remediated, why didn't you and your family move back in?
A. Well, we couldn't. At this point I had been dropped from the War College, and my tour had been extended, so what that left me, although it solved some of the initial problems, it left me without a house because my landlord would not extend our lease to match up with my new departure date. Therefore, if I moved back into the house, then my lease would have expired in June while I still had five months of schooling left, and you have to occupy government quarters a minimum of six months in order to be granted them, and along with the fact that I knew a private venture was taking over government housing as opposed to the government. So I could either move into base housing now, or it would not be available to me at the expiration of my lease, which would leave me with the only other option of finding an acceptable short-term lease in Newport, Rhode Island, during peak tourism season, which is far beyond my financial means.

Q. Could you have stayed at Wolcott Street, say, through the end of the year, and then moved into base housing?

A. Through the end of the year?

Q. Through the end of 2004?

A. It's possible I could have, but I would still have been paying on the lease that ran through the summertime, and once you move onto base, you lose your housing allowance.

Q. What happened to your lease with the Wolcott Street property?

A. We abandoned it.

Q. And did you have to compensate the landlord in some way?

A. Well, we did. I mean, they kept our security deposit that we put down, which was one month's rent, but we essentially quit paying the rent after November, I believe it was. I'd have to check my records to be sure.

Q. So you believe you paid rent for the month of November for the Wolcott Street house?

A. I would have to go back and check, I'm not sure. I know I paid August and September and I think October, but I would have to go back and check my records, but after we moved into base

housing, we were no longer getting a housing allowance. That's when our money was out.

Q. Besides keeping your security deposit, which was $1,100; is that right?

A. I believe so.

Q. Did you have to pay your Wolcott Street landlord any other compensation for terminating the lease early?

A. No.

Q. And did you ever have to pay the Wolcott Street landlord for anything having to do with mold in the house?

A. I don't know that I -- I didn't pay her, but there were some things that were damaged during the remediation or lost, which I replaced for her, such as -- I don't know what you call them, things that hold up curtains that disappeared, some curtain rods, that sort of thing.

Q. How much did you spend on those items?

A. I couldn't tell you right now. It's recorded in my notes.

Q. More than $1,000?

A. It wasn't more than $1,000, no.

Q. Explain to me how the base housing allowance works?

suffered?
A. Well, we had our loss of income resulting from the money that we would have saved from our BAH as we discussed previously, our out-of-pocket expenses for living in a hotel, living off the local economy, and other associated expenses from not having our home, which I don't have a figure on that, and those are all I can think of right now as far as concrete damages, although there are others.
Q. What was the amount of out-of-pocket expenses that you incurred?
A. I can't tell you right now. I would have to go back and look at my notes.
Q. Have you received any compensation from the government relating to this matter?
A. I have.
Q. Tell me what you've gotten?
A. Again, I can't give you an exact figure, but I believe the total amount was around $52,000.
Q. And where did that money come from?
A. It came from the U.S. government.
Q. Did you file a claim of some sort?
A. I did file a claim.
Q. Now, to your knowledge, did Williams pay for

remediation costs for Wolcott Street?
A. I believe he did.
Q. And that was for remediation of the house and for whatever goods were salvageable, correct?
A. That was for the remediation of the home and the failed remediation of the goods.
Q. Let's talk about the remediation of goods a little bit more then. Do you have in your possession today any of the goods that were shipped from San Antonio to Newport in the Summer of 2004?
A. Yes.
Q. What do you have?
A. I couldn't tell you. There were some items that were left in the storage facility that we never could turn over to Andrews. There was mainly junk, more or less, some pot lids, some silverware. I'm trying to remember what else, pieces of toys, and some other items I can't remember specifically.
Q. And those things are in a storage locker somewhere?
A. They're in storage, yes, somewhere.
Q. Somewhere here in Rhode Island?
A. No, they're not in Rhode Island. I transported them to Alabama when I PCS'd from here, and

they're stored on private property right now.
Q. I believe you mentioned that there were clothes that were cleaned and salvaged; is that correct?
A. Yes, they were.
Q. Were there any furniture items that you managed to salvage from the goods that were shipped from Texas?
A. No.
Q. Were there any other personal items that you managed to salvage from the goods that were shipped from Texas?
A. Yes.
Q. And what did you manage to salvage in terms of personal items?
A. Just some pictures was pretty much the extent of it.
Q. Family items?
A. Yes.
Q. Anything else, any other personal items that you were able to salvage?
A. Yes, some personal items of mine, some baseball cards and comic books.
Q. You have some sort of collection of comic books and baseball cards?
A. I used to. Some of them are destroyed now, but

what was left and what was salvageable, again, we have stored in Alabama right now until we can find a reputable company to clean them.
Q. So you still have possession of everything that you had in Texas that was comic books or baseball cards; is that right?
A. That's not everything I had in Texas.
Q. But in those two categories?
A. No, some of them were lost and thrown away. I mean, they were just not any good anymore.
Q. Have you done anything to assess the work that would be involved in remediating the comic and baseball cards you still have?
A. I haven't had a chance yet.
Q. Was there any other personal property that you salvaged?
A. No, besides -- there is a toolbox that was left in the storage facility and a work bench.
Q. So those are still in your possession essentially?
A. They are.
Q. How about any weapons?
A. Weapons, yes.
Q. Those were salvaged, correct?
A. Yes.
Q. Is there anything else you can think of?

exact date, I would have to look at a calendar to figure that out, of course you have the e-mail that has it in there, I believe.

Q. Who made the decision to declare the shipment a total loss?

A. I don't know.

Q. Was it you?

A. It wasn't me. I mean, I would have preferred to hire another company, a more reputable company to try to salvage our stuff, but I don't think the government or Rick Williams wanted to try that again, but I don't know.

Q. Did you have discussions with Tina Vars about whether or not it would be declared a total loss?

A. Yes, we did.

Q. What did you talk with her about on that subject?

A. I don't know, we were at a point and, again, I don't remember exactly when this was, but after we started receiving back the items that were cleaned, which still had obvious mold growing on them, our position was we either needed to declare the entire shipment a loss, or we needed to get someone reputable to come in and clean this again.

Q. That was your personal position?

A. Right.

Q. So you were willing to have it declared a total loss?
A. Yes, if we couldn't have someone clean it again.
Q. Just so I'm clear, was it your desire at the time to have the shipment of goods declared a total loss?
A. At the time that it happened, I either wanted a new company hired that we approved of to come in and clean our items or to have the entire shipment declared a total loss.
Q. Was it your first choice to have another company come in and clean or try and clean the goods?
A. Yes.
Q. But someone advised you that wasn't possible?
A. I don't know that it wasn't possible, but I don't think any of the parties involved in making that decision wanted to do that.
Q. Including the Newport TMO?
A. Including Newport TMO.
(DEFENDANT'S EXHIBIT J MARKED FOR IDENTIFICATION)
Q. Showing you what's been marked as Exhibit J to your deposition. Have you seen this document before?
A. I have.

Q. And is that your signature at the bottom of the page, on the first page?
A. It is.
Q. What is this document?
A. This is my application to request MAST. It's a procedure within the military to speak directly with a commander.
Q. And what sort of commander?
A. In my case I wanted to go to the Secretary of the Navy, which was the Honorable Mr. England at the time, although he's not there anymore.
Q. When did you prepare this document?
A. When did I prepare it? Before the 2nd of September, I'm not sure exactly of the day.
Q. Looking at the second page of Exhibit J, who prepared this Paragraph 8.b?
A. I did.
Q. And was this an accurate recitation of the facts as you knew them at the time?
A. Yes.
Q. Now, looking at the first page, in the third full paragraph, about two thirds of the way down, see where it refers to IAQM?
A. Yes.
Q. It continues, "After assessing the damage, they

informed us that the house was uninhabitable." Do you see where I am?

A. Yes.

Q. I think you already testified that that's what they told you when they inspected?

A. Yes.

Q. And then it continues, it refers to your wife seeking medical treatment?

A. Yes.

Q. And then after that it continues it would require extensive remediation to correct, and that the majority of our household goods would probably have to be discarded; do you see that?

A. Yes.

Q. And that is what IAQM told you; is that correct?

A. Yes, to the best of my recollection.

Q. Looking down just at the beginning of the next paragraph, it says, "For the next two weeks we were either stonewalled or redirected by almost everyone we have spoken to, from both the civilian carrier and military side." Do you see that?

A. I see it.

Q. Now, who were you referring to in particular when you referred to the military side in that sentence there?

A. I can't remember specifically, but at the time I wrote this, Newport TMO. I could have been referring to -- I know I was definitely referring to the Installation & Logistics Division at Headquarters Marine Corps, and those were probably the two agencies.

Q. And at the time that this was prepared, September 2, 2004, what were your complaints about the Newport TMO?

A. Our complaints regarding the Newport TMO were that they weren't doing enough to correct this situation.

Q. What more did you think they should be doing?

A. I thought that we should have been taken out of this loop totally in dealing with the carriers, and that was what everyone was telling us initially is that we had to work this out with Andrews or with Day Transfer or whatever, and those companies were doing nothing for us. They wouldn't even talk to us for the most part. So I believe that the government should have inserted itself into the situation, did whatever they could for us, and then pursued the carriers to correct the situation.

Q. Now, you just mentioned Day Transfer, what were

your efforts to communicate with Day Transfer?
A. Initially none because we did not know who Day Transfer was, and that was because Rick Williams contacted us and told us that he was the man who was -- I forget the words but basically who everything rolls down hill to, and he was the person we needed to be talking to. I've never talked to anyone from Day Transfer at all. Well, I take that back, later on I did, but initially I did not talk to anyone from Day Transfer. It was all Rick Williams and Williams Moving Company.
Q. And what were your complaints about the ILS office I think you called it?
A. Installation & Logistics Division. They are the personnel who are supposed to be responsible for inconvenience claims. They deal with the carrier when something goes wrong and gets the carrier to do something about it. Well, in our situation, they didn't do anything for us, and they just redirected us to other people initially, and it took several weeks before I was able to talk to somebody and find out what they could do to get them to do something.
Q. Looking at the next page of Exhibit J, and the beginning of the first full paragraph on that

page, it starts out, "It was not until 27 August 04 that anything significant happened, when the Surface Deployment Distribution Command stepped in to put some pressure on the shipper to correct the situation by putting his contracts in suspension." Do you see that?

A. Yes.

Q. So were you aware as of September 2nd that the Surface Deployment Distribution Command had put the shipper's contracts in suspension?

A. That's what I understood, although I can't tell you who I heard it from.

Q. Do you remember being told that, though?

A. I can't remember specifically being told that, but that's what I understood.

Q. And you understood that it was because of that pressure that the carrier had stepped up and offered some money, correct?

A. Well, I know that nothing happened until I supposedly felt that there was some pressure applied so, yes, I made that assumption.

Q. Now, the next sentence of that paragraph says, "He has offered to pay 100 percent of the cost for mold remediation of our household goods and 50 percent of the cost for structural

decontamination of the house," correct?
A. Yes.
Q. To your knowledge, did Williams pay the cost of mold remediation for your household goods?
A. To my knowledge, yes.
Q. And to your knowledge did they pay 50 percent of the cost of the structural decontamination?
A. No.
Q. They didn't pay 50 percent?
A. To my understanding they paid 100 percent.
Q. Now, did you pursue this MAST application?
A. No, I did not carry it through. It was submitted, and I had a date set up, but sufficient action or what I thought was sufficient action had taken place before I was scheduled to speak to the Commanding General, so it was withdrawn.
Q. Who were you scheduled to meet with?
A. I can't remember the General's name. He was Commanding General of the Training & Education Command in Quantico, Virginia, but I don't remember his name.
Q. Did you have any conversations with any of your other superiors in the military about this application at the time you submitted it?
A. Yes. I informed my boss, Colonel Rushworth,

occurrence for a Marine Corps officer?
A. Oh, it definitely is an unusual occurrence for Marine Corps officers.
(DEFENDANT'S EXHIBIT K MARKED FOR IDENTIFICATION)
Q. Showing you what has been marked as Exhibit K to your deposition. Have you seen this document before?
A. I have.
Q. And what is this document?
A. This was a letter I received from Day Transfer Company.
Q. What's the subject of this letter?
A. The subject, I guess, was the payment of the services performed by ServiceMaster, as well as the proposed payment of my inconvenience expenses.
Q. And this letter confirms that there is an agreement reached between Tina Vars of the Transportation Office acting on your behalf, that Day Transfer would pay all cleaning charges for the household items transported by Day and stored at Andrews Express; is that right?
A. That's what the letter says.
Q. And that was the case, correct?
A. What's that?
Q. That was the case, as far as you knew there was

such an agreement?

A. As far as I knew, yes, there was an agreement between Tina Vars and Rick Williams. As far as acting on my behalf, I disagree with that.

Q. You were not called on to pay any of the remediation costs for the house at Wolcott; were you?

A. Yes, I was.

Q. What did you pay?

A. I didn't pay any, but I was called upon to pay.

Q. You did not pay any remediation costs for Wolcott Street?

A. I did not.

Q. Those were paid for you, correct?

A. Well, I did not owe anything in remediation costs, as I did not do any damage that required remediation. That was done by someone else. So, no, I was not required to pay any remediation.

(DEFENDANT'S EXHIBIT L MARKED FOR IDENTIFICATION)

Q. Showing you what's been marked as Exhibit L to your deposition. Have you seen this document before?

A. I have.

Q. And is that your signature on the bottom left-hand corner?

A. It is.
Q. And what is this document?
A. This was my acknowledgement of request MAST that I would not be -- it was basically a withdrawal and my acknowledgement that the withdrawal was by my decision.
Q. The first paragraph of this document says that you understand the disposition or probable disposition of my problem complaint; do you see that?
A. Yes.
Q. And at that point in time what did you understand the probable disposition of your problem or complaint?
A. That our entire shipment would be declared a loss, and we would be allowed to claim it.
Q. And this indicates that you voluntarily agreed with that outcome, correct?
A. Well, this indicates that I no longer need to request MAST because the situation has been resolved.
Q. In fact, in the next paragraph it says that you're satisfied with the action taken by the NAVSTA Newport TMO and HQMC (MRP-2) in determining your HHG shipment to be a total loss, correct?
A. Yes.

Q. And that was a true statement?
A. It is, and that I'm satisfied that there is nothing else that can be done, or at least that's what they told me.
Q. And you agreed that the household goods would be declared a total loss, correct?
A. Yes.
(DEFENDANT'S EXHIBIT M MARKED FOR IDENTIFICATION)
Q. Showing you what's been marked as Exhibit M to your deposition. Have you seen this document before?
A. I have.
Q. Can you tell me what it is, please?
A. This is a form, a DD Form 1842, that's required to be filed with a damage claim to the government.
Q. Who prepared this?
A. I did.
Q. Do you recall when you prepared this one?
A. Is there a date on it? No, I don't recall specifically.
Q. Did you prepare more than one of these claims?
A. I did. It's all the same claim, but I submitted it in different parts.
Q. How many different parts did you submit?
A. I believe it's three.

Q. What is this letter related to?
A. Without reading it again, what I remember it being was that this was the approval from the Navy Judge Advocate General's Office to exceed the $40,000 cap we spoke of earlier.
Q. In fact, if you look at the bottom of the first page, there's a number $52,665.07; do you see that?
A. Yes.
Q. Have you received that amount of money from the U.S. government in connection with losses relating to your move from Texas to Newport?
A. Yes.
Q. In addition to the $52,665.07, have you received any other compensation from the government?
A. From the government relating to?
Q. Relating to this loss?
A. Relating to this loss, no.
(DEFENDANT'S EXHIBIT Q MARKED FOR IDENTIFICATION)
Q. Showing you what's been marked as Exhibit Q to your deposition. Have you seen this document before?
A. I have.
Q. What is this document?
A. This was an update on my situation from Tina

leaving Rhode Island in April. I don't remember the number of times.
Q. Has she received any medical treatment in connection with alleged stress?
A. In connection with the stress, no, she has not received any medical treatment that I'm aware of.
Q. You said you suffered some physical injury, what was that?
A. I suffered severe trauma to my back, lower back, when I was gathering evidence that the articles that were cleaned by ServiceMaster had not, in fact, been cleaned sufficiently and still had mold.
Q. Where were you when this trauma occurred?
A. I was at the storage facility where our goods were stored when ServiceMaster returned them, which is Newport Mini Storage.
Q. What were you doing?
A. Well, the items that they had moved inside the storage facility, I would look at each one and see if there was any evidence of mold.
Q. You were moving boxes?
A. Moving boxes as well as power tools.
Q. Was anyone else with you at that time?
A. No, there was not.

Q. You mentioned earlier some do-it-yourself moves that you had performed prior to 2004. Before 2004 had you ever used the services of a trucking company or a moving company?

A. For a do-it-yourself move?

Q. For any type of transportation service at all?

A. I had used them through government moves, yes.

Q. Just so I'm clear about the number of moves prior to 2004. I think you mentioned there were four moves; is that correct?

A. As a family, yes.

Q. Were the other moves that you mentioned personal moves that involved only you and your belongings?

A. Yes, but those were all DITY moves before I was married.

Q. Before June of 2004 how many times had you utilized the services of a trucking or moving company to do any type of move?

A. It would have been our move to Okinawa, our move from there to Virginia. I moved from there to San Antonio. So that would have been three times. This was our fourth move going to Rhode Island.

Q. Is your testimony that the pre-Rhode Island moves involved an outside carrier and not your hiring a

U-Haul or a similar service?
A. No. In every move that we've done there has always been some sort of DITY move, even if it's just throwing a suitcase in the back of your car and getting it weighed. So every move I've done has involved a DITY move of some sort.
Q. Do you recall who any of carriers were that you used prior to June of 2004?
A. No, I don't.
Q. Did any of those pre-2004 moves involve meetings of the type you had with the TRO in San Antonio for this move?
A. I believe so, yes. I can't really remember.
Q. Do you recall receiving any type of shipping records relating to your pre-2004 move?
A. Shipping records to my pre-2004 move? I'm not sure I understand the question.
Q. Prior to 2004, had you received any DD Form 1299 of the type we've marked as Exhibit A?
A. I'm sure I probably received those on previous moves. I can't remember specifically.
Q. Can you recall whether you had received bills of lading on the pre-2004 moves?
A. I can't recall specifically.
Q. During any of your meetings you had had with TRO

Q. At that time did you have any expectation as to how long it would take on an average to attain your next promotion to Lieutenant Colonel?

A. Yes. There is a general guideline, but it changes from year to year, so I had a general expectation, yes.

Q. In the spring of 2004, do you recall having any specific length of time by which you expected to make Lieutenant Colonel?

A. I expected to be in zone for Lieutenant Colonel sometime in 2007, 2008.

Q. Was that based on a marine officer's average experience, or did it also involve any specific discussions with any of your superior officers?

A. Both. In general, you can expect to be considered for Lieutenant Colonel at 16 years. That's what it is, give or take how things change, and it's actually been getting shorter as the years have gone on because the Marine Corps is generally behind the other services, but that's the rule of thumb that you would get in professional development classes and you would also hear from your superiors if you talked to them.

Q. Since the spring of 2004 have you had any reason

2008. At that point I would be available to go to joint duty.

Q. Is there anything that's happened to you since the spring of 2004 that leads you to believe that you will not be promoted at all in the future?

A. Yes.

Q. And what is that?

A. Well, the fact that I have requested MAST through my chain of command as a marine officer, although it is not forbidden, it is acceptable to do it, it is not looked upon highly, unofficially. Two, I will not have any joint experience before I am in zone for Lieutenant Colonel by the fact that I am in Montgomery, and, three, the type of duty that I am doing in Montgomery is a type of duty that I have done before. It's inspector instructor duty, which I was doing in San Antonio prior to coming to Newport, Rhode Island, so it doesn't give me the amount of variety in assignments that is generally looked more highly upon.

Q. Would you agree that at this point it's unpredictable whether you will be promoted to Lieutenant Colonel and, if so, when?

A. It is unpredictable, but in comparison to my

peers, they have a much better chance than I do at this point just based on past history of promotion boards.

Q. Have any of your superiors told you that filing your MAST request has reduced your promotability?

A. No.

Q. Have any of your superiors since the spring of '04 made any statements to you that any other factor has reduced your promotability?

A. I'm sorry, was it any of my seniors?

Q. Any of your superiors since the spring of '04?

A. Since the spring of '04, yes, I have been told that it was not good for me to do another tour of inspector instructor duty.

Q. Who told you that?

A. That was -- I can't remember his name. It was one of my fellow students in the course. I can't remember his name.

Q. When you moved to Newport in the summer of '04, did you know at that time what your next assignment would be after you finished your stint at the War College?

A. I did not.

Q. Did you have any subsequent knowledge about any potential assignments other than the one you're on

nonuniformed female person you mentioned earlier, did she advise you of your option to pay any of the charges yourself related to this part of the move, the Exhibit A part?

THE WITNESS: My option to pay any of the charges from the move?

MR. WRIGHT: Right.

A. No, other than penalties that could be assessed upon me for having too much weight or for excessive storage or excessive length of storage, things like that.

Q. Did she tell you that if you wanted to ship more weight than is allowable per your rank, that you would pay for that yourself?

A. Yes.

Q. Did she tell you that if you wanted to declare any value on your shipment for shipment purposes that that would cost you extra, that you would pay any additional charges for that yourself?

A. I don't recall that, no.

Q. Prior to '04 had you declared any value on any of your other shipments involving moving companies or other carriers?

A. Declared any of my valuables, what do you mean by valuables?

Q. Declared a value on your shipment, in other words, have you ever declared a value on your shipment for loss or damage purposes?
A. Not that I recall, no.
Q. Do you recall ever making a conscious decision not to declare a value on any previous shipments?
A. I do not recall making a conscious decision not to declare a value.
Q. What about with respect to this shipment, did you make a conscious decision not to declare any value?
A. No, I did not. I made a decision based upon the explanation of the driver from Apollo on what the value of my shipment was.
MR. GRADY: Objection. The answer is not responsive to the question.
Q. Did anyone from the DOD advise you of the amount of compensation that you would be entitled to if there were any loss or damage to the part of the shipment covered by Exhibit A and Exhibit C?
A. I believe I was advised on the maximum amount that the government would pay out.
Q. And what amount was that?
A. Well, I've learned since that it was $40,000, but I can't remember if that was what I heard

perspective, it's our administrative officer.
Q. Can you recall whether you gave the TMO in San Antonio any information that you asked to be passed along to the moving company about your shipment?
A. No, not that I recall.
Q. And just so I'm clear, my question isn't just about the physical dimensions or weight or delivery deadline, but any information at all that you considered important in the spring of '04 up until June 4th. Do you recall any information at all of any kind that you requested the TMO to convey to the mover about your shipment or about the conditions in Rhode Island that you would be in by August?
A. I don't believe so, other than the information that is contained on the enclosure 1, I believe it is. I can't think of anything else.
Q. Enclosure 1, which document is that?
A. I'm sorry, enclosure -- is it A? Or Exhibit A, I'm sorry.
Q. The application for shipping?
A. Yes, Box Number 13, Remarks.
Q. So everything that you expected the TMO to pass along to the moving companies prior to the

June 4th pick-up is reflected in Exhibit A; is that a fair statement?

A. I think so. I really didn't expect them to pass anything other than the time and location and when the pack-up and pick-up needs to occur.

Q. Between the June 4th pick-up and the August 16th delivery, was there any other information that you sought to convey to the moving company or any of its employees or agents about your shipment?

A. No. That's incorrect, I mean, other than I don't know if we had the address at this time as far as where the delivery would go, and if it wasn't, I'm sure I conveyed that to the Newport TMO office to pass onto the carrier where the delivery would occur.

Q. Have you signed any agreement with the government to pay back any part of the $40,000 that it's paid to you so far on your shipment?

A. I've not signed any agreement with them, but it is understood if any of the monies that the government paid me, if that is reimbursed through some other source, then I am to reimburse the government accordingly.

Q. Have you seen that understanding put in writing anywhere?

week in school. I can't remember the exact day, but it would have been the week of the 22nd, sometime during that week.

Q. Of August?

A. Correct.

Q. Was that decision made by you or someone else for you?

A. Well, I really had no other options, so I guess you would say it was made by me.

Q. Why did you have no other options?

A. Well, there's no way that I could have continued to keep up with the academic requirements of the course, so really it's another Hobson's choice, I could either drop from the course or I could fail it.

Q. And at the time you made the decision in late August to drop, what was going on at that time that made you decide that you couldn't handle the academic demands?

A. The fact that -- trying to correct this situation, talking with everyone or trying to talk with everyone in both the government and the civilian carrier side had taken up all my time, in addition to dealing with the stress that it had placed on my family, I had been able to do none of

the reading that was required, which the reading load on average is 500 to 700 pages per week, and I had done none of that, and we were already into the second week of the course with a pending paper due, so it was just not going to happen.

Q. Is the course you began in August of this year and completed in November, the very same one that you expected to begin in August of '04 and complete in June of '05?

A. In requirements it is. I believe the curriculum has changed somewhat.

Q. I'm wondering why it was that in the second session you finished it in about four months when it was expected to take 10 months when it began in August of '04?

A. I'm not sure I understand that question. Could you repeat it again.

Q. And maybe I've got my dates wrong, but I understand from what you've said so far that when you began the course in August of '04, you expected to graduate in June of this year or about 10 months later. When you resumed that course after dropping it in June of this year -- I'm sorry, you said August, August of '05?

A. When I resumed the course in August of '05,

yes.

Q. And you just graduated in November, which is about four months later?

MR. PALUMBO: You started the whole discussion by asking him about his whole curriculum, not about the course, this course we're talking about.

Q. Well, let's call them course one and course two. Course one being August '04 to June of '05 that was contemplated. Course two being August '05 to November of '05. I think you testified that the course was basically the same between session one and two?

A. It was.

Q. With some changes?

A. I think where the confusion is coming in here is there is a summer break. So it's not as easy as picking up a course after the fall trimester and finishing 10 months later because you have a summer break in there for the entire school. My plan changed or my graduation date changed. Originally I was to start school in August of '04 and graduate in June of '05. Once that was pushed back, I started school in November of '04 and I graduated in November of '05.

MR. PALUMBO: Objection.
MR. GRADY: Objection.
Q. It's actually identified as a shipping order. Do you know of any other written agreement to which Day is a party relating to your shipment?
MR. PALUMBO: Objection.
MR. GRADY: Objection.
MR. WRIGHT: On what ground?
MR. PALUMBO: You're implying that is a contract between Day and the plaintiffs and/or Day and the government, which I don't think there is anything in this record that indicates he's testified that he's acknowledged that to be the case.
Q. All right, are you aware of any contract between Day and the government relating to your shipment?
A. Just the agreement that they would remediate the damages to our home and goods.
Q. Do you consider the GBL or the government bill of lading to be a contract between Day and the DOD?
MR. PALUMBO: Objection.
A. I don't know.
Q. Do you know whether the DOD had a contract with any carrier to transport your shipment?
A. I don't know.

Q. I'm not sure whether I asked you this question, to your knowledge did Williams have any contract or agreement at all with the DOD relating to your shipment?
A. I am not aware of any, any written contract relating to the shipment of my goods.
Q. Between Williams and the government?
A. Correct.
Q. Are you aware of any verbal or oral agreement between Williams and the government?
THE WITNESS: Relating to the shipment of our goods?
MR. WRIGHT: Yes.
A. No. Relating to the remediation of our home and goods, yes.
Q. Do you consider that to be a separate agreement from the transportation agreement?
A. Yes.
Q. And why is that?
A. Because it had nothing to do with the shipment. It is about cleaning up our home which was damaged and made uninhabitable.
Q. By the shipment?
A. What's that?
Q. Would you agree that --

emotional distress?

A. Being homeless is what our emotional stress stems from more than anything and not knowing when the situation was going to be resolved. It has nothing to do with losing our goods. We lose stuff all the time. It's about being homeless.

Q. Was there ever a time after August 16, 2004, that you had no shelter at all?

THE WITNESS: Was there ever a time after August 16th?

MR. WRIGHT: Yes, '04.

A. Well, initially on August 16th we had no shelter, and it was only through connections with my associates in the Marine Corps that we were able to procure shelter because there was none available.

Q. Did you spend any night at 505 Wolcott?

A. No.

Q. Can you tell me how many hours altogether you spent in that home as a resident of the house?

A. I think we were there maybe an hour the night previous to the move, and that was it.

Q. And how long was it between -- how long was it after August 16, 2004, that you obtained base housing in Newport?

A. I believe I moved into base housing on the first of September, but I can't be sure. I would have to check my dates.
Q. During that two-week period, were you staying in one or two motels?
A. During that two-week period I believe we stayed in three different motels.
Q. Is it during that two-week period in which you stayed in three motels that you contend that you personally sustained emotional distress as a result of being homeless, or was it for a longer period?
A. Well, I sustained emotional distress during those two weeks, and it continued. It continues to today resulting from the fact that we were in a situation where there was no resolution in sight. We did not know what was going to happen next, and we were out of money and out of resources.
Q. And what is the source of your emotional distress that continues up until present?
A. Well, the memories from that experience.
Q. Anything else besides the memories?
A. The conflict that went on between my wife and I that resulted from this and the effect that it had on our children.

the shipment?
A. I don't recall knowing that.
Q. And yet I believe you testified that you had conversations with your insurance company and made changes prior to the move, right?
A. Yes, I did have conversations with my insurance company and made changes to our policy.
Q. And wasn't that to make sure that you had adequate insurance coverage during the move?
A. It was, but it was also to make sure that we had adequate rental insurance for our rental that we were moving into in Rhode Island.
Q. Do you recall at the time that you had this counseling in Schertz, Texas, at the TMO or at any prior time when you had counseling, that the government would provide you with the option to buy more insurance at your own expense?
A. I remember that they did offer an option for additional insurance.
Q. And that would provide coverage that would be greater than $1.25 per pound times the net weight of the shipment?
A. That's not the way I understood it.
Q. What was your understanding?
A. I understood that instead of depreciated value

for your goods, you could buy insurance and get full replacement value.
Q. Was there any kind of a limit to that kind of coverage?
A. Well, I understand the $40,000 cap now, but I can't recall if I knew that then or if I learned that later.
Q. But is it fair to say that you were in communication with your own insurance company about this coverage problem because you didn't want to pay the amount for increased coverage from the government that you learned about at the time of this counseling?
A. No. We had -- I'm fairly certain I had received this renter's policy coverage before I went to counseling -- well, I can't say. I can't remember. But the main purpose of talking to my insurer was to change the policy on our home that we owned in San Antonio, as it was becoming a rental property versus our home that we lived in, and also concerning the renter's insurance we would need for the home that we would rent in Rhode Island.
Q. Is there any reason that you did not obtain the increased liability coverage from the government?

A. Well, from what I remember, I already had renter's insurance that would be in effect during the move.
Q. You thought the renter's insurance would cover it, and that's why you didn't get the increased coverage from the government?
A. Well, the renter's insurance would cover the loss, a covered loss, from what my representative at USAA told me.
Q. And so you had that conversation, and you had that knowledge prior to the time that the move was commenced in early June?
A. I believe so.
Q. I believe you indicated that you had the renter's policy with USAA, and I think you indicated that your personal property coverage was $75,000?
A. I believe so.
Q. Was the limit increased to $75,000 just prior to the move?
A. No, it was not. It was -- I did not have a renter's policy at all, and we initiated a renter's policy.
Q. Oh, you purchased it?
A. Right.
Q. It wasn't a renewal or a change in some of the

particulars of the policy?
A. I can't remember specifically, but when I'm talking to USAA about our house, we go into our car insurance because we're changing addresses and everything else, and the renter's policy was one of the things that came up, which they did.
Q. And they brought it up?
A. Yes, they did.
Q. And so one of the things that you inquired about was coverage with respect to your goods in the process of the move?
A. Yes.
Q. And, of course, you never thought that there would be damage from mold, so you never talked about that, right?
A. Well, no, we didn't talk about mold specifically.
Q. But if the damage had occurred in some other way other than through mold, there would have been coverage from USAA for your goods?
A. Well, I had coverage from USAA for mold anyway. Mold was not the issue. The issue was the circumstances of the loss as to why my renter's policy did not cover this loss.
Q. Did you understand specifically what that issue

was?

A. The issue was the cause of loss was gradual seepage, is what my insurance company determined. Whereas if it was a flood, I would have been covered, but because it was due to the neglect of the facility where they were stored, and it was caused by a leak through the roof, they termed that as gradual seepage, which made it a noncoverable loss.

Q. Okay. So is it fair to say that at the time that you arranged for this shipment and began the shipment in June of 2004, you believed that your renter's insurance covered damage to your goods in the process of the move?

A. Yes.

Q. Now, directing your attention to Exhibit D, as in dog, in the lower left-hand corner, in the shaded area beside the X that you indicated Tracy Keller put on the form, appears the handwritten entry per GBL; do you see that?

A. I do see that.

Q. Did you write that or did Tracy Keller write that?

A. I wrote that.

Q. That's your handwriting?

A. Yes.

CERTIFICATE

I, Jane M. Poore, a Notary Public/RPR, in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of Jason York, a Plaintiff in the above-entitled cause, was taken before me on behalf of the Defendant, at the offices of Partridge, Snow & Hahn, LLP, 180 South Main Street, Providence, Rhode Island, on December 15, 2005, at 10:00 A.M., that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned and sworn to testify to the truth, the whole truth, and nothing but the truth, and that he thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5(d) and 30(f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Defendant's attorney, Robert K. Taylor.

I have enclosed with the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF, I hereunto set my hand this 3rd day of January, 2006.

Jane M. Poore Notary Public

JANE M. POORE, NOTARY PUBLIC, RPR
My commission expires 9/11/09

DATE: December 15, 2005
IN RE: York vs. Day
WITNESS NAME: Jason York