MARINE CORPS REQUEST MAST APPLICATION
NAVMC 11296 (Rev. 6-97)
SN. 0000-00-888 0350 U/I EA

PRIVACY ACT STATEMENT

Authority: Title 5, U S Code 301; Title 10, USC Section 5013

Principal Purpose: Formal filing of complaints/problems to command personnel.

Routine Uses: To provide a record to facilitate personnel management actions and decisions; to serve as a date source for complaint/problem information and resolution efforts.

Disclosure: Disclosure is voluntary. Failure to complete the requested items could result in delayed command action and/or an inaccurate/incomplete analysis of the complaint/problem.

PART I: TO BE COMPLETED BY THE APPLICANT

| | | |
|---|---|---|
| 1. NAME: YORK, JASON D. | 2. RANK: MAJ | 3. SSN: [redacted] |
| 4. UNIT: COLLEGE OF NAVAL CMD & STF, NAVAL WAR COLLEGE | 5. RACE/ETHNIC GROUP: WHITE | |
| 6. GENDER: MALE | 7. DATE: 2 SEP 04 | |

8a. I desire to Request Mast with: (Provide the name and billet of the Commanding Officer with whom you desire to communicate.):

THE HONORABLE GORDON ENGLAND, SECRETARY OF THE NAVY

b. NATURE OF COMPLAINT/PROBLEM: (Give in as much detail as possible the basis of your complaint; describe the incident(s)/behavior(s) and date(s) of the occurrence(s); the names of the individuals involved, witnesses and to whom it may have been previously reported. Include any other information relevant to your compliant/problem. Attach additional sheets, as needed).

SEE ENCLOSURE (1) FOR NATURE OF COMPLAINT/PROBLEM (4 pgs)

OTHER ENCLOSURES:

(2) DETAILED CHRONOLOGICAL SUMMARY OF CONTACTS/KEY EVENTS (15 pgs)
(3) EXPENSES TO DATE FROM LOSS OF HOME (4 PGS)
(4) MEDICAL CONDITION OF WILLIAM F. YORK (1 PG), DEPENDENT SON
(5) EMERGENCY ROOM REPORT FOR MAUREEN YORK, SPOUSE (4 PGS)
(6) NEWPORT TMO INSPECTOR'S REPORT (2 PGS)
(7) SERVICE MASTER MOLD REMEDIATION ESTIMATE (14 PGS)
(8) IAQM MOLD REMEDIATION ESTIMATE (3 PGS)

c. REQUESTED REMEDY/OUTCOME: (Clearly state what assistance or complaint resolution you are seeking from the commanding officer named in 8a above.)

SEE ENCLOSURE (1) FOR REQUSTED REMEDY (4 pgs.)

9. AFFIDAVIT

I, JASON D. YORK, have read this statement which begins in Block 8b on this page (page 1) and ~~ends on page~~ (83 ATTACHED ENCLOSURES). I fully understand the statement made by me and certify the statement is true. I have initialed corrections. I make this formal statement without threat of punishment and without coercion, unlawful influence, or unlawful inducement.

[signature] 2 SEP 04

(SIGNATURE OF APPLICANT/DATE)

# COMPLAINT AND REQUESTED REMEDY

**Paragraph 8.b (Complaint)**

On 7 June 2004, I detached from my previous command to execute Permanent Change of Station (PCS) orders to attend the College of Naval Command and Staff at the Naval War College in Newport, RI, with 45 days of leave enroute. During the week prior, my house-hold goods (HHG) were packed and picked up for shipment to my new duty station. On 16 August 2004, my HHG shipment was delivered to the residence I am currently leasing at 505 Wolcott Avenue in Middletown, RI, as scheduled, by Andrews Express & Storage Warehouse—a franchise of Mayflower Van Lines. Andrews had been contracted to store our shipment by the Government Bill of Lading (GBL) carrier—Day Transfer Company—for two months until we were able to occupy our home and accept delivery.

After the movers had moved most of our HHG into our home and began to unwrap them, my wife discovered that most of our furniture and boxes were showing visible signs of water damage and mold growth. The air quality within the home had also worsened significantly, so much so that you could not stay in the house more than a few minutes without feeling ill. Upon questioning the movers, they stated that they had known of the damage when they had loaded our HHG on the truck the previous Saturday, and that the source of the problem was the dilapidated warehouse with a leaking roof owned by Andrews. At this point we began to start the claims process, contacting Andrews and the Newport Transportation Management Office (TMO) to get representatives out to inspect and provide assistance. Both redirected us to other agencies, and only after repeated calls and assistance from the personal property claims section in HQMC (MRP-2) were we able to get an inspector from Newport TMO to come out.

Our main concern at this point was the health of our children, especially our youngest son who has a history of respiratory problems which required extended hospitalization (Encl 4). We had fortunately arranged for day-care service for our children on our move-in day, but knew we could not bring them into the house until this situation was rectified. The base inspector filed a report (Encl 6), but admitted that he had little experience in mold situations such as this, so we set out to find a professional. We called several mold remediation companies until we were finally able to find one to come to the house that day and make an assessment--Indoor Air Quality Management (IAQM) of New England. After assessing the damage, they informed us that the house was uninhabitable (My wife had to seek medical treatment after extended exposure to the house on 16 & 17 August—Encl 5); would require extensive remediation to correct; and that the majority of our HHG would probably have to be discarded. We also learned that mold remediation service would cost in the tens of thousands of dollars—much more than we could afford to pay for out of pocket and hope to get reimbursement for later (Estimates are in Encl 7 & 8). . We continued to talk with or try to contact the various agencies involved at this point, but met with no solutions and were forced to seek temporary lodging and live off the local economy until this was resolved.

For the next two weeks, we were either stonewalled or redirected by almost everyone we have spoken to, from both the civilian carrier and military side. Enclosure (2) details our contacts and conversations with the various agencies involved. The crux of the issue seems to be that our shipment went into a planned Storage-in-Transit (SIT)

prior to our arrival in Newport. Because of this, according to the current shipping regulations and contracts, I'm told the GBL carrier is not responsible for the damages to our shipment, and they have laid the responsibility on the storage company. The storage company will not talk to us and has been referring to the GBL shipper to make decisions. Everyone on the government side is saying the GBL carrier is responsible despite what the contracts say, but apparently has no power to force him to correct the situation. Although we did receive a $10,000 emergency advance through MRP-2, I was told by them that the money was to be used solely for the replacement of our HHG that were destroyed by this incident. Until our house is decontaminated and a survey of salvageable items done, it does us no good as we don't know what we will need to purchase and have nowhere to put it anyway.

It was not until 27 Aug 04 that anything significant happened, when the Surface Deployment Distribution Command (SDDC, formerly MTMC) stepped in to put some pressure on the shipper to correct the situation by putting his contracts in suspension, and the carrier has now offered some concessions. He has offered to pay the 100% of the cost for mold remediation of our HHGs, and 50% of the cost for structural decontamination of the house (due to a report by one of the mold remediation companies stating that there was mold present in the basement of our home that was probably pre-existing). Who pays the other 50% (which will run between $2500-$3000) is still in question, but the first option suggested by TMO was that I pay it out of my emergency advance and attempt to claim it later (Which MRP-2 has told me previously is not an option). The other option was to get my landlord to pay for it, which I'm certain will not be received very well. Regardless, mold remediation services will begin today, 2 Sep 04, and are not expected to be completed until 14 September. I am forced to accept this situation for my own financial and legal well-being (civilian legal counsel has advised me that I could be held liable to my landlord for any damage to the residence, regardless of who is at fault, and I need to get it decontaminated as soon as possible.), but there are still many unanswered questions.

The carrier also offered to pay me $2500 towards my expenses (which as of today are above $4600 and climbing-Encl (3)), but other than "going up a couple of hundred dollars" from that figure, that seems to be the maximum he is willing to pay. He has fallen back on his contract that states his maximum liability to the government is $14.5K for our shipment, and he is not going to go beyond that figure (in his words, "the taxpayer can eat the rest"). Further, the carrier has agreed to pay the complete cost for my lodging, buy on 50% of the cost for my meals (his argument being that I would have had to buy food anyway, regardless of this situation—ignoring the fact that I can prepare food in my home for far less than 50% of the bill at any average restaurant in Newport, RI for a family of four.). My "advocates" in this matter (Newport TMO/HQMC TMO) seem to think this is acceptable and have agreed to it, along with his refusal to pay any of my child care costs—without which it would have been impossible for my wife and I to deal with this matter while trying to control three year old & 22 month old boys in a hotel room all day. It seems to me our advocates want to get this over with as quickly as possible rather than ensure that my family is fully compensated for this disaster, and spend more time arguing the carrier's position with us rather than vice versa.

Beyond this, no one is addressing the fact that the carrier or his agents' negligence and failure to act quickly in this matter has led to my tour at the War College being

## COMPLAINT AND REQUESTED REMEDY

extended so that I could attend to this disaster. While this has alleviated some of the stress on my family, it has raised another problem in that I will be forced to remain in Newport through next summer until November 05. My current lease expires in June 05, and my landlord will not extend the lease or terminate it, nor can I enact my military clause as I am not leaving the Newport County area. This forces me into a situation in which my family will be homeless during the peak tourist season in Newport, when a short-term lease for suitable housing is far beyond our financial means to afford, not to mention adding the stress of another move on my family. Due to this and the fact that I can't afford to continue living in a hotel until mold remediation is completed, I will have to move on base and give up my BAH while I continue to be bound by the terms of my lease until my landlord can hopefully find a new renter.

If the situation stands as it is, my family will have lost at least $8000 from this disaster, and that's the best case scenario where my landlord finds another tenant. Worst case is well above $17,000--when you add in the full value of my lease—not to mention the fact stated previously that I could also be sued by my landlord if the mold remediation is not done properly. These figures are not even taking into account what I stand to lose on my damage claim for my HHGs when I am finally able to file it, as I know that "fair & reasonable value" will not come close to equaling the money we have invested in our HHGs which were destroyed. All in all, this will consume any savings my family had coming into this, and leave us indebted for thousands of dollars when we leave, through no fault of our own. For the sake of my family, I need to get resolution on this situation as soon as possible.

**Paragraph 8.c (Requested Remedy)**

In order to remedy this situation, I request the following occur:

1. That my family be assigned an advocate to deal with the carrier in this matter who is more concerned with our interest rather than the extra workload they have to take on.

2. That appropriate funds be provided to me immediately to do the following:

a. Pay the balance of the structural cleaning of our residence at 505 Wolcott Avenue that is not being covered by the carrier (estimate is between $2500-$3000).

b. Pay the remaining balance of the my lease at 505 Wolcott Avenue until another tenant can be found by the landlord, allowing my family to find other suitable housing for the duration of my orders at the NWC. (Full value of lease is $11,000, or $1100/month).

c. Reimburse my family's out-of-pocket expenses for meals, lodging, and incidentals resulting from this situation. (Total expenses as of 1 September 04 are $4625.57)

**COMPLAINT AND REQUESTED REMEDY**

2. That the government seeks restitution for the above damages and expenditures directly from the carrier responsible for them through whatever means available, and removes me and my family from the process.

3. That a review be conducted of the applicable orders and directives governing the claims process and carrier responsibilities in this situation, and revisions made so that no service member's family has to endure a debacle such as this.

DETAILED SUMMARY OF CONTACTS/KEY EVENTS IN MAJ YORK DAMAGE/INCONVENIENCE CLAIM

## CONTACT LIST

NAVSTA Newport TMO

| | | |
|---|---|---|
| Basil Distefano | Inspector/Quality Control | (401) 841-6199 |
| Tina Vars | Head, NAVSTA TMO | (401) 841-2309 |
| tina.vars@navy.mil | | |

M&RA, HQMC

| | | |
|---|---|---|
| Ms. Elder | Asst Head Persnl Prop Claims (MRP-2) | (703) 784-9533 |

I&L, HQMC (LPC-4)

| | | |
|---|---|---|
| Willie County | | (703) 695-7762 |
| Gary Good | | (703) 695-7765 |

SDDC (MTMC)

| | | |
|---|---|---|
| Dennis Williams | Quality Assurance | (703) 428-2954 |
| Charles Fishburn | Carrier Review Board | (703) 428-3176 |

GBL Carrier (Day Transfer Co/Williams Moving Co)

| | | |
|---|---|---|
| Rick Williams | President/Claims | (573) 624-3505 |
| | | FAX (573) 624-2782 |

Packing Company (Lonestar Relocation Services)

| | | |
|---|---|---|
| Mr. Stauty | Manager | (210) 653-7000 |

Storage Facility (Andrews Express & Storage)

| | | |
|---|---|---|
| William O'Louglin | Manager/Sales Rep | (401) 847-3600 |
| Harry Andrews | Owner | (941) 928-3109 |

Vanliners Insurance Company

| | | |
|---|---|---|
| Judy Marchetto | Claims Adjustor | (636) 343-9889 Ext 465 |

Mold Remediation Companies

| | | |
|---|---|---|
| Shawn Pannone | Indoor Air Quality Management (IAQM) | (401) 231-4276 |
| Mike Pomeranz | Clean Air of America | (401) 274-4444 |
| Chris Vamvaketis | Servicemaster Clean | (401) 828-4138 |

Legal

| | | |
|---|---|---|
| NWC SJA | Cmdr Jane Bell | 841-2279 |
| NWDC SJA | Cmdr Ken Brown | 841-3346 |
| Base legal claims | Karen | 841-3766 ext 210 |
| Groton Claims | Donna Blackman | 860-694-3209 |

NWC Marine Reps

| | |
|---|---|
| Col Rushworth | (401) 841-4862 |
| Patti Desmond | (401) 841-4779` |

Landlord, 505 Wolcott Ave

| | |
|---|---|
| Chet & Debby Kunz | (781) 662 6045(h) |
| | (781) 223-0081(c) |

DETAILED SUMMARY OF CONTACTS/KEY EVENTS IN MAJ YORK DAMAGE/INCONVENIENCE CLAIM

## SUMMARY

All times approximate

13 August 2004

**-PM** Contacted by shipper via telephone (mistakenly, he was trying to get in touch with his driver and confused our delivery with one that was going on the 13th) and confirmed delivery for 16 August 04. No mention made of any problems with HHGs.

16 August 2004

**-0815** Mayflower Van Lines arrives a 505 Wolcott Ave with shipment and commences to move HHGs into residence. Maureen York takes up station in front yard to track item numbers as the five movers call them off and move items into the house. At some point after the majority of the shipment has been moved indoors she notices a film on a piece of furniture that was not wrapped in blankets, assuming it was dust. She later goes indoors after all boxes have been moved inside and furniture unwrapped and immediately notices a musty smell and begins to feel ill. After looking closely at the items for the first time, she discovers that there is apparent water damage to many items and mold and mildew is present on the majority of the items. She questions the movers about the condition of the HHGs and they proceed to tell her that they were aware of the condition of the items (damaged, wet, and moldy) when they picked them up; and that the warehouse where the items were stored (Andrews Express & Storage Warehouse) was in poor condition with a leaking roof. She asks the driver for the phone number to Andrews to begin the claims process for the damages and is directed by Andrews Express to the Naval Station Newport Property Office to get an inspector.

**-1215** Mrs. York contacts Basil Distefano (FST/Quality Control) at the NAVSTA Newport property office to request an inspector, and was advised by him to hire a cleaning/repair service and retain receipts for future reimbursement. A short time later, Mrs. York begins to develop physical reactions to the mold now in the house, and realizes that this is a bigger problem than simple damage. She calls Mr. Distefano again to let him know that this is a potential health issue that could affect the inhabitability of the house. Mr. Distefano tells her that since she is a Marine spouse, she needs to contact a Ms. Elder (Asst Head Personal Property Claims Section (MRP-2) at MCB Quantico to get assistance in dealing with the issue. Mrs. York immediately contacted Ms. Elder and explained the situation, and was told by her to get Mr. Distefano out to the house immediately to inspect and write a report on the incident. Mrs. York contacted Mr. Distafano a third time and he agreed to come out and inspect. During the conversation, Mrs. York inquired about the need to get a mold specialist to inspect the property due to the physical reactions she was experiencing in the house, and Mr. Distefano advised her to do so. After consulting the yellow pages, she called several mold inspection/remediation companies, only one of which-- Indoor Air Quality Management of New England (IAQM)--was able to come out on that day. Mr. Shawn Pannone agreed to come inspect the property later that afternoon. During the interim before the inspectors

arrived, Mrs. York contacted Andrews Express & Storage several times to get in touch with the warehouse manager, Mr. William O'Loughlin, to inform him of what was going on and their need to get representatives out to the house as it was likely to be uninhabitable in its present condition due to the damaged shipment. No calls were returned.

**-1430** Mr. Distefano arrives to inspect the shipment, takes notes, and advises us that he will send his report to Ms. Elder, and that we should deal with her from this point on. He then departs before the mold remediation specialists arrive.

**-1530** Mr. Pannone from IAQM arrives to inspect the property. After surveying the damage, he confirmed that mold was present and advised us that that the house was now contaminated from the shipment and uninhabitable—particularly in light of the history of respiratory problems our youngest son has experienced . He also advised us that based on his assessment most of our items would have to be discarded, as the damage was either too severe or the restoration costs would exceed the value of the items. He agreed to put together a proposal of what would have to be done to restore the home and salvage some of our HHGs, and submit it to us the following day. He also estimated the mold remediation was not inexpensive and would run in the thousands of dollars range. It should be noted that Mr. Pannone also found additional damage and mold infestation that was not noted by the NAVSTA inspector by conducting a more detailed inspection of the interior and underside of items.

**-1630** After Mr. Pannone departed, Mrs. York contacted Ms. Elder to explain the severity of the situation. Mrs. Elder advised her to submit for an Emergency Advance Claim the next day due to the apparent severity of the damage and large amounts of money that would be involved. Mrs. York also asked about lodging/expenses reimbursement due to the loss of the home and Ms. Elder stated that her office was only concerned with personal property damage and that we should contact a Mr. Gary Good within HQMC, I&L to deal with inconvenience claims.

**-PM** Unable to contact Mr., O'Loughlin of Andrews, Mrs. York contacted Mayflower Van Lines customer service (as it was a Mayflower truck that brought our shipment) and talked to a Mr. Bob Johnson to explain the situation and he agreed to cover hotel cost for the night until the situation was rectified. At this point, we began to search for lodging since nothing else could be done on that day and we were unable to reach anyone via telephone. No vacancies were available aboard NAVSTA Newport so we made arrangements for lodging that night at the Best Western Mainstay Inn, as well as arrangements for continued child care for our children the next day.

<u>17 August 2004</u>

**-0830** Spoke with Mr. Gary Good regarding the situation. He informs us that Mr. William County will research and get back to us.

**-0900** Informed Col Charles Rushworth--Marine Corps Representative at Naval War College of situation. Recognizing the apparent severity of the situation and the fact that classes had already started at NWC, he stated the possibility of dropping me to the November class so that I could devote my full attention to this matter. I stated that I was hoping for a fairly quick resolution and thought I would be able to catch up and graduate on time.

**-0930** Spoke with Mrs. Elder regarding claim and got her in touch with Shawn Pannone of IAQM to get an idea of the cost of clean-up. The plan, as we understood it at the time, was to try to get us money so that we can hire IAQM (who requires an upfront fee) to begin mold remediation. We also received the emergency advance claim forms for HHG damage via fax, and began to gather information for it. Made repeated calls to Andrews Express but no response.

**-1030** Went to house from hotel and find that William O'Loughlin of Andrews Express has left his business card. Attempted to call and leave messages but get no response.

**-1100** Received call from Mr. Distefano of Newport TMO giving us the phone number for a Mr. Dave Stauty at Day Transfer Company and stating that he is the person we should talk to regarding our inconvenience claim.

**-1110** Called Mr. Stauty at the phone number provided. He states that he represents Lone Star Relocation Services in San Antonio, TX and was responsible for packing our shipment. He does not know who Day Transfer Company is, but gives us the phone number of the POC and company who contracted him—Rick Williams of Williams Moving Company.

**-1200** William County calls to say that Ms. Elder is person to talk to regarding our claim. Also states that the GBL shipper is going to send inspector to our home and make an estimate and we will move on from there. This is a different plan from what we understood after speaking with Ms. Elder, so we asked him to contact Ms. Elder and let us know what is going on.

**-1300** Spoke with Ms. Elder regarding claim forms. One required form was missing from original fax transmission, so she said she would send it to us.

**-1400** Mr. Rick Williams of Williams Moving Co calls us to say that he is the GBL Shipper and is the person who will handle our claim. He states the damage to our shipment resulted from a leak in the warehouse roof at Andrews Storage. We asked him to contact Ms. Elder, as she is the one handling the case for us.

**-1530** Mr. Bob Johnson of Mayflower Van lines calls to say that they will not cover any costs for us as this is not their responsibility.

DETAILED SUMMARY OF CONTACTS/KEY EVENTS IN MAJ YORK DAMAGE/INCONVENIENCE CLAIM

**-1600** Met with Shawn Pannone from IAQM and reviewed proposal for mold remediation. Estimated cost was 14-15K. He stated he had spoken to Ms. Elder and they were working a solution for payment.

18 August 2004

**-0830** Faxed emergency advance claim to Ms. Elder and called to confirm receipt. Ms. Elder stated she had received it but would not be able to process it until tomorrow due to her voucher clerk being absent. She also stated that she was going to attempt to add-in extra money to our claim in order to pay the up-front fee to IAQM to start mold remediation and that Mr. County would be the POC for our inconvenience expenses.

**-0900** Called Mr. County at I&L, HQMC, regarding reimbursement of our inconvenience claim. He stated that we would have to take it up with the GBL shipper and work it out with them.

-0930 Called Mr. Rick Williams regarding mold clean-up of our home and inconvenience claim. He stated he had been trying to get in touch with Mr. O'Loughlin of Andrews to see what they wanted to do about the situation—specifically if they wanted to get a mold remediation company of their own out to our house to provide an estimate--but they apparently had their "head in the sand" hoping this situation would go away. He also stated that he would not reimburse us for our inconvenience expenses as his insurance company will not cover it and the damage is the fault of Andrews Express.

**-1030** Called Ms. Elder regarding starting mold remediation of our home. She stated that she had to give the shipper/Andrews a chance to bring in their own people to inspect the situation, and was setting a deadline by noon today for them to respond. If she got no response, we could go ahead and hire IAQM to expedite the process.

**-1100** Called Andrews Express and spoke with a secretary. No one is able to get in touch with Mr. O'Loughlin. Asked for and got the phone number for the owner of Andrews Express—Mr. Harry Andrews.

**-1110** Called Mr. Andrews--regarding housing situation and stating need to acquire funds for inconvenience expenses immediately. Although somewhat informed of our case, he was unsure what was being done and who was responsible for our claim. I made it clear to him that we were getting the run-around and that we needed to get this resolved quickly as it was having a derogatory effect on my family, financial stability, and progress in school. He stated that he would contact his people and get back to us. Haven't heard from him since.

**-1230** Contacted Ms. Elder regarding the mold remediation of our home. She stated she was still waiting to hear from the shipper.

DETAILED SUMMARY OF CONTACTS/KEY EVENTS IN MAJ YORK DAMAGE/INCONVENIENCE CLAIM

**-1300** Received call from a secretary at Andrews Express stating they need us to be at our home at 1400 today to meet with representatives from Smokeclean to inspect our home and conduct estimates.

**-1350** Mr. O'Loughlin shows up in advance of Smokeclean at our home. After introductions he receives a cell phone call and slinks away, avoiding our questions.

**-1400** Smokeclean (actually Clean Air) inspectors arrive and inspect home. They take no air samples or mold samples, only house measurements and note contents. They state that they will not estimate now or take a guess as to how long remediation will take or how much it will cost, and say they will prepare an estimate tomorrow and submit it to Andrews's insurance company (Vanliners) and provide us a copy as well. They agreed that the house is uninhabitable and will submit to the insurance company that they will need to provide lodging for us. Mr. O'Loughlin sneaks away at some point while the inspection is going on, but does speak to Mrs. York before he departs and states that the damage did take place in their warehouse due to a leak in the roof at a junction where repairs were recently done. He remains evasive about reimbursement of our expenses and states that their insurance company should handle it.

**-1530** Received a call from Rick Williams saying that there was a large discrepancy between IAQM's cost estimate and another estimate (I assumed it was Clean Air, since no one else has been out) for mold remediation of our home and contents, so he wanted to send out a third mold remediation company to make an estimate. Said a representative from Masterclean would be contacting us today to set up an appointment for some time this week. I stressed that we needed to get this done quickly, as the condition of the house was only getting worse and these delays were causing me to fall behind in my studies. He asserted that he had the right to get another estimate since he would be paying for this.

**-1600** Received a call from the Masterclean representative stating he would like to come inspect on Friday, August 20, to inspect. I stressed that we needed to do this as soon as possible, and he agreed to come out on the afternoon of the 19 August.

**-1700** Contacted the Clean Air representatives who had inspected our home to inquire about their estimate. They stated they had not prepared or submitted yet, and were unclear what I was talking about when I told them that Mr. Williams had told me that he had already received it. The promised to send me a copy once completed.

**-1730** Mrs. York went to the Newport Hospital Emergency Room due to breathing difficulties. The attending physician diagnosed with pneumonitis probably resulting from breathing the mold inside the house, and prescribed an albuterol inhaler and advised a follow-up appointment if problems persist.

**-1800** Moved from Best Western Mainstay Inn to Best Western Atlantic Beach Hotel due to cheaper rate and better living accommodations for children. (separate room for them to

sleep in). Also enrolled our children in Island Child Care as it appears there is no promise of a quick resolution to our situation.

19 August 04

**-0900** Attempted to contact Mr. O'Loughlin regarding inconvenience expenses. No response. Left messages.

**-1000** Contacted by Tina Vars, Head of TMO at NAVSTA Newport. She states she has been tracking our case because it is at the "3 star level" now and will keep us advised on what is going on. She will contact Andrews and put pressure on them to try to get us some reimbursement.

**-1330** Met with representative from Masterclean to inspect our home. He does essentially the same thing as the Clean Air representatives—takes down room dimensions and notes contents, and states he will give us a copy of his proposal once completed. He also agrees that the house is uninhabitable in its current condition.

**-1430** Received phone call from secretary at Andrews Express. She passes on a message from Mr. O'Loughlin with a phone number to Andrews' insurance company (Vanliners) and states we are to call them to get reimbursement. She also states Mr. O'Loughlin is unavailable to provide any more information. I called the number provided several times but only got an answering machine.

**-1600** Contacted Clean Air representatives to get a copy of their proposal and estimate for mold clean-up of our home. They now state that they cannot give it to us unless Andrews or their insurance company approve its release. We inquired if they could ask for a release on our behalf, since we are having no luck in getting in touch with either Andrews or their insurer to ask them ourselves. They state that they might mention it but it is not their responsibility.

20 August 04

**-AM** Called the number for the insurance company given to me by Mr. O'Loughlin and informed that it is the wrong number. The Gentleman who answered told me that he has dealt with Andrews before and not surprised at the run-around we are getting. He then gave me the correct number to call to file a claim. After being directed and redirected to various people within the insurance company, I was finally directed to Ms. Judy Marchetto of Vanliners Insurance. She told me I could not file a claim because the company listed on my GBL as the carrier was Day Transfer Company—who was not a client of theirs. She then went further to say that even if she was the insurer for Day Transfer, they would not cover the expenses I was asking for (food/lodging/etc.)

**-AM** Attempted to call Ms. Vars at Newport TMO to seek assistance and was told that she was out for the day. Her Assistant instructed me to contact Mr. County @ I&L, HQMC.

DETAILED SUMMARY OF CONTACTS/KEY EVENTS IN MAJ YORK DAMAGE/INCONVENIENCE CLAIM

**-AM** Called Mr. County to explain the problems we are having seeking reimbursement from anyone. He stated that he would look into it and talk to SDDC representatives to see what he could do.

**-AM** Called Mr. Rick Williams of Williams Moving Company again to explain situation on getting reimbursement from Andrews. After much haranguing by myself about the personal expense we are enduring—He offered to divert funds to us (approximately $2500) that he owes to Andrews Express for the storage of our HHGs. After consulting both military and civilian legal counsel, I was advised that if I accepted the money, it would be best to get a signed statement from Mr. Williams indicating that this was not a final settlement and by no means excused him from any further liability. Mr. Williams stated he would be amenable to signing such a document after having it reviewed by his own legal counsel to ensure it was not too "restrictive," with the caveat that he would need it within the next couple of hours (NLT 1700 CST) due to his "leaving the country for business the next week." When asked who would be handling matters in his absence, he responded no one. Although we were able to draft and fax the statement to him by 1630 CST, he had unfortunately already departed and is not scheduled to return until 27 August.

**-PM** Spoke with Cmdr Ken Brown, SJA for NWDC aboard NAVSTA Newport (the only lawyer available on base to see us.) regarding legal recourse for this. He directed me to a Naval civilian claims lawyer in Groton, CT , Ms. Donna Blackman, who should be able to address our claims and direct us on how to seek restitution through the government. Unfortunately, she was on leave until 24 Aug, so we would have to wait until then.

**-PM** Servicemaster faxed me their proposal and the cost quoted was $10,413.76

<u>21-22 August 04</u>—weekend-no action taken. Contacted Sprint PCS to change calling plan to cover excess minutes over current plan due increased use and reliance on cell phone. Monthly service increased from $39.99 to $99.99.

<u>23 August 04</u>

**-1000** After attending morning classes at the Naval War College, the decision was made to drop me from the current class, as there appeared to be no resolution in sight, I was already well-behind in my coursework, and this matter would require my full attention. I was directed to start again during the winter trimester that begins in November, and my graduation date would shift from June to November 2005.

**-PM** Received news from Col Rushworth that he had gotten e-mail traffic from either Mr. Good or Mr. County that they were working with SDDC (Dennis Williams) to attempt to get reimbursement for us.

**-PM** Contacted my landlord to inform them of the situation with my delayed departure. They were unwilling to either extend my lease which expires in June 05 or terminate it. I

am also unable to enact the military clause within my lease because I am not leaving the Newport Co area.

24 August 04

**-0900** Contacted Ms. Blackman in Groton about our situation and she asked us to send all of our information to her and she would forward it to D.C. to ask for advice. We sent her the information and waited for her response either "today or early tomorrow."

**-AM** Contacted NWC student housing office to inquire about the availability of base housing for July-November 05. Was informed that although they could probably find on-base housing for us now, they could make no guarantees that it would be available for the time period requested. Housing regulations require that personnel will occupy base housing for at least six months if assigned (we're about 6 weeks short of that), and a new private business venture will take control of all government housing this November which could affect our chances.

**-AM/PM** Attempted to contact Mr. County or Mr. Good at I&L to get an update on our situation. Was told that Mr. County was TAD and Mr. Good was unavailable. Left messages for them to please update me. Called back at 1500 and was told that they had left for the day.

25 August 04

**-AM** Attempted to contact Mr. Good and was told that he was at SDDC all day working our case. Asked for his supervisor--Mr. Thein—and was told he was unavailable.

**-AM** Received call from Ms. Vars stating that she had spoken to Mr. Andrews and had threatened to cancel his government contracts unless he provides us some reimbursement of our expenses by 1200 on 27 Aug 04. She also informed us that Mr. Andrews was saying that he could not do anything until Mr. Williams returned to the country. We informed her that it was not a simple matter of reimbursement for inconvenience expenses now, and due to everyone's failure to act quickly we were now stuck in a lease that would leave us homeless in June 05 and unable to afford the extremely expensive short term leases in Newport during the summer. We also stressed again the need to employ the most qualified mold remediation company due to our youngest son's medical history, and not the lowest bidder. She advised us that she would be speaking with Mr. Andrews again and would ensure that he was aware of the circumstances.

**-AM** Contacted Ms. Blackman in Groton and was told that she had not received a response yet and would inform us once she had.

**-PM** Received a call from GySgt Fields in Mr. Good's office stating that SDDC was going to put pressure on the shipper in order to force him to compensate us.

DETAILED SUMMARY OF CONTACTS/KEY EVENTS IN MAJ YORK DAMAGE/INCONVENIENCE CLAIM

<u>26 August 04</u>

**-0800**. Spoke with Ms. Blackman who informed us that our case was a Marine Corps problem and referred us to a Mr. Brown in Quantico. After contacting Mr. Brown, he made us aware that he was Ms. Elder's supervisor, that they had already addressed the problem of an emergency advance for us, and that we need to talk to Mr. County/Mr. Good at I&L about our inconvenience claims.

**-0900** Contacted Mr. Good at I&L confirming the message from the previous night. Inquired as to why the government could not reimburse/advance us funds now and seek the damages from the shipper later. He said he would look into it and get back to me.

**-1000** Spoke with Ms. Vars to get an update. She was still talking with Mr. Andrews, but he was still waiting on Mr. Williams' return. She had also spoken with Mr. Good and gave us the same information he had given us in regard to SDDC. She also gave us the contact for Mr. Charles Fishburn at SDDC.

**-1300** Spoke with Mr. Fishburn regarding our case. He asked for this summary and expenses/damage to date regarding our case.

**-1530** Received e-mail from Mr. Fishburn stating that the carrier of record was going to call me to finalize this matter. She never called.

<u>27 August 04</u>

**-0900** Called Mr. Fishburn to ensure he had received our summary and inform him that the carrier had not called us. He stated he would get in touch with her and make sure she called.

**-0945** Mr. Good from I&L called to follow up on my questions from the previous day. He stated that they were asking the "money-folks" if there was any way that the government could reimburse us upfront and seek damages from the carrier later. I asked him who the "money-folks" were, and he stated he could not remember the name or office but would get back to me. He also stated that Ms. Elder had set a deadline of noon today for whomever she deals with to remedy our situation or she would suspend the agent.

**-0950** Called Newport TMO to get an update. Ms. Lori Clark is filling in for Ms. Vars this morning, and she states she will contact Mr. Andrews at noon to see what the situation is.

**-1130** Mr. Rick Williams calls, identifying himself this time as a representative of Day Transfer Company vice Williams Moving Company. He begins by saying that he is calling on behalf of a Ms. Bonnie Miller—the owner of the company—and is acting as both her claims representative and legal counsel. He states that the $2500 dollars that he had offered us previously was still on the table (this time, on behalf of Andrews Express

& Storage), however, the statement that I had faxed him last Friday to sign (As advised by my lawyer, to ensure that the $2500 was not a final settlement and my acceptance of such did not release him from further liability) was unacceptable, as it identified Williams Moving Company as the party responsible which was not the case and implied that they would be responsible for further damages. I stated that they would be responsible for further damage, as my out-of-pocket expenses had already exceeded the amount in question, and the mold remediation of our home had not even begun. He responded that the government was responsible for the clean-up of our home (despite what he had led me to believe in previous conversations—that he and Andrews would be paying for it). He went further to say that this was no different from any other move claim, and that I should just pay for any repairs I needed and claim the expenses with the government. I responded that he knew that this was not a normal claim due to the amounts of money involved, and was more than we could afford to claim upfront and hope we were reimbursed later. Mr. Williams responded that it was not his problem, and the maximum amount that he was liable for by contract was $14,500.00—anything above that "the taxpayer will have to eat." At this point, it was obvious I was not going to get anywhere, so I told him to relay to his client that it would take the following to make this situation right:

-Immediate contracting of a reputable mold remediation company to disinfect our home and salvage our HHGs, as his company was responsible for the damage of our goods and home through his agents.

-Either payoff or assumption of my current lease, as his failure to act quickly to resolve this situation had resulted in setting the conditions that forced me to drop from my NWC class and extend my tour in Newport beyond the terms of my lease; which would leave me without housing from July-November 05 when I will be unable to afford acceptable housing in the Newport area with a short term lease.

-Complete reimbursement of all my inconvenience expenses resulting from meals, lodging, and incidental expenses until I am able to move back into my home, as they are a result of his or his agents' actions in making our home uninhabitable.

I then concluded our conversation and told Mr. Williams that I would contact Mr. Fishburn at SDDC to inform him that nothing had been resolved.

**-1200** Contacted Mr. Fishburn to appraise him of the situation. He stated he would get in touch will Mr. Williams and get back to us.

**-1210** Contacted Ms. Clark at Newport TMO and told her to have Ms. Vars contact us as soon as possible, as Ms. Clark was too uninformed with our situation to be any help.

**-1215** Contacted Mr. Good to appraise him of the situation. He stated he would get with Mr. Fishburn and get back to us.

DETAILED SUMMARY OF CONTACTS/KEY EVENTS IN MAJ YORK DAMAGE/INCONVENIENCE CLAIM

**-1410** Contacted Ms. Vars at Newport TMO. She had just gotten in so I informed her of our conversation with Mr. Williams. She stated should would find out what was going on and get back to us.

**-1600** Contacted Mr. Good's office and spoke with GySgt Fields. He stated that Mr. Good had departed for SDDC's office and would not be returning today. He said that there had been a conference call between Mr. Good, Mr. Fishburn, Ms. Vars, and the GBL carrier; and it appeared that they had reached an initial settlement to have the carrier hire one of the mold remediation companies to begin cleaning our home and pay $2500 towards our out-of-pocket expenses.

**-1630** Contacted by Ms. Vars regarding the conference call above. She stated that Mr. Williams had agreed to hire Servicemaster to begin mold remediation of our HHGs, but would only pay 50% for disinfection of the house as the proposal from Servicemaster stated that there was mold in the basement that was probably pre-existing. He would also provide $2500 towards our expenses. We responded that this was unacceptable, as no one is sure who will pay the remaining 50% of the structural remediation (approximately $3000+), as $2500 would not cover our expenses to date (approximately $3500+), and there was no mention of assumption of our lease. Ms. Vars stated they would continue to talk with the carrier to work this out. I expressed that while we were willing to accept Servicemaster as the mold remediation company in order to get the decontamination process started, this was not a situation that should just be handed out to the lowest bidder when the health of our children is at issue. Ms. Vars stated that Servicemaster was a national company and was not the lowest bidder of the three or four estimates provided. A company called AngelClean had actually provided the lowest estimate according to Mr. Williams. I found this very strange as I had never heard of this company and they certainly had not been to our home to do an estimate. (I later looked them up in the yellow pages and called them. AngelClean is a local maid housecleaning service and they stated specifically that they are not qualified to do mold remediation. This is obviously the other estimate Mr. Williams was referring to when I spoke to him on 18 August @ 1530). I also expressed that I did not understand why the government is seemingly negotiating with Mr. Williams when all of our claims are a result of his or his agents' negligence. Ms. Vars stated that contractually he was not required to do anything for us, so there had to be some give and take. She told us to get back with her on Monday and we would go from there.

<u>28-29 August 04</u> Weekend-no action taken. Attempted to find a furnished home for rent through November 2005. Unfortunately, all suitable housing within our BAH range is occupied by current November students and will not be available until they graduate this November, or is only available until June 05.

<u>30 August 04</u>

**-0800** Contacted Ms. Vars to get update. Stated she will continue talking to Andrews and Day Transfer to work details and find out who will pay the remaining 50% of structural remediation for our house.

**-0850** Contacted by Andrews Express secretary asking when we would like a van to come out and pick up our damaged goods. I told her I have no idea what she is talking about and do not know when mold remediation will start, so cannot tell her. She says she will find out more information and get back to me.

**-0900** Tried to contact Mr. Fishburn. Left message.

**-0910** Tried to contact Mr. Good. Left message.

**-1000** Contacted Ms. Vars regarding call from Andrews. She had no new information and would get back with us.

**-1400** Met with our civilian legal counsel. He expressed concern over our potential liability for damages to the home and possibility of being sued by our landlord, regardless of responsibility, if mold remediation/structural decontamination of the home is not conducted.

**-1600** Received message from Ms. Vars asking to meet with us this evening. Returned her call saying we are unable to as we have to go pick up our children.

<u>31 August 04</u>

**-0730** Spoke with Col Rushworth. Stated that he had received e-mail from Mr. Good stating that the carrier was going to pay for and commence mold remediation and begin reimbursement for my inconvenience claims with $2500, with more money to follow as expenses occur. Told him that was not the situation as I understood from my last conversation with Ms. Vars, but would talk to her to see if the situation had changed.

**-0800** Called Ms. Vars and scheduled a meeting to discuss situation and mold remediation of our home.

**-0830** Spoke with NWC student housing office to request assignment to base housing, as we will be unable to afford to stay in a hotel much longer. Was advised that we should be able to accept housing this Friday.

**-1030** Met with Ms. Vars and Naval Station XO, Cmdr Wayne Bergeron, regarding the situation. Ms. Vars stated that Servicemaster could begin mold remediation services this Thursday. She stated that the remaining 50% (approximately $2500-3000) of the structural decontamination that the shipper would not pay would have to be paid by me. Ms. Vars stated that she had spoken with a woman named Jennifer at MRP-2 who stated that I could use the money from my $10K advance to pay for this, despite what Ms. Elder and Mr. Brown in the same office had told me (that the advance was for replacement of HHG) . I would then include it in my total claim once all damage had been discovered and recorded. I asked if that would count against the government cap on liability ($40K), and she stated that it would, but she had seen very few claims that had reached that cap.

DETAILED SUMMARY OF CONTACTS/KEY EVENTS IN MAJ YORK DAMAGE/INCONVENIENCE CLAIM

Ms. Vars contacted Mr. Williams during our meeting to let him know that mold remediation services that we had agreed to commence mold remediation services on Thursday. Mr. Williams responded that he would contact Servicemaster to get them started, but there was a problem with laundering of clothing and linens. Servicemaster had not included that in their estimate, so we could either pay Servicemaster to do it or take them to someone else and file the cost with our total claim at the end. Ms. Vars responded that Mr. Williams had already agreed to pay for the cleaning of all of our boxed contents, and laundry services was part of that. Mr. Williams responded that he would look into it, but he was approaching the cap of his maximum liability to the government (approximately $14.5K), and that was as high as he was going to go. Ms. Vars said she would discuss that with him later.

As far as reimbursement of our out-of-pocket expenses are concerned, the carrier was willing to pay us the per diem rate for Newport, but wanted to keep the cost at $2500, and maybe "a couple hundred dollars more." Since we have already exceeded

with the carrier and attempt to get him to agree to pay per diem until we were able to acquire permanent housing. As far as how payment would be transmitted to us, she was unsure at this point.

<u>1 September 04</u>

**-0900** Sent e-mail to Col Rushworth to update on current situation.

**-1000** Attempted to contact MRP-2 in regard to question on using advance claim funds to pay for 50% of structural cleaning bill. Ms. Elder is away at training and Mr. Brown is out for the day.

**-1030** Contacted Ms. Vars update. No questions answered but SDDC will be speaking to the carrier today.

**-1200** Contacted Mr. Fishburn at SDDC. Relayed concerns regarding structural cleaning payment, laundry issue, inconvenience expenses (maxed at $2500 or reimbursed at per diem rate/child care expenses), and lease issues. He stated he will be conferencing with the carrier today, and is relying on Mr. Good to advise him on what the reasonable reimbursements are.

**-1300** Attempted to contact Mr. Good (he was out of the office and not returning today) or Mr. Thein (unavailable). Spoke with GySgt Fields and relayed concerns to him to pass on to whoever was going to speak with Mr. Fishburn today.

**-1330** Contacted Col Rushworth to ensure receipt of e-mail and advise of no progress.

**-1545** Sent e-mail to Col Rushworth/Col Bearor advising of desire to request mast with SECNAV if no suitable answers today.

DETAILED SUMMARY OF CONTACTS/KEY EVENTS IN MAJ YORK DAMAGE/INCONVENIENCE CLAIM

**-1600** Received call from Ms. Vars relaying information from conference with carrier. Major points as follows:

-Carrier still agreeing to pay 100% of cost of HHG cleaning and 50% of structural cleaning, however he wants Servicemaster to provide an updated estimate tomorrow as they begin services. The other 50% to be paid by me and processed with final claim.

-Carrier will pay 100% of my lodging costs and 50% of meals and approved incidentals (child care not included). If this exceeds $2500, he will pay overage from carriers insurance.

-No discussion of lease issue (assumption/reimbursement resulting from carrier's inaction making lease untenable and loss of BAH).