# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

***************************
JASON YORK AND MAUREEN YORK*
*
Vs. * No. C.A. NO. 04-551S
*
DAY TRANSFER COMPANY, *
APOLLO VAN LINES, INC., *
AND ANDREWS EXPRESS & *
STORAGE WAREHOUSE, INC. *
Vs. *
WILLIAMS MOVING COMPANY *
***************************

DEPOSITION OF WILLIAM O'LOUGHLIN, a Witness in the above-entitled cause, taken On behalf of the Plaintiff, pursuant to Notice, before Linda J. Faria, a Notary Public in and for the State of Rhode Island, at the office of Joseph R. Palumbo, Jr., 294 Valley Road, Middletown, Rhode Island, On Thursday, February 23, 2006 at 3:30 p.m.

APPEARANCES:

FOR THE PLAINTIFF:
BY: Joseph R. Palumbo, Jr., Esq.

FOR THE DEFENDANT:
GIDLEY, SARLI & MARUSAK, LLP
BY: James P. Marusak, Esq.

FOR THE DEFENDANT:
PARTRIDGE, SNOW & HAHN, LLP
BY: Robert K. Taylor, Esq.

FOR THE DEFENDANT:
HINCKLEY, ALLEN, SYNDER, LLP
BY: Mitchell R. Edwards, Esq.

FILE COPY

condition of the items, don't they?

A Well, no, not necessarily because, see, the goods are all wrapped up. We don't unwrap them not until we get to the residence.

Q But, let's assume, let's say, for example, if there were any boxes that appeared to be water stained, they have an opportunity to observe that?

A Oh, yes.

Q And are all items, large items of furniture, let's say, are they supposed to be wrapped either with blankets or some other covering?

A Yes.

Q And when they're carried from the warehouse out to the truck, loaded onto the truck for ultimately to be shipped, delivered to the house, those blankets or whatever, the wrappings are kept on the goods?

A Yes, unless if it's a complicated piece and it starts slipping with them, then they'll take it off. But most of the time, they'll just leave it on there.

Q Now, you understand that at some point there was a claim made that these goods were -- that the York's goods were water damaged, right?

Q Besides Chris, was anybody else involved in making the repairs to the roof?

A It could have been Chris with anybody that worked in the warehouse that day.

Q Did Chris tell you what he saw when he looked at the roof before the repairs were made?

A A bunch of punctured hole marks.

Q Excuse me?

A A bunch of punctured hole marks.

Q And before the goods -- the shipment left the warehouse on June 16, 2004. Were you aware that you had a leaky roof?

A No.

Q Were you aware before the shipment left the warehouse that day that the York's goods were water damaged?

A No.

Q And so that if a former employee of Andrews Express were to testify that you did know that the York's goods were water stained before they left the warehouse on June 16, 2004, you'd dispute that; is that right?

MR. TAYLOR: Objection. I object to the form of the question.

MR. PALUMBO: You can still answer.

MR. TAYLOR: Go ahead and answer, Bill. I'm just objecting for the record.

A Um, yeah, because I basically know I wasn't there to load it. I spent a lot of my time up in the office. That's why some of these guys I don't know their last names because I don't associate myself. I'm too busy making sure -- we book jobs to get moves and bringing work into the place. I don't get to know guys on last name basis. A lot of times guys walk in there and Chris is the one who interviews them.

All I know, I have nothing to do with loading this, and I wasn't around the time of delivery. I wasn't around. Yeah, I'd dispute it.

Q Let me ask you this. In between the time that the goods were received at the warehouse on June 16, 2004, and the time they left the warehouse on August 16, 2004, did you ever step foot in the warehouse itself?

A Most likely.

Q On approximately how many occasions?

A Could have been anywhere's from 2 to 50 times.

Q And, if you recall, if you know, did you walk in the vicinity where the York's goods were stored in Section F during that period of time?

A Most likely.

Q And, approximately, how many times would you say that you walk in the vicinity of Section F?

A About as many times because I have to walk right by it.

Q And your purpose for going in the warehouse during that period of time would have been what?

A I could have been a warehouseman that day, or I could have been just checking on the crews.

Q Were there any other lots stored in Section F during the period of time that the York's goods were stored there?

A No.

Q How close if you know was the next lot, as I understand the phrase, of goods stored to the York's goods during that period of time?

A Could have been right next to theirs.

Q And that would be a different section?

A Yes.

Q When you say right next to it, how close? How far away?