# EXHIBIT 3

MIDWEST LITIGATION SERVICES

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JASON YORK AND MAUREEN YORK
VS.
DAY TRANSFER COMPANY, ET AL.

C.A. No. 04-551S

# DEPOSITION OF RICK WILLIAMS
DECEMBER 19, 2005

OFFICES MISSOURI ■ ILLINOIS ■ KANSAS

HEADQUARTERS: 711 NORTH ELEVENTH STREET, ST. LOUIS, MISSOURI 63101

800.280.3376

Page 53

**the Yorks' residence in the Newport area?**
A How did we participate?
**Q No, what was your responsibility to see that it got there? The stuff got there?**
A Well, we're responsible to make sure that Andrews Express would deliver the goods to the residence.
**Q Yeah. Now, let me ask you this. Do you know who actually made the delivery, what company made the delivery of the goods out of storage to the Yorks' residence?**
A We were invoiced by Andrews Express & Storage Warehouse, Incorporated.
**Q Okay. And you're looking at a particular document. May I see what you're looking at?**
A Yes. The invoice from the storage warehouse.
**Q Do you know if Andrews Express & Storage Warehouse has some relationship with Mayflower Van Lines?**
A At the time the shipment was delivered, I believe they were an agent for Mayflower Van Lines.
**Q And did you enter into an agreement**

Page 54

**-- some agreement with Andrews with respect to the delivery of the Yorks' household goods from the warehouse to the residence in the Newport area?**
A No, I didn't.
**Q Well, how -- how -- how was -- how was the basis upon which they would charge, how was that established?**
A It's spelled out in the rate solicitation from the government.
**Q You mean to tell me it's spelled out in the rate solicitation how much they could charge to go from 10 First Street in Newport, Rhode Island, to Wolcott Avenue in Middletown, Rhode Island?**
A Yes, sir.
**Q Tell me how that's spelled out.**
A There's a section in the rate solicitation titled Storage and Transit Charges. It's based on geographical areas and weight of the shipment. They find the geographical area for Newport, Rhode Island, and it'll tell them the applicable rate per 100 pounds for delivery out.
They apply that to the net weight

Page 55

of the shipment, and that's how much they could charge, along with their storage charges which is based on a daily -- how long it stayed there.
**Q Okay. But would it be a fair statement that you were responsible to see to it that the household goods of the Yorks were delivered in a safe and timely manner to their home in the Newport, Rhode Island, area?**
A Yes.
**Q So I assume there came a time when you learned of the designated delivery date to that home.**
A The day after delivery.
**Q The day after it was delivered?**
A Was when I became aware of the delivery date, yes.
**Q Okay. And if you recall, was the delivery date August 16th, 2004?**
A Correct.
**Q Okay. So you became aware on the 17th?**
A Yes.
**Q And if you know, what, if any, ramifications would have accrued to Andrews if they had not delivered the shipment to the**

Page 56

**residence in a timely manner?**
A They would have been reprimanded by their local transportation office.
**Q If they hadn't gotten it to the residence on August 16?**
A That's correct.
**Q And could they possibly -- could there have been a worse penalty, worse than reprimand? Do you know?**
A The -- yes, Newport, Rhode Island, could have put them in a non-use status.
**Q So on August 17th, tell us what happened. As far as your, you know, your becoming aware of a problem.**
A On the morning of August 17th, I received a call from Tina Vars, transportation office in Newport, Rhode Island, informing me that Andrews Express had delivered the York shipment the day before and that it had water damage to the shipment due to a warehouse leak at Andrews Express.
**Q Okay. And is that -- was that the gist of the conversation?**
A Yes.
**Q More or less?**

Page 73

A And I probably sent a -- I'm not positive, but I probably sent a copy of this report to Tina Vars.

**Q Okay. And what, if anything, did the -- did Tina Vars tell you on that date?**

A She said she would contact the Yorks and inform them that we were going to have ServiceMaster come in and clean.

**Q Okay. What else happened on that date of any note?**

A I don't remember anything else.

**Q How about on August 22? What happened of any note?**

A Over the next few days we engaged in a debate on who was going to actually do the cleanup.

**Q Okay. What was the -- what was the crux of the debate?**

A They weren't satisfied with ServiceMaster. They wanted their company to do it.

**Q Did they tell you why?**

A Other than she just didn't like the way he looked. I mean, she just -- that was about it. She couldn't give me any real good

Page 74

reason. She said, this is the company that we want to do the cleanup.

**Q Okay. And what, if any, problem, by the way, did you have with having that Indoor Air Quality Management do the cleanup?**

A Primarily price.

**Q Yeah.**

A This was the cheaper bid.

**Q Yeah. ServiceMaster was lower than IAQM. Right?**

A Right. And I was familiar -- ServiceMaster is a national, well-known corporation with -- and I had worked with their other affiliates throughout the country on cleanup projects and repair projects, and I had never heard of Indoor Quality Air Management.

**Q Did you ever work with the ServiceMaster outfit that's located in Coventry, Rhode Island?**

A No.

**Q Before this?**

A No.

**Q Okay. So I'm just trying to understand what -- I'm not going to -- rather than belabor each individual day, from August**

Page 75

**20th up until August 31 when you actually get ServiceMaster on board, what were you doing, if anything, to address the problem with the Yorks' shipment?**

MR. WRIGHT: Other than what he's testified to?

MR. PALUMBO: Yeah.

MR. WRIGHT: Okay. Can you recall anything else?

A Just conversations with the transportation office and perhaps even calls from Military Traffic Management Command wanting to know what was going on. And I explained it to them, they said okay.

**Q So you're telling -- your testimony is that this debate went on for the better part of two weeks? Of who to hire?**

A Approximately seven to nine days, yes.

**Q Well, you -- you said that -- okay. Seven to nine days. And that just, what, was a Mexican standoff over those seven to nine days?**

MR. TAYLOR: Object to the form of the question.

**Q (BY MR. PALUMBO) Huh? You**

Page 76

**understand what I mean? Or you want me to say it a different way?**

A Rephrase it, please.

**Q Okay. So this debate went on for seven to nine days?**

A Yes.

**Q Isn't it a fact that you went out of the country during this period of time?**

A Yes, I -- yeah, I did take a vacation.

**Q I'm sorry, did you finish?**

A I took a vacation, yes.

**Q Where did you go?**

A Puerto Vallarta, Mexico.

**Q Okay. When did you go?**

A I don't know.

**Q You'd have records to show?**

A I would, yes.

**Q How long were you out of the country?**

A I think it was a five day.

**Q So that was five of the seven to nine days that we're talking about. Right?**

A Yes.

**Q And did you have someone working on**

Page 77

**this in your place while you were away?**
A No.
**Q In fact, you told Mrs. York, she asked you, you told her you were going on vacation. Right?**
A Yes. I told her I needed a decision to be made because I was getting ready to leave the country for four to five days and we needed to get this wrapped up before I left.
**Q You told her you were going on vacation.**
A Yes, I did.
**Q And she asked you whether there would be somebody else to work on this while you were away. Is that correct?**
A Yes.
**Q And you told her no, there wasn't. Isn't that right?**
A That's right.
**Q That if you weren't working on it, nobody else could. Or words to that effect.**
A Right. I'm the only one that handles that.
**Q How many people, by the way, how many employees does Day Transfer -- does Williams**

Page 78

**Moving Company have?**
A Employees?
**Q Yeah. Total.**
A Total, um, approximately 20.
**Q And how many people work in, I'll call it the claims area, so to speak, in your company?**
A At that time?
**Q In, yeah, in August of 2004.**
A There was one. Me.
**Q Just you. Nobody else. No secretarial help, nothing.**
A No. No one else.
**Q Okay. And who was the individual at your insurance company that you spoke with that gave you -- suggested that you contact ServiceMaster? Do you remember?**
A Judy Marciano.
**Q And what office does she work out of?**
A She's in Vanliners claims.
**Q Where, though?**
A I don't know. She's an adjustor.
**Q Is it here? Is she here, do you know?**

Page 79

A Yeah. She was at that time.
**Q Okay. All right.**
A She's since been moved to another department. I don't talk to her now.
**Q Okay. What were the terms of your agreement with ServiceMaster when you finally did hire them on or about August 31, 2004?**
MR. TAYLOR: Object to the form of the question.
**Q (BY MR. PALUMBO) Strike that. Let me ask it a different way.**
**Did you make an agreement with ServiceMaster on or about August 31, 2004?**
A Yes.
**Q What was that agreement?**
A There's a copy of the contract here somewhere.
**Q What was the -- essentially what was it?**
A That they would clean up the residence and the goods that were cleanable, and that there was several items that would not be cleanable and they need to be disposed of, if I remember right, particularly he said overstuffed furniture, and the terms of the payment were half

Page 80

at the start of the job and half at completion.
**Q Okay. So was there a fixed price, so to speak, for the work?**
A Yes, and it was approximate -- it was a total of approximately 10,000, and approximately five for the cleaning of the furniture and five for the cleaning of the residence.
**Q Okay. So it wasn't based on how much time they put in, it was just sort of a flat fee, so to speak, for the work?**
A Yes. Well, it was an estimate. I don't remember if he said that was a flat fee. He said this was the estimate.
**Q And you said there was a written contract covering this?**
A Yes.
**Q You have a copy of that in your file somewhere?**
A Not in this file, no.
**Q But somewhere in your records.**
A Yeah, somewhere, I think it was August the 31st, if I recall.
**Q Because I haven't seen that. And who was the -- do you remember the name of the**