# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JASON YORK and
MAUREEN YORK,
Plaintiffs,

VS. C.A. NO. 04-551S

DAY TRANSFER MOVING &
STORAGE CO.,
APOLLO VAN LINES, INC.,
ANDREWS EXPRESS &
STORAGE WAREHOUSE, INC.,
and WILLIAMS MOVING
COMPANY,
Defendants.

DEPOSITION OF JASON YORK, a Plaintiff in the above-entitled cause, taken on behalf of the Defendant, Andrews Express & Storage Warehouse, Inc., before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Partridge, Snow & Hahn, LLP, 180 South Main Street, Providence, Rhode Island, on December 15, 2005, at 10:00 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

ramps that they pull out from underneath the truck, set those up, open the doors, get out all of their equipment that they use to move. I'm not sure if they laid down protective covering for the floors inside the house so that they won't mar anything. Basically just setting up so they could move our items into the home.

Q. All right, and then at what time that day did you return to the house on Wolcott Street?

A. As I said previously, I can't remember exactly, but I believe I returned around noontime.

Q. And what did you find at that point?

A. Well, when I got there, my wife was on the front yard, and she explained to me that there was some problems with the shipment.

Q. What did she say?

A. I don't remember her exact words, but basically that some of our items were water damaged and there was mold present on some of our things, in addition to I believe some of the boxes were crushed and in pretty poor condition.

Q. And did you look at any of the boxes or goods at that point in time?

A. I did.

Q. What did you observe?

A. I observed several boxes which were crushed, coming open, looking like they had been water damaged, and that they had gotten wet and dried and sort of started coming apart in places. I observed some film on the outside of our furniture, those that had been unwrapped. A lot of them were still wrapped up in blankets inside the house.
Q. When you say some of the boxes looked crushed, can you give me a number?
A. I can't.
Q. Can you give me a percentage? Was it half?
A. I wouldn't want to hazard a guess at that. I would just say that there were many, and again at this point I don't remember how much. I mean, we had boxes all over the house at this point, so I'm not sure exactly, and I was only in one room before I went to change out of my uniform and get into regular clothes so I could assist my wife.
Q. Now, did you spend the rest of the day at the house then?
A. Yes.
Q. And when you got back, was the unloading completed?
A. No, it wasn't.

Q. At what point during the day did the movers finish unloading the goods out of the truck and into the house?

A. It was shortly after I returned. I don't remember an exact time, but I would say most of the stuff, of our stuff had been moved into the house by the time I got back.

Q. Now, in addition to boxes that were crushed, you said there was some signs of water damage?

A. Yes.

Q. When you first came back after your class or whatever it was you were doing at school that morning, what did you observe about that?

A. I observed boxes that appeared to have been damaged by water and possibly dried at some point, and they were basically not solid. They were more flimsy since they had been damaged by water, and some of them were coming apart, and some of them had visible what appeared to be mold growing on them.

Q. On the outside of the boxes?

A. Yes.

Q. Were any of the boxes that you observed actually wet?

A. I don't recall.

Q. What proportion of the boxes had mold on them?
A. I couldn't tell you.
Q. Was it a significant number?
A. Yes.
Q. And you said that there was furniture that had mold on it also; is that right?
A. Yes, what appeared to be mold to me.
Q. Had you ever lived in a house with mold before?
A. I've never lived in a house with mold, no.
Q. Have you seen furniture with mold before?
A. I have.
Q. Where had you seen that?
A. Back on -- I live on a farm in Alabama, and we have some outbuildings with cellars, and sometimes we've stored furniture down there before, and I've seen those places are pretty dank, and mold growing on that sort of stuff.
Q. So you've had some experience with moldy furniture before; is that right?
A. I haven't a lot of experience. I've seen it before.
Q. You came back I believe around noon on the 16th; is that correct?
A. I returned around noon on the 16th.
Q. And walk me through what you did for the rest of

mainly what he does is work on contracts for government shipments. I don't think they were going to review him and give him an award.
Q. After August 16th, you and your family moved into a hotel for awhile; is that right?
A. After August 16th, yes, we were in a hotel.
Q. And then after that you moved to a new house; is that right?
A. Well, we moved to another hotel, and then once we ran out of money, we were forced to move onto base housing.
Q. That's the Jones address you gave me before?
A. It is.
Q. And who pays for base housing?
A. Who pays for base housing? The taxpayer, I would guess. It's the U.S. government.
Q. After the 16th of August, did you ever move back into Wolcott Street?
A. No, I did not.
Q. To your knowledge was the building remediated for the presence of mold?
A. ServiceMaster stated that they completed remediation of the building, but there was no test done or anything else.
Q. And are you aware of any complaints from anybody

A. The base housing allowance is an allowance that is different depending on where you live. It's sort of cost of living adjusted, I guess you would say. So if housing costs are more expensive in a certain area, then the basic allowance for housing would be more extensive in that area or the allowance that you receive. If you live off base, outside of the government housing, then you are entitled to the base or to the basic allowance for housing. BAH is what it's called. And if you live in government housing, then obviously the government is providing for your housing costs so, therefore, you don't receive that allowance any more.

Q. What was the basic allowance for housing that you were receiving in August of 2004?

A. In August it was the Newport rate for 2004, which I do not remember exactly, but I believe it was over $2,000.

Q. And how does that get paid to a service member such as yourself?

A. It comes every two weeks for me through direct deposit along with -- they'll basically add up your base salary plus your base allowance for housing, plus your base allowance for subsistence,

plus anything else you have, and subtract the taxes, and you get half of it every two weeks.
Q. So in August of 2004, your BAH was --
A. Yes, I was receiving BAH.
Q. It was roughly $2,000?
A. Yes. It was more than that. I don't remember the exact amount, but it was over $2,000.
Q. And if you had continued to live on Wolcott Street, how much monthly basic allowance for housing would you have been paid over the period of lease?
A. I would have continued to receive the rate for Newport, which was over $2,000, until December 31, 2004, and then on January 1st I would have began receiving a higher amount because the amount increased at the start of the calendar year.
Q. Do you know what that new amount was?
A. It was closer to $2,500.
Q. If a member of the service is receiving a basic allowance for housing that is above the amount that they're actually paying for lodging, does the service man have any obligation to refund any of the money to the government?
A. Not at all.
Q. It's money in your pocket?

A. It is.
Q. Is it taxed?
A. It is not taxed. It's an allowance.
Q. You don't declare it as income?
A. It's not declared as income. It's one of the benefits of service, one of the few.
Q. What monetary damages do you contend you suffered as a result of the damage to your goods?
A. The damage to my goods, I don't have an exact figure, but what I claimed with the government was -- I'd have to go back and look, but I think it was in the neighborhood of 75 to $80,000.
Q. And what was the basis of the 75 to $80,000 number?
A. That was the cost that I researched to replace the items that we lost, plus the cleaning cost for our clothing.
Q. 75 to $80,000 was your calculation of the cost to clean clothing and to replace all of the items that were lost; is that correct?
A. I believe so. Again, I would have to look at the paperwork that I turned into the government to get an exact figure, but I think it was in that neighborhood.
Q. What other monetary damage do you claim to have

A. What do you mean by loss?
Q. Let me put it this way, do you contend you've been harmed in any other way?
A. Oh, definitely.
Q. Tell me what you contend your harms have been?
A. Well, as a result of this incident, obviously financially we've lost -- we pretty much cleaned out our savings that we had and had been planning to invest for sometime. As a result of this incident, the stress that was put on my family from having to endure this, and the lack of concern by the parties involved was very traumatic and has continued with us to this day. My career has been hazard. My potential for further advancement through what I had to do within my chain of command and also by the fact that my graduation from school was delayed and my choices for future jobs was severely limited due to that. I've suffered physical injury as a result of this to my back while I was having to deal with this process. My wife as well suffered physical injury, and we're still living with this today because it has not been resolved. So, yeah, we've been harmed by it.
Q. Well, you say it has not been resolved, you're

leaving Rhode Island in April. I don't remember the number of times.

Q. Has she received any medical treatment in connection with alleged stress?

A. In connection with the stress, no, she has not received any medical treatment that I'm aware of.

Q. You said you suffered some physical injury, what was that?

A. I suffered severe trauma to my back, lower back, when I was gathering evidence that the articles that were cleaned by ServiceMaster had not, in fact, been cleaned sufficiently and still had mold.

Q. Where were you when this trauma occurred?

A. I was at the storage facility where our goods were stored when ServiceMaster returned them, which is Newport Mini Storage.

Q. What were you doing?

A. Well, the items that they had moved inside the storage facility, I would look at each one and see if there was any evidence of mold.

Q. You were moving boxes?

A. Moving boxes as well as power tools.

Q. Was anyone else with you at that time?

A. No, there was not.

Q. Did you ever ask anyone for assistance moving those boxes?
A. I did not.
Q. What was the nature of the trauma to your back?
A. The nature, it was diagnosed as a skeletal muscle injury. I don't remember the exact name for it, if it was anything, but it was just an emergency room visit where I was examined, and then a follow-up visit with my military healthcare provider.
Q. And was there any treatment prescribed for you?
A. Yes, there was.
Q. What was that?
A. They gave me medication, muscle relaxants, some pain killers and the like. There was also a program of physical therapy as well as they prescribed bed rest, but I was not able to do that at the time due to the circumstances we were involved in.
Q. Have you gotten any further medical treatment in connection with your back since that time?
A. Yes, I have. I've had the same injury three times since it originally happened. One most recently requiring another trip to the Emergency Room, and I'm on a program of physical therapy

right now in Montgomery, Alabama.
Q. You indicated that this incident cleaned out your savings; is that right?
A. That's correct.
Q. What were your savings before August 16th?
A. I can't remember right now. I would have to go back and look, but somewhere between 10 and $20,000. I don't remember the exact amount.
Q. And it's your testimony you spent between 10 and $20,000 in connection with --
A. I spent more than that. Besides our savings I maxed out our credit card -- credit cards, I should say.
Q. What was the amount of money you charged on your credit cards as a result of this?
A. I can't remember exactly. My limit is $10,000, and we reached that on the Visa, and I can't remember what it was on our other cards.
MR. TAYLOR: I have no further questions at this time. It does appear to me that there might be some other documents with some medical information that if there is going to be some sort of claim for personal injury here, I need to see those, and it may require further inquiry. So I will reserve the right to reopen

officers prior to 2004, did you have any discussions regarding the value of your shipment?

A. I'm assuming you mean TMO rather than TRO?

Q. I said TRO, I meant TMO.

A. Yes.

MR. WRIGHT: Freudian slip.

A. I had talked to TMO officers regarding my shipment.

Q. Did those discussions with the TMO officers relate to the value of your shipments at that time or any of them?

A. Well, the value of shipment was always something that was discussed, but that's mainly just a brief of -- I'm sorry, I'm thinking of weights. Excuse me, as regards to the value of the shipment, no, I can't recall anything.

Q. In the spring of 2004, was it your expectation that your next promotion would be from Major to Lieutenant Colonel?

A. In the spring of 2004, yes, that would be my next promotion.

Q. At that point how long had you held the rank of Major?

A. In the spring of 2004 it would have been one year.

Q. At that time did you have any expectation as to how long it would take on an average to attain your next promotion to Lieutenant Colonel?

A. Yes. There is a general guideline, but it changes from year to year, so I had a general expectation, yes.

Q. In the spring of 2004, do you recall having any specific length of time by which you expected to make Lieutenant Colonel?

A. I expected to be in zone for Lieutenant Colonel sometime in 2007, 2008.

Q. Was that based on a marine officer's average experience, or did it also involve any specific discussions with any of your superior officers?

A. Both. In general, you can expect to be considered for Lieutenant Colonel at 16 years. That's what it is, give or take how things change, and it's actually been getting shorter as the years have gone on because the Marine Corps is generally behind the other services, but that's the rule of thumb that you would get in professional development classes and you would also hear from your superiors if you talked to them.

Q. Since the spring of 2004 have you had any reason

to believe that your promotion to Lieutenant Colonel should have occurred prior to this date, prior to today?

A. I'm sorry, I'm not sure I understand the question.

Q. I will try again. If in the spring of 2004 your expectation was to be promoted by 2007, did anything happen in the meantime after the spring of '04 that has led you to believe that your promotion to Lieutenant Colonel should have already taken place by now?

A. No, it shouldn't have taken place by now.

Q. And going back to the spring of '04, can you recall any specific discussions you've had or had at that time with your superiors that led you to believe you would be promoted to Lieutenant Colonel by any particular date or year?

A. Yes. There were conversations I had and coming to Newport was one of the wickets that I needed to get in order to get promoted to Lieutenant Colonel, and, that is, achieve resident education, professional military education, and then the other one was joint duty. Those are generally the two things they're looking for in order to get promotion to Lieutenant Colonel.

Q. What exactly does the term joint duty mean?
A. Joint duty means serving with one of the unified service commands, of which there are seven in the U.S. military. You've heard of Central Command or Southern Command or Special Operations Command, those are what are called joint commands, and service on those -- they're called joint commands because it's made up of members of all the services working together. And by the Goldwater Nickels Act of 1986, jointness became a high priority for all the services in order to get promoted. The primary venue for fulfilling that is through the joint commands, so to get that experience that you need to get promoted to the next level.
Q. Have you served under a joint command since 2004?
A. I have not.
Q. Do you have any present prospect of doing so?
A. Not before I'm looked at for Lieutenant Colonel, no.
Q. So is your present expectation that you will need to be promoted to Lieutenant Colonel before being assigned to a joint command post?
A. My present expectation is that I will be in Montgomery, Alabama, in a non-joint billet until

2008. At that point I would be available to go to joint duty.

Q. Is there anything that's happened to you since the spring of 2004 that leads you to believe that you will not be promoted at all in the future?

A. Yes.

Q. And what is that?

A. Well, the fact that I have requested MAST through my chain of command as a marine officer, although it is not forbidden, it is acceptable to do it, it is not looked upon highly, unofficially. Two, I will not have any joint experience before I am in zone for Lieutenant Colonel by the fact that I am in Montgomery, and, three, the type of duty that I am doing in Montgomery is a type of duty that I have done before. It's inspector instructor duty, which I was doing in San Antonio prior to coming to Newport, Rhode Island, so it doesn't give me the amount of variety in assignments that is generally looked more highly upon.

Q. Would you agree that at this point it's unpredictable whether you will be promoted to Lieutenant Colonel and, if so, when?

A. It is unpredictable, but in comparison to my

peers, they have a much better chance than I do at this point just based on past history of promotion boards.

Q. Have any of your superiors told you that filing your MAST request has reduced your promotability?

A. No.

Q. Have any of your superiors since the spring of '04 made any statements to you that any other factor has reduced your promotability?

A. I'm sorry, was it any of my seniors?

Q. Any of your superiors since the spring of '04?

A. Since the spring of '04, yes, I have been told that it was not good for me to do another tour of inspector instructor duty.

Q. Who told you that?

A. That was -- I can't remember his name. It was one of my fellow students in the course. I can't remember his name.

Q. When you moved to Newport in the summer of '04, did you know at that time what your next assignment would be after you finished your stint at the War College?

A. I did not.

Q. Did you have any subsequent knowledge about any potential assignments other than the one you're on

now?
A. Did I have any subsequent knowledge of potential assignments subsequent to?
Q. After moving to Newport in the summer of '04, did any other job or assignment prospects come to your attention other than the Alabama assignment that you're on now?
A. Yes, they came to my attention, but those were jobs that were available during the summer of '05.
Q. And what were those jobs?
A. I can't remember all of them, but it's various jobs. That's where all the joint assignments were, but it was all over the Marine Corps.
Q. I'm sorry, I didn't hear that?
A. It was all over the Marine Corps, different types of assignments.
Q. Have you ever been promised a joint duty assignment at any point?
A. No.
Q. Exhibit A refers to -- I'm looking at Box 13 just above your e-mail address. It says group counseled per DD 1797; do you know what the reference to the 1797 means?
A. I do not know.
Q. Was the TMO officer that you met with that day

top, Instructions to Member.

Q. I see it, okay. Go back to Exhibit J for just a moment. On Page 3, Page 3 of the typewritten text.

A. Okay.

Q. The first full paragraph states, "If the situation stands as it is, my family will have lost at least $8,000 from this disaster. Worse case is well above $17,000 when you add in the full value of my lease." Do you recall how you arrived at those numbers at that time?

A. I don't recall exactly, but I believe that was strictly looking at our out-of-pocket expenses and had nothing to do with our property.

Q. If I correctly recall your earlier testimony, you mentioned that on the morning of August 16th you were attending a convocation to begin your class at the War College, and what was the anticipated curriculum period starting August 16th before the class was dropped?

THE WITNESS: Are you talking about, is the question what was my schedule for school on August 16th?

MR. WRIGHT: Right.

A. I don't remember exactly. I would have to

refer back to my notes, but I believe I was occupied from nine to noon.
Q. I don't mean that particular day, I mean from August 16th -- well, at that time what was your anticipated graduation date?
A. My anticipated graduation date on August 16th would have been sometime in June, and I don't remember the exact date, 2005.
Q. So this was a 10-month course of study?
A. Correct.
Q. And after you dropped or were dropped from that curriculum, when did you begin that class again?
A. After I was dropped from this particular part of the curriculum at the War College, which was the strategy and policy course, I did not begin that again until August 15th I believe of 2005.
Q. And have you graduated from that course yet?
A. I have.
Q. And when did that occur, in November?
A. November 16th.
Q. When was the decision made to drop the class that began on August 16, '04?
THE WITNESS: To drop me?
MR. WRIGHT: Yes.
A. It was the week following -- it was my second

week in school. I can't remember the exact day, but it would have been the week of the 22nd, sometime during that week.

Q. Of August?

A. Correct.

Q. Was that decision made by you or someone else for you?

A. Well, I really had no other options, so I guess you would say it was made by me.

Q. Why did you have no other options?

A. Well, there's no way that I could have continued to keep up with the academic requirements of the course, so really it's another Hobson's choice, I could either drop from the course or I could fail it.

Q. And at the time you made the decision in late August to drop, what was going on at that time that made you decide that you couldn't handle the academic demands?

A. The fact that -- trying to correct this situation, talking with everyone or trying to talk with everyone in both the government and the civilian carrier side had taken up all my time, in addition to dealing with the stress that it had placed on my family, I had been able to do none of

the reading that was required, which the reading load on average is 500 to 700 pages per week, and I had done none of that, and we were already into the second week of the course with a pending paper due, so it was just not going to happen.

Q. Is the course you began in August of this year and completed in November, the very same one that you expected to begin in August of '04 and complete in June of '05?

A. In requirements it is. I believe the curriculum has changed somewhat.

Q. I'm wondering why it was that in the second session you finished it in about four months when it was expected to take 10 months when it began in August of '04?

A. I'm not sure I understand that question. Could you repeat it again.

Q. And maybe I've got my dates wrong, but I understand from what you've said so far that when you began the course in August of '04, you expected to graduate in June of this year or about 10 months later. When you resumed that course after dropping it in June of this year -- I'm sorry, you said August, August of '05?

A. When I resumed the course in August of '05,